**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GENE R. ROMERO, et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 01-3894 |
| | : | |
| | : | CONSOLIDATED WITH |
| ALLSTATE INSURANCE COMPANY, | : | |
| et al., | : | NO. 01-6764 |
| Defendants. | : | NO. 01-7042 |

**TABLE OF CONTENTS FOR CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO THE VALIDITY OF THE RELEASE**

I.   **FACTUAL BACKGROUND**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.   **Allstate's Agency Programs Prior to 1999**. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.   The NOA Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      2.   R830 and R1500 Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      3.   Allstate's Exclusive Agent Independent Contractor Program. . . . . . . . . . 9

      4.   Allstate's Litigation with the IRS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   B.   **The Preparing for the Future Group Reorganization Program**. . . . . . . . . . 15

      1.   The Sales Organization of the Future Initiative. . . . . . . . . . . . . . . . . . . . 15

      2.   Background Behind the Preparing for the Future Program. . . . . . . . . . . 17

      3.   The Announcement of the Preparing for the Future Program. . . . . . . . . 21

      4.   Program Information Provided After the Program Announcement. . . . . . 23

      5.   The Release. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

6.     The OWBPA Disclosure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

7.     State-Specific Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       a.     New Jersey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

       b.     Montana. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

       c.     West Virginia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

       d.     Delaware. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

8.     Alleged Misrepresentations by Allstate about the Program. . . . . . . . . . . 31

       a.     Confidentiality and Non-Compete Restrictions. . . . . . . . . . . . . . 31

       b.     Rehire Policy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

       c.     Commission Rates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

       d.     Expected Results for R3001 Agents. . . . . . . . . . . . . . . . . . . . . . 35

       e.     Allstate's Level of Control Over Exclusive Agents. . . . . . . . . . . 36

**C.**     **The *Romero* Plaintiffs**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

1.     General Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

2.     Plaintiffs' Consultations Regarding the Program and Release. . . . . . . . . 41

3.     Plaintiffs' Program Option Selections. . . . . . . . . . . . . . . . . . . . . . . . . . 42

       a.     The EA Option. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

       b.     The Sale Option. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

       c.     The Enhanced Severance Option. . . . . . . . . . . . . . . . . . . . . . . . . 43

       d.     The Base Severance Option. . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

4.     Rationales' for Plaintiffs' Program Selections. . . . . . . . . . . . . . . . . . . . 44

5.     EEOC Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      **D.**      **Procedural History**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**III.**    **SUMMARY JUDGMENT STANDARD OF REVIEW**. . . . . . . . . . . . . . . . . . . . . . 50

**IV.**    **DISCUSSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      **A.**      **Whether the Release Reaches All of The Claims Asserted in *Romero I* and Count II of *Romero II*.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

          1.      *Romero I* Claims and Count II of *Romero II*. . . . . . . . . . . . . . . . . . . . 2

          2.      Counts I and III of *Romero II*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

                a.      Whether the Language of the Release Excepts Out the Claims or Is Ambiguous and Should Be Construed in Plaintiffs' Favor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

                      (i)      "Claim . . . to Benefits". . . . . . . . . . . . . . . . . . . . . . . . . . 61

                      (ii)     "Benefits to which I am entitled". . . . . . . . . . . . . . . . . . 66

                b.      Whether Counts I and III Arose After the Execution of the Release. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

                c.      Whether Plaintiffs' ERISA Claims Are Protected by ERISA's Anti-Alienation Provision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

          3.      Conclusion Regarding the Scope of the Release. . . . . . . . . . . . . . . . . . 75

      **B.**      **Whether the Release Is Valid.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

          1.      Compliance with the OWBPA Disclosure Requirements. . . . . . . . . . . . 76

                a.      The Disclosure Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . 78

                      (i) Voluntary and Involuntary Terminations. . . . . . . . . . . . . . . . 80

                      (ii)     Montana Agents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

                      (iii)     Exclusion of R3000 Agents from the List of Those Not Eligible or Selected. . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

                      (iv)     Inclusion of New Jersey Agents. . . . . . . . . . . . . . . . . . . . . 92

b.      The "Understandability" Requirement.. . . . . . . . . . . . . . . . . . . . 97

      (i)      Complex Language. . . . . . . . . . . . . . . . . . . . . . . . . . 98

      (ii)     Whether the Release Created the False Impression that
            Agents Could Not Challenge Its Validity or File EEOC
            Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

c.      The Consideration Requirement. . . . . . . . . . . . . . . . . . . . . . . . 112

      (i)      Whether Plaintiffs Were Entitled to Continued
            Employment and Employment Benefits. . . . . . . . . . . . 113

      (ii)     Whether Allstate Provided Plaintiffs With Any
            Consideration in Addition to That to Which They Were
            Already Entitled.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

      (iii)    Conclusion as to Consideration. . . . . . . . . . . . . . . . . . 124

d.      Conclusion as to the OWBPA Requirements. . . . . . . . . . . . . . 125

2.      Whether the Release Was Knowingly and Voluntarily Executed
Under the Totality of the Circumstances. . . . . . . . . . . . . . . . . . . . . . . . 125

a.      Whether the Release Was Voluntarily Signed.. . . . . . . . . . . . . 127

b.      Whether the Release Was Knowingly Signed. . . . . . . . . . . . . . 139

c.      Conclusion as to Knowing and Voluntary Execution
of the Release.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

3.      Whether the Release Was Unconscionable. . . . . . . . . . . . . . . . . . . . . . 148

a.      Procedural Unconscionability. . . . . . . . . . . . . . . . . . . . . . . . . . 148

b.      Substantive Unconscionability.. . . . . . . . . . . . . . . . . . . . . . . . . 150

V.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

iv

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GENE R. ROMERO, et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 01-3894 |
| | : | |
| | : | CONSOLIDATED WITH |
| ALLSTATE INSURANCE COMPANY, | : | |
| et al., | : | NO. 01-6764 |
| Defendants. | : | NO. 01-7042 |

**<u>MEMORANDUM</u>**

RONALD L. BUCKWALTER, S.J.                              February        , 2014

Currently pending before the Court are the Cross-motions for Summary Judgment by

Plaintiffs Gene R. Romero, et al. (collectively "Plaintiffs"), Defendants Allstate Insurance

Company, et al. (collectively "Allstate" or "Defendant"), and Defendant Edward M. Liddy as to

the Validity of the Release.  For the following reasons, all Motions are denied.

## I.      FACTUAL BACKGROUND

The factual and procedural background of this case is a lengthy and convoluted one,

commencing in 1999 and spanning to the present day.  The general facts are well-known to both

the parties and the Court.  The sole issue of relevance at this juncture is whether the release of

claims signed by Plaintiffs  is valid and/or bars Plaintiffs' claims for relief.  For the sake of both

simplicity and judicial economy in an already complex case, the Court will set forth only the

basic, undisputed facts regarding the events that led to this litigation[1] and will deal with the

---

[1]  In light of the thousands of pages of exhibits, the Court will stray from normal practice
and will not cite to the parties' evidentiary submissions for each undisputed fact.  To do so would
result in an exorbitantly lengthy opinion with little benefit to the parties.  Rather, the Court will

disputed issues of fact regarding the Release in the course of the legal discussion.

A.      **Allstate's Agency Programs Prior to 1999**[2]

Defendant Allstate Insurance Company is an Illinois Corporation that sells insurance and related products and services.  Defendant Edward M. Liddy is the former President, Chief Executive Officer, and Chairman of Allstate.  He served as Chief Operating Officer from August 1994 to January 1999, as Chief Executive Officer from January 1999 to May 2005, and as Chairman of the Board of Directors from January 1999 to April 2008.

As of November 1999, Allstate's agency force included approximately 15,200 captive agents that worked for either Allstate Insurance Company or Allstate New Jersey and could sell and service only Allstate authorized products.  Approximately fifty-four percent of the agents operated under one of several employment contracts—the R830 Agent Compensation Agreement, the R1500 Agent Employment Agreement, the eighteen-month R3000 Exclusive Agent Employment Agreement, or the eighteen-month R4616 associate agent contract.  After eighteen months under the R3000 contract, Allstate offered approved agents the R3001 contract. The R4616 contract was self-terminating after eighteen months and, with good performance by the agent, could lead to an additional contract.  The remaining forty-six percent of agents worked

limit its evidentiary citations to situations where necessary to eliminate an issue of fact or where the Court is quoting directly from a source.

[2]  The Court uses the outline and headings adopted by Allstate in its Statement of Undisputed Facts as a framework for a review of the crucial facts in this case.  Notwithstanding this decision, the Court has fully incorporated Plaintiffs' Statement of Undisputed Facts into this summary, relying particularly on Plaintiffs' cross-references to its Statement of Undisputed Facts in their Response to Defendants' Statement of Undisputed Facts.  The Court, however, has eliminated from this summary many of Plaintiffs' factual allegations dealing with matters extraneous to the validity of the release or otherwise dealing exclusively with the merits of the substantive claims of age discrimination.

as independent contractors under the R3001 contract.  All of the Plaintiffs in this case, except Arlene Wendt, were employed as an employee agent under either an R830 or R1500 contract. Each of the agent programs and contracts had a variety of differing terms.  Allstate's R830 and R1500 contracts, however, were not subject to negotiation and were therefore uniform or "standardized."  All captive agents, regardless of their contract, sold the same products and had the same managers.  In addition, as of November 1999, Allstate had about 400 captive employee agents in Canada who sold Allstate property and casualty insurance.

      1.    **The NOA Program**

Prior to 1984, Allstate sold its insurance products primarily through employee agents located in Sears retail stores or in Neighborhood Sales Offices or Local Sales Offices.  In 1984, Allstate introduced the Neighborhood Office Agent ("NOA") Program, the reasons for which are disputed by the parties.  At the time it introduced the NOA Program, Allstate also introduced the R1500 Agreement.  Existing R830 agents could continue working under their existing agent program or voluntarily enter the NOA Program by either signing an amendment to the R830 Agreement or entering into an R1500 Agreement.  Also effective in 1984, all new agents joining Allstate were required to both be NOAs and work under the R1500 Agreement.[3]  The R830 and R1500 Agreements were employee contracts.

According to Allstate, the NOA Program was designed to provide employee agents more "entrepreneurial" discretion than those working in Sears stores or company-owned Neighborhood Sales Offices since NOA agents were able to operate individual Allstate agencies with clerical

---

[3]  Allstate ceased using the R830 contract for newly hired agents in 1984 when it introduced the R1500 contract with the "Neighborhood Office Agent" program.

and solicitor support staff they hired through a temporary agency and could choose their locations and officer partners.  To market the NOA Program to its existing agents, Allstate represented that if "you" wanted to have "a proprietary interest in a business," "choose your own office site," "select your own clerical help," "have unlimited income potential," and still "have job security," then "you" should become an Allstate NOA.  (Declaration of Coleen M. Meehan ("Meehan Decl."), Ex. 92 ("NOA Brochure"), at RH05112.)  Plaintiffs, on the other hand, believe that the NOA Program was designed to shift costs from the company to the employee agents and grant the agents a clear "proprietary interest" in the business.

Allstate required the NOA employee agents to lease or otherwise secure their agency office location in their own names within an Allstate specified geographic area.  Agents in the NOA Program also paid their own office and operating expenses, including telephone lines, certain of which were subject to reimbursement from an Allstate-provided office expense allowance ("OEA").  NOA agents had discretion to manage their OEA funds and office expenses, but the OEA was not always sufficient to cover routine office expenses.  The maximum amount of OEA reimbursement available under the NOA employee program was approximately twenty percent of the commissions earned when a policy was issued or renewed. Agents had to invest their own funds to pay for operating costs above the OEA.  Indeed, Allstate's NOA Ready Reference Guide for Market Sales Managers directed managers, when interviewing prospective NOAs, to "[m]ake sure that the candidate is willing and able to spend his or her money. . . ."  (Meehan Decl., Ex. 93 ("NOA Ready Reference Guide"), at ARI 142109.)  The NOA Manual also stated that an agent could obtain an OEA advance from Allstate to pay up front expenses.  Agents who received an OEA advance signed a "permanent advance

4

receipt" acknowledging that the funds were Allstate's property and that the agents promised to

repay them.  The NOA Manual provided that unpaid advances outstanding at termination would

be deducted from final pay and/or reimbursement where permitted by law.  Plaintiffs contend

that, over the years, Allstate urged all of its NOA agents to invest in their agencies.  In turn, many

of the Plaintiffs made substantial investments in their agencies.  All Plaintiffs incurred over

$10,000 in unreimbursed business expenses, and over half incurred such expenses in excess of

$100,000.

### 2.    R830 and R1500 Contracts

The introductory paragraph of Allstate's R830 contract represented to employee agents

that their "agreement was carefully planned to provide you with financial opportunity and

security[, including] . . . the security of continued income gained through renewals[,] . . . the

opportunity to share in the profits you help create, and the usually broad protection plans for you

and your family through the Allstate benefit package.  (Declaration of Jordan M. Heinz ("Heinz

Decl."), Ex. 10 ("R830 Agreement"), at ARI 020338.)  The R830 Agreement, however, provided

that, "You do not have . . . any vested interest in any business produced under the terms of this

agreement."  (Id. Part Four ¶ II, at ARI 020346.)  Similarly, the R1500 Agreement provided that

"[t]he Company will own all business produced under the terms of this Agreement.  You

acknowledge that you have no vested interest in such business."  (Heinz Decl., Ex. 11 ("R1500

Agreement") ¶ 3.b, at ARI 002036.)

Employee agents under the R830 and R1500 agents were eligible for a wide range of

company-sponsored health and welfare benefits, including group medical insurance coverage for

themselves and families, group dental insurance coverage for themselves and families, group

vision care coverage for themselves and families, group long term care insurance, group long

term disability insurance, group life insurance coverage, group accidental death and

dismemberment (AD&D) insurance coverage, use of pre-tax Flexible Spending Accounts, group

coverage for certain legal services, and paid vacation.  In addition, all full-time employee agents

were entitled to a "production allowance" paid by Allstate to compensate for new business

production lost because of authorized absences or attendance at certain company meetings.

   Both the R830 and the R1500 Agreements had termination provisions.  The R830

Agreement stated as follows:

> This agreement will automatically terminate upon your death.  Either you or Allstate
> have the right to terminate this agreement upon mailing to the other, at his or its last
> known address, written notice of termination.  After such termination you agree not
> to act or represent yourself in any way as our agent.  The Company will not terminate
> your employment because of unsatisfactory work unless you have been notified that
> your work is unsatisfactory and that your job is in jeopardy and unless you have been
> given a reasonable opportunity to bring your performance up to satisfactory
> standards. . . .  In no event shall an employee be released for any reason without the
> following review and approval procedure having been adhered to . . .

(Heinz Decl., Ex. 10, R830 Agreement, Part Four ¶ XI.)  Employees who signed the R830

contract had the right to have any involuntary termination reviewed by the Agent Review Board.

Likewise, the R1500 Agreement contained the following termination provision:

> Your employment and this Agreement will automatically terminate upon your death,
> retirement, loss or relinquishment of your insurance agent license, or failure to return
> to work upon expiration of a leave of absence.  In addition, your employment and this
> Agreement may be terminated at will by either party, subject only to such limitations
> and restrictions as may be imposed by law, and in accordance with Company rules
> and procedures.  Termination shall be effective upon giving notice of termination
> orally or in writing, delivered personally or mailed to the last known address of the
> other.  Upon termination, you agree not to act or represent yourself in any way as an
> employee, agent or representative of the Company, except as otherwise agreed to in
> writing by you and the Company.

(Heinz Decl., Ex. 11, R 1500 Agreement, ¶ 11, at ARI 002038)  The R1500 Procedure Manual also provided for agents to receive a job in jeopardy notice, be given a reasonable opportunity to cure, and receive a review of the termination through the Agent Review Board.

Although neither the R830 Agreement nor the R1500 Agreement provided severance or post-termination pay in the event of termination, Allstate maintained two pre-existing ERISA plans—the Allstate Severance Pay Plan and Allstate Service Allowance Plan—in the event of certain types of involuntary terminations.  The Allstate Severance Pay Plan stated that post-termination pay could be provided under the Allstate Severance Pay Plan if the agent's employment was "involuntarily terminated by the Employer for lack of work, employees, rearrangement of work, or reduction in workforce, as determined in the sole discretion of the appropriate Human Resource Account Team leader of the Employer."  (Heinz Decl., Ex. 24, ("Allstate Severance Pay Plan"), at A046690.)  It expressly did not apply to employees "terminated under the terms of any group reorganization/restructuring benefit plan or program sponsored by the Employer."  (Id.)  The severance benefit under the Allstate Severance Pay Plan was "two (2) weeks of pay for each complete year of service [up] to a maximum of fifty-two (52) weeks of pay."  (Id. at A46692.)  This plan did not impose any non-solicitation or non-compete obligations.

The Allstate Service Allowance Plan provided for post-termination pay if the agent's employment was "involuntarily terminated by the Employer for inability to satisfactorily perform the responsibilities of his/her position as determined in the sole discretion of the appropriate Human Resource Account Team Leader of the Employer."  (Heinz Decl., Ex. 25 ("Allstate Service Allowance Plan"), at A004944.)  The amount of the mandatory service allowance under

7

this plan depended on the agents' completed years of service and ranged from "two weeks of pay (for 1–4 years of continuous service) and thirteen weeks of pay (for 20 and over years of continuous service)."  (Id. at A004945.)  Like the previous plan, this plan did not impose any non-solicitation or non-compete obligations.

R830 and R1500 employee agents also participated in the Pension Plan, a traditional defined benefit plan designed "to provide, at no cost to employee agents, an income based on [their] level of compensation and length of employee service, upon retirement."  (Meehan Decl., Ex. 67 ("Agents Pension Plan"), at A008649.)  Under the Pension Plan's benefit formula, the greater the agent's compensation and the greater their years of service, the larger their pension benefit at retirement, although the Pension Plan benefits ceased accruing once an agent hit a certain income level.  Normal retirement benefits were payable on or after age sixty-five, but those with twenty or more years of continuous service could retire and start their benefit as early as age fifty-five.  In addition, those who completed twenty or more years of continuous service were entitled to an early retirement subsidy for a "beef-up" of the compensation used in calculating their pension before Allstate purported to phase out the benefit between 1991 and 1999.  "Continuous service" required that an employee have no more than twelve months between any termination of or retirement from employment with Allstate and his/her re-employment by Allstate.

Aside from employer-provided pension benefits, R830 and R1500 agents could fund their retirement through Allstate's 401(k) plan—the Savings and Profit Sharing Fund—and receive an annual company match up to a certain percentage.  In addition, Allstate had long provided subsidized medical coverage for its retirees and their eligible dependents, as well as retiree life

insurance benefits for those eligible.  To be eligible for retiree medical and life, employee agents needed to work as Allstate employees until they attained at least (a) age sixty or (b) age fifty-five with at least twenty years of continuous service.  These eligibility requirements were reduced to age fifty with at least ten years of service in cases involving "a right sizing, migration environment, or for health reasons."  (Meehan Decl., Ex. 69 ("March 12, 1993 Memo to Managers"), at ARI 071978.)  If an R830/R1500 agent converted to an Exclusive Agent (described below), the agent forever lost the opportunity to receive the retiree medical or life insurance benefits.  Like the Pension Plan, the greater the number of years of service completed by an R830/R1500 agent, the greater the company subsidy for retiree medical coverage.

Each year, Allstate provided all R830 and R1500 agents with a personalized statement of "total compensation," which Allstate defined as comprising both pay and benefits to highlight their compensation from a total package benefit perspective.  In these statements, Allstate emphasized the importance of the benefits and noted that they were a significant component of their total compensation.  Allstate included paid time off as a component of the agents' compensation.  Independent contractors were not offered similar benefits.

### 3. Allstate's Exclusive Agent Independent Contractor Program

In 1990, Allstate introduced the Exclusive Agency ("EA") Program.  In that Program, agents could first operate under an eighteen-month provisional R3000 employee contract.  After eighteen months under the R3000 Contract, Allstate offered approved agents the R3001 contract to become so-called independent contractor Exclusive Agents.  Alternatively, agents could enter directly as independent contractors under an R3001 Agreement.  With the introduction of the R3000/R3001 contracts, Allstate ceased using the R1500 contract for newly hired agents.  This

was the first time in Allstate's history that it deviated from an all-employee agency force.

The R3001 Agreement differed from the employee agent programs in several respects. First, the R3001 expressly provided that agents under this Agreement were "independent contractor[s] for all purposes and not . . . employee[s] of the Company."  (Heinz Decl., Ex. 31 ("R3001 Agreement"), at I.B. )  Second, Allstate contends that while employee agents were required to run individual agencies under Allstate's supervision, EAs had more flexibility in their office operations—a fact which Plaintiffs dispute.  Third, agents operating under the R3001 contract accrued an immediate vested interest in the business developed under the R3001 contract, and those who converted to the EA Agreement before January 1, 2000 possessed an "interest," transferable after a set period of time, in the policies and accounts that they had generated while working as an employee under the R830 and/or R1500 contracts.  Fourth, renewal commissions payable to EAs were greater than the commissions payable to R830 and R1500 agents.  Fifth, EAs were not entitled to the same office expense reimbursements as R830/R1500 agents.  Finally, EAs were not given the same employee benefit entitlements of R830/R1500 agents.

R830 and R1500 agents could apply to convert to the EA Program.  In order to convert, agents had to undergo a multi-step application process, which included submission of an Exclusive Agent Appointment Request, a Letter of Understanding, a business plan, and a final approval request, as well as repayment of all outstanding advances to Allstate.  Between 1990 and May 1998, agents who wished to convert also had to meet certain production requirements and have certain ratings on their most recent evaluations.  As of June 1998, however, Allstate eliminated the production and performance criteria for conversion to the EA program.  Agents

that converted to the EA Program from the R830 or R1500 Agreements between 1990 and

November 1999 did not receive a conversion bonus.  In addition, for those R830 or R1500 agents

who converted to the EA Program prior to November 1999, their economic interest in the book

of business serviced while an employee agent became transferable after five years, subject to

Allstate's approval.[4]  Allstate encouraged employee agents to convert to this program.  Although

some agents had converted to the EA Program by 1999, it is unclear exactly how many.  Notably,

all employee agents who converted to the R3001 Agreement prior November 1999 could do so

without having to sign a release.

### 4.        Allstate's Litigation with the IRS

In the mid-1990s several employee agents in the NOA Program obtained a tax court

ruling in the case of Butts v. Commissioner of Internal Revenue, 49 F.3d 713 (11th Cir. 1995).

The court found that the agents had proven that their professional relationship with Allstate was

not as employees, but rather as independent contractors, meaning that their business deductions

were to be reported under Schedule C of the tax return and not as Schedule A unreimbursed

employee business expenses.  Id.  This ruling meant that the continued participation of

independent contractors in Allstate's tax-qualified employee benefit plans could have resulted in

those plans losing their tax-qualified status.

Allstate and the Internal Revenue Service ("IRS") subsequently entered into amicable

---

[4]  Plaintiffs discuss a plan devised by an outside attorney to allow employee agents to set up business entities through which they acquired a financial interest in other agents' books of business without the five-year waiting period.  Plaintiffs also note that employees who converted to a variant of the R3001 Exclusive Agent Agreement possessed a transferable interest in the policies and accounts they generated before the five-year waiting period.  Neither of these averments undermine the fact that, under *Allstate's* EA Program prior to November 1999, there was a five-year waiting period.

negotiations in order to resolve how to maintain the employee pension plans.  Several options

were discussed.  Allstate's first option, proposed by the IRS, was for Allstate to re-classify all

employee agents as independent contractors.  Allstate rejected this proposal and insisted on

continuing the NOA program as an employee option.  As it stated to the IRS:

> [C]onverting all NOAs to independent contractors would result in a quagmire of
> litigation and severely disrupt the business activities of Allstate's agents.  Such a
> change would require amending or terminating the NOAs' compensation agreements
> [i.e., R830/R1500 contract] to reflect independent contractor status.  A unilateral
> change to the compensation/expense reimbursement structure for this agent group
> would undoubtedly lead to litigation and significantly damage[] Allstate's
> relationship with the agents. . . .
> . . .
> The NOAs are long-service employees.  They have expected to be compensated as
> employees and receive the fringe benefits that Allstate has traditionally provided.
> Not only would individuals lose future benefit plan accruals and contributions if they
> were all converted to independent contractors, many of these individuals have spent
> all of their careers with Allstate and have hoped to retire with retiree life and medical
> benefits.  Ceasing the NOAs' employee service at this juncture in their careers would
> have severe economic consequences to them.

(Meehan Decl., Ex. 54 ("Allstate Insurance Company Pre-Submission for June 23, 1997

Meeting"), at ARI 10110.)

Next, the IRS proposed that Allstate eliminate the financial risk faced by NOAs by paying

for more or all of their business expenses.  Allstate likewise rejected this solution.  Finally,

Allstate proposed that it could change financial control over the NOAs by limiting office rent and

support staff to the total of an agent's OEA.

After several years of negotiations, Allstate and the IRS finally reached an agreement in

1998 (the "IRS Closing Agreement").   This Agreement provided, in part, that beginning by

January 1, 1999, NOAs were to perform services for Allstate under the following express terms:

1.      Allstate shall restructure its compensation and expense allowance for NOAs

12

as of January 1, 1999.  Any changes to an NOA's compensation and expense allowance as of that date and thereafter shall be made only upon approval by the company.

2. Allstate shall pay directly or maintain a system of reimbursement for Allstate business expenses that are approved by the Company and incurred by an NOA, including office lease and support staff, and Allstate may limit reimbursements to the amount of an NOA's office expense allowance that is established by the Company.

3. Allstate shall require that no NOA incur combined expenses for office lease or for support staff services that exceed the amount of the NOA's office expense allowance from the Company.

4. Allstate shall pay a minimum compensation amount to each NOA, regardless of the premium income attributable to such agent.

5. Allstate shall instruct NOAs on how to conduct sales for each of its major product lines and train NOAs on the means and manner of interacting with customers, including specific dialogues and procedures to be followed with customers and policyholders.

6. Allstate shall maintain a system under which NOAs are managed and evaluated on the basis of adherence to the Company's policies and practices.

7. Allstate shall require that NOAs work full-time and maintain specified office hours.

(Heinz Decl, Ex. 41 ("IRS Closing Agreement"), at ARI 04485.)

In March 1998, Allstate announced to agents that the changes agreed to by Allstate in the Closing Agreement with the IRS would take effect on January 1, 1999.  In turn, Allstate required agents to sign an "Acknowledgment of Understanding," in which NOAs specifically agreed and acknowledged as follows:

By signing this Acknowledgment of Understanding ("Acknowledgment") which is effective January 1, 1999 and continues in effect so long as I am employed under the R830 or R1500 Agreement, I acknowledge that I am an employee of Allstate Insurance Company ("Allstate") and that Allstate has the right to control the manner and means by which I perform services for Allstate.  I acknowledge that, as

13

a condition of my continued employment, I am required to act in a manner consistent with my status as an employee of Allstate.  *Note: Under the federal tax laws, unreimbursed expenses incurred by employees may be reported only on Form 2016 (Employee Business Expenses).  Such expenses reported on Form 2106 are required to be transferred to, and deducted , Schedule A of Form 1040.*

> If I do not act consistently with my status as an employee, I understand that (1) my R830 or R1500 Agreement, as well as my employment with Allstate, may be terminated at the sole discretion of Allstate and (2) thereafter, Allstate may choose not to allow me to perform agent related services as an independent contractor.  I further understand that if I do not, or if any other agent working under the R830 or R1500 Agreement does not, act consistently with employee status, such actions could, among other things, lead to the discontinuation of Allstate's employee agent programs.

(Heinz Decl., Ex. 42 ("Acknowledgment of Understanding") (emphasis in original).)  In addition, Allstate required agents in the NOA Program to prepare Office Expense Allowance Worksheets to comply with paragraph three of the foregoing Closing Agreement requirements.  If the amount of OEA was insufficient to cover office lease and support staff payments, NOA agents could increase the OEA available by reallocating one or two commission percentage points to OEA.

As a result of these changes, there were multiple groups of captive agents and the NOA Program had multiple reimbursement arrangements.  According to Allstate, but disputed by Plaintiffs, these modifications resulted in inefficiency and impaired its ability to make product and pricing changes.  Moreover, Allstate contends, and Plaintiffs dispute, that the IRS Closing Agreement requirements hindered Allstate's flexibility and ability to take advantage of opportunities in the marketplace.

14

B.     **The Preparing for the Future Group Reorganization Program**

1.     **The Sales Organization of the Future Initiative[5]**

The Sales Organization of the Future ("SOOF") initiative was large in scope and used

extensive Allstate resources from 1997 to 1998, including dozens of Allstate employees, some of

whom worked full-time on the initiative.  SOOF was a project led by outside consultant

McKinsey & Company ("McKinsey") to simplify procedures, take low-value-added activities out

of the agents' offices, and allow agents to sell more products.  McKinsey was paid $525,000 per

month in consulting fees.  Nonetheless, the SOOF work was overseen by a high level "steering

committee" that included certain of Allstate's senior officers, including Edward Liddy, who was

then Chief Operating Officer of Allstate.  Among the other officers on the steering committee

were Bob Gary, then President of Allstate's Personal Property & Casualty business; Steve Groot,

then Senior Vice President and President of Allstate Indemnity; Lou Lower, then President of

Allstate Life Insurance; Frank Pollard, then Senior Vice President and Chief Information Officer;

Rita Wilson, then Senior Vice President; and Tom Wilson, then Senior Vice President and Chief

Financial Officer.  As Allstate advised the IRS, Mr. Liddy chaired a SOOF "task force . . .

appointed to work directly on [the NOA classification] issues" in the course of "reviewing

Allstate's agent distribution system and . . . recommending changes . . . to best position Allstate

---

[5]  Allstate objects to many of the SOOF documents created by McKinsey & Company as
inadmissible hearsay that have not been authenticated or established as an admissible business
record.  Nothing in the record suggests, however, that Plaintiffs will be unable to authenticate
these records at trial and establish them as business records.  It is well established, under Federal
Rule of Civil Procedure 56(c)(2), that the party offering the evidence need not present the
disputed evidence in a form admissible at trial, but need only demonstrate that the evidence could
be reduced to an admissible form at trial.  Fed. R. Civ. P. 56(c)(2); Knopick v. Downey, No.
Civ.A.09-1287, 2013 WL 1882983, at *4 (M.D. Pa. May 6, 2013).

for the future."  (Meehan Decl., Ex. 54, ("Allstate Insurance Company Pre-Submission for June 23, 1997 Meeting"), at ARI 180109.)  By November 1997, Messrs. Liddy and Gary had reportedly spent approximately forty hours in working sessions with the SOOF team.

Several proposals were offered by McKinsey, although the evidence is disputed as to whether Allstate ever considered such proposals.  First, there was a suggestion to impose minimum performance standards, which would result in approximately 1500 agents unable to meet those standards.  Second, the SOOF initiative included a separation allowance proposal to allow agents to voluntarily leave Allstate if they did not want to participate in changes.  Neither of these proposals was adopted.

One of the questions that the SOOF team discussed was whether agents should be employees or EA's/independent contractors.  The SOOF team recognized that Allstate could "not force conversion of reticent employee agents" and thus proposed a "[g]radual transition to EA . . . through [i]ncenting employee agents to convert and removing barriers."  (Meehan Decl., Ex. 134 ("SOOF Blueprint of Emerging Vision"), at ARI 210916, ARI 210931.)  The draft document entitled "SOOF Emerging Blueprint," created by McKinsey, stated that "[o]ur objective is to migrate existing agents to EA over a multi-year period . . . . We will not force conversion; rather we will make migration to EA as attractive as possible by removing barriers such as medical and retirement benefit options."  (Meehan Decl., Ex. 129 ("SOOF Emerging Blueprint November 1997"), at ARI 018587.)  The draft document also noted that two-thirds of Allstate agents were employee agents, of which fifty percent were over fifty years old.  A McKinsey-prepared document, entitled "Compensation Comparison Across Contracts," revealed that, in comparing the R830/R1500 contracts versus the EA's R3001 contract, conversion of all R830/R1500 agents

16

to EAs would result in an Allstate savings of $90 million per year due to the elimination of employee benefits and entitlements.  The same document recognized that the "best financial strategy" for an R830/R1500 agent was "to remain an employee (earning higher revenue)" and then convert to an EA five years before retirement "to cash in on the book as well."  (Meehan Decl, Ex. 120 ("SOOF Compensation Comparison Across Contracts"), at AF061697.)  The SOOF team projected, however, that if Allstate took no action to encourage the R830/R1500 agents to convert to EA's or leave, it would take thirty-one years to remove R830 agents from the system and thirty-five years to remove R1500 agents from the system.  McKinsey subsequently looked into how to provide incentives for conversion and to identify disincentives to voluntary conversion.  To that end, McKinsey proposed various options.  At no time prior to November 1999, however, did Allstate adopt any deadline for conversion or change the age/service requirements under the Pension Plan.

Allstate contends that by November 1999, SOOF was never used in building any real program.  It further asserts that SOOF was irrelevant to the November 1999 Program that is the subject of this litigation.

### 2.     Background Behind the Preparing for the Future Program

Effective January 1, 1999, Allstate had five captive agent programs operating pursuant to the following contracts: (1) R3001 contract; (2) R3000 contract; (3) R4614 Associate Agent contract; (4) R830 contract; and (5) R1500 contract.  As noted previously, each of these programs had different compensation/commission structures, different OEA formulas, and different evaluation standards.  Therefore, in June 1999, Allstate began evaluating whether changes could be made to consolidate its agency programs into a single program.  Barry Hutton,

17

an Assistant Vice President in Allstate's Sales Department, was charged with spearheading this inquiry.  Hutton's team was initially called the Channel Integration Project and/or the Early Bird team.  The members of the Channel Integration team included: Helen Brown, Regional Distribution Leader; James Dill, Home Office Counsel; George Giles, Human Resources; Carole Jassen, Senior Sales Manger; Dolores Jossund, Measurement Director, Distribution; Michael Rocen, Senior Sales Professional; and Dudley Bright, Director of Personal Lines Finance.  In addition, the team received assistance from field representatives, including Mike Brown, Jim Brown, Brad Roeber, and Ken Schmidt.

Because the team discussed highly sensitive topics and met frequently, the team worked at an off-site location.  Members of the team signed a confidentiality and non-disclosure agreement.  The team then reported, every one or two weeks, to a small group of Allstate officers that included Robert Gary, Phil Lawson, Rick Cohen, and Jeff Kaufman.

The Channel Integration Team was assigned to investigate three broad topics: (1) whether Allstate should move to a single-contract agent program whereby all agents would operate under the same contract; (2) what Allstate could do to help underperforming agencies; and (3) how Allstate could better align agent compensation with company objectives.  Mr. Hutton identified two possible designs, both of which involved forcing the conversion of employee agents to the R3001 contract.  The parties dispute the reasoning and logic behind the merging of the various agency programs into one.  Allstate claims that it was an effort to address the inefficiencies associated with changing all of Allstate's existing programs to respond to fluid market conditions, the complexity associated with introducing and pricing of new insurance products, and the challenge of supporting an agency force comprised of both employees and independent

18

contractors.  Plaintiffs, however, argue that Allstate managed employee agents and exclusive agents in the same way and that Allstate suffered no additional complexities.

The Hutton team selected the EA Program as the program of choice to which it would move all of its agents.  Both parties agree that this Program was not impacted by the same IRS issues.  Allstate, however, claims that this Program was its most successful and provided the agents with the most freedom.  Plaintiffs, on the other hand, suggest that Allstate chose this Program because it significantly lowered the company's costs by allowing it to have captive agents without either the office expense reimbursement or the costly employee benefits entitlements of its employee agents.  By July 1999, the concept of a Release was included in one of the Channel Integration Team presentations entitled "Winning in the New Century," and the concept of offering three options to employee agents was introduced.  The presentation remarked that "[e]mployee agents cannot convert, sell BOB [books of business] or receive the Separation Plan without signing a release."  (Meehan Decl., Ex. 155 ("Winning in the New Century"), at ARI 000631.)

On July 12–13, 1999, Allstate met with its Board of Directors to discuss, among other items, its strategy for employee agents.  The discussion was led by Bob Gary, the President of Allstate Property and Casualty.  Allstate set aside an hour and one-half with the Board to address its strategy for the agents.  One of the slides presented at that meeting stated as follows:

AGENCY TRANSITION

| Wish List | | Realities |
|---|---|---|
| • Agency Reduction in Force Based on Standards | ➡ | • Not Legally Possible |
| • Agents All on One Contract | ➡ | • Legal and Fairness Issues |
| | | • Large Charge to Pension Fund |
| • Reduce Agent Compensation | ➡ | • Difficult Move in View of All That is Coming Down |

(Meehan Decl., Ex. 151 ("Allstate Board of Directors Strategy Meeting"), at ARI 003317.)  This

same document advised Allstate's Board that an agent reduction in force based on standards was

not legally possible.  No minutes were taken of the July 12–13, 1999 Allstate Board of Directors

strategy meeting.

In late September 1999, the Hutton team recommended to Richard Cohen, Allstate's

President, that Allstate discontinue its employee agency program and offer all employee agents

the opportunity to become Exclusive Agents under an R3001 contract.  In September and

October 1999, Cohen and Edward Liddy had frequent discussions concerning the Hutton team's

recommendation.  In late October, Liddy and Cohen made the decision to go forward with this

recommendation.  Allstate contends that this decision was necessary to effectively compete in the

marketplace, whereas Plaintiffs believe that Allstate made this decision to strip the employee

agents of their employee benefits, including pensions, and to rid itself of older employee agents.

Ultimately, by late October 1999, the Hutton team moved forward with what became known as

the Preparing for the Future Group Reorganization Program (the "Program").  In November

1999, Allstate formally adopted the Agent Transition Severance Plan ("ATSP"), which contained

20

both non-compete and non-solicitation provisions that constituted eligibility requirements for participation in that Plan.

### 3. The Announcement of the Preparing for the Future Program

On November 10, 1999, Allstate announced the Program by noting that as part of a "New Business Model" it was "reorganiz[ing] its existing captive agency program to a single exclusive agency independent contractor program." (Meehan Decl, Ex. 37 ("Nov. 10, 1999 Press Release"), at ARI 001257.) At the November 1999 scripted presentation to employee agents, Allstate represented that the Exclusive Agency program is the "premier program" and provides agents with more flexibility to grow their agencies and effectively manage their operations. (Id. at ARI 001264.) With few exceptions, Allstate terminated the employment contracts of the 6,200-plus R830 and R1500 employee agents effective no later than June 30, 2000. Those agents were not given job-in-jeopardy notices, were not offered the opportunity to have their termination reviewed by an Agent Review Board, and were not terminated based on any individual circumstances. While Allstate argues that the Program applied to all agents regardless of age, productivity, or performance, Plaintiffs contend that it adversely and disproportionately impacted older employees since, as agreed by the parties, approximately ninety percent of the R830/R1500 agents were over forty years of age.

In connection with the termination of the R830 and R1500 employment contracts, Allstate offered the agents working under those contracts four options. The first three options were conditioned upon the agents' agreement to execute a release of claims, while the fourth option did not. The first option was the "EA Option." According to the Program Information Booklet, this option would allow the agent to enter into an R3001C or R3001S Agreement

21

thereby converting the agent from an employee to an independent contractor.  The agent would then be entitled to all of the benefits and requirements of that contract, including increased renewal commissions, plus a conversion bonus, earlier transferability in the agent's book of business, debt forgiveness, and reimbursement for moving expenses if necessary.  The agent was not permitted to take advantage of this option, however, without the signing of a release.

The second option was the "Sale Option."  This option also permitted an agent to enter into R3001C/S Agreement with Allstate, thus converting the agent to an EA independent contractor.  In turn, the agent would receive a "conversion bonus" and Allstate would forgive any advances owed, assume certain lease and advertising obligations incurred as an employee agent, and permit the agent, after thirty-days' service as an EA, to sell his or her book of business written while an R830 or R1500 agent.  Again, this option required the agent to sign a release.

The third option was the "Enhanced Severance Option."  Under this option, Allstate would pay the agent "enhanced" severance equal to one year's pay based on the better of 1997 or 1998 total compensation, forgive debt and/or expenses that Allstate had advanced to the agent, and relieve the agent of certain lease and advertising obligations incurred as an R830 or R1500 agent.  Yet again, this option was not available unless the agent signed a release.

The final option was the "Base Severance Option."  If an agent elected this option, then Allstate paid him or her up to thirteen weeks of pay.  The agent electing this option did not need to enter into a release, although he/she was subject to certain additional non-compete and non-solicitation obligations.  Notably, Allstate had determined that agents affected by the Program were ineligible for the existing severance or post-termination pay plans described above (the Allstate Severance Pay Plan and Allstate Service Allowance Plan) because they were not

terminated for any of the reasons set forth in those Plans.  Allstate also took the position that the

pre-existing severance/post-termination pay Plans were inapplicable because they did not apply

to group reorganization programs.

### 4.  Program Information Provided After the Program Announcement

Following the November 10, 1999 Program announcement, Allstate held meetings with

agents on a regional basis to provide information about the Program.  After the initial meetings,

Allstate conducted additional regional and local meetings with agents to further discuss the

details of the Program.  Although agents were not permitted to ask questions at the initial

November meeting, Allstate managers took questions and provided answers at many of the

subsequent regional meetings.

In addition, Allstate provided each employee agent with a detailed package of written

materials regarding the Program.  Each package included a Program Information Booklet that

explained the Program and the Program options, as well as a copy of the Release, copies of the

R3001S and R3001C booklets explaining the impact of conversion on agent benefits and

descriptions of the EA benefit plans, and other information.  Each employee agent also received a

personalized information worksheet estimating the amounts that the agents would receive under

each of the options.  Notably, the personalized information worksheets did not identify the

amount each agent would receive in base severance if they did not sign the Release, nor did they

identify any estimate of what an agent could or would receive from an Allstate-approved buyer

for selling his or her book of business.  Moreover, Allstate did not quantify the value of the

benefits that employee agents were losing as a result of the conversion to the R3001 contract.

Instead, the worksheet directed agents to perform this calculation on their own on a designated

23

space on the form.

Allstate also gave each employee agent an Informational Notice, dated November 16, 1999, that purported to explain the Release requirement for the EA Option, Sale Option, or Enhanced Severance Option.  The Notice stated, in its entirety, the following:

**NOTICE REGARDING THE "PREPARING FOR THE FUTURE" GROUP REORGANIZATION PROGRAM FOR R830 AND R1500 AGENTS (THE "PROGRAM") ELECTION FORM AND GENERAL RELEASE AND WAIVER AGREEMENT ("RELEASE"); EMPLOYMENT TERMINATION NOTICE, AND OTHER IMPORTANT INFORMATION**

Please note the following specific items.

a.  Each option chosen under the Program contains specific payments, benefits, limitations and requirements  You should review carefully the "Preparing For the Future"—R830 and R1500 Agent Information Booklet For the Group Reorganization Program ("Program Information Booklet") and all other information given to you in connection with the Program, including the Release and ADEA Waiver Information attached to this Notice, before you make our decision.  Please note also in making your election that the Exclusive Agency program, like other Allstate programs, is subject to change in the future to meet future business needs.

b.  You have more than 45 days from the date of this Notice, or until June 1, 2000 (or in Delaware, December 1, 2000), to consider whether to accept one of the options available under the Program.

c.  If you elect an option under the Program and sign the Release, you will then have seven days after signing to change your mind and revoke the Release (15 days in Minnesota).

d.  Your employment as an Allstate Agent and your R830 Agent Compensation Agreement or R1500 Agent Employment Agreement shall terminate no later than the close of business on June 30, 2000 (or if in Delaware, no later than close of business on December 31, 2000).[] This constitutes any notice suggested or required pursuant to any federal, state, or local law.  You may contact our Regional Human Resources Manager if you have any questions regarding this.  Details regarding our ability to terminate your employment earlier under the Program are discussed in the Program Information Booklet and related materials.

24

**If you sign the Release, you will be waiving your rights to any claims or potential claims arising out of your employment, termination of employment or transition to independent contractor status which have been, or could be filed against Allstate, or its affiliates pursuant to any local, state or federal law. Therefore, we advise you to consult with an attorney before you elect one of the options available to you and release and waive any legal claims.**

As noted in the Program Information Booklet, in order to be eligible for the enhanced severance pay or other compensation or benefits available under the Program, except for base severance pay, you must submit the Release properly addressed and postmarked or received by Allstate no later than June 1, 2000 (or if in Delaware, December 1, 2000). If you wish to receive only base severance pay, under the terms of the Agent Transition Severance Plan you are not required to sign the Release, but you should submit instead the Base Severance Pay Election Form properly addressed and postmarked or received by Allstate no later than June 1, 2000 (or if in Delaware, December 1, 2000). Please mail or hand deliver the Release or Base Severance Pay Election Form to your Regional Human Resource Manager. **Failure to submit either form by the deadline noted above shall be viewed as an election of the base severance pay option only.**

(Heinz Decl., Ex. 62 ("Informational Notice") (emphasis in original).)

From November 1999 through June 2000, agents could submit questions to their agency manager, then to their local HR manager, and finally to Allstate's 800-number resolution line. Allstate identified between 500–600 agency managers and 13–14 local Human Resources managers as persons who would answer questions from employee agents about the Program. Agency managers were provided with uniform materials to answer questions and were instructed to stick to Allstate's script. Allstate then provided R830 and R1500 agents with eleven sets of Questions and Answers regarding various aspects of the Program that were generated from agent inquiries. In total, there were more than 230 Questions and Answers provided to agents.

### 5.   The Release

As noted above, in connection with the announcement of the Program and the provision of the Informational Notice in November 1999, agents also received a copy of the Release. The

25

Release was three-pages long, including a signature page.  The Release and Waiver Provision

stated:

> In return for the consideration that I am receiving under the Program, I hereby release, waive, and forever discharge Allstate Insurance Company, its agents, parent, subsidiaries, affiliates, employees, officers, shareholders, successors, assigns, benefits plans, plan administrators, representatives, trustees and plan agents ("Allstate"), from any and all liability, actions, charges, causes of action, demands, damages, entitlements or claims for relief or remuneration of any kind whatsoever, whether known or unknown, or whether previously asserted or unasserted, stated or unstated, arising out of, connected with, or related to, my employment and/or the termination fo my employment and my R830 or R1500 Agent Agreement with Allstate, or my transition to independent contractor status, including, but not limited to, all matters in law, in equity, in contract, or in tort, or pursuant to statute, including any claim for age or other types of discrimination prohibited under the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act, the Employee Retirement Income Security Act ("ERISA"), the Illinois Human Rights Act, and the West Virginia Human Rights Act as those acts have been amended, or any other federal, state, or local law or ordinance or the common law.  I further agree that if any claim is made in my behalf with respect to any matter released and waived above, I hereby waive any rights I may have with respect thereto and agree not to take any payments or other benefits from such claim. I understand that this release and waiver does not apply to any future claims that may arise after I sign this Release or to any benefits to which I am entitled in accordance with any Allstate plan subject to ERISA by virtue of my employment with Allstate prior to my employment termination date.

(Heinz Decl., Ex. 186 ("Release"), at ARI 004101.)

The next section of the Release states:

I acknowledge that:

> (a)    I have read this Release, and I understand its legal and binding effect.  I am acting voluntarily and of my own free will in executing this Release.

> (b)    I have had the opportunity to seek, and I was advised in writing to seek the advice of an attorney prior to signing this Release. . . .

> (c)    I was given at least 45 days to consider the terms of the Program, including this Release, before signing it.  I understand that I may make an election under the Program before forty-five (45) days, but I am under no obligation

26

to do so.

(d)     If I am a Minnesota, California, North Dakota, or South Dakota agent or resident, I acknowledge that I have reviewed the disclosures and agree to such statements relevant to me as discussed below.

(Id.)

The Release then goes on to provide information regarding the right to revoke or rescind,

as follows:

I understand that if I sign this Release, I can change my mind and revoke it within seven days after signing it.  I understand that the Release and Waiver set forth in the first paragraph and the consideration available under the Program above will not be effective until after this seven-day period has expired. . . .  I understand that a decision to revoke or rescind within such period should be submitted in writing to my Human Resource Manager.  If I do not revoke within the seven-day period discussed above . . ., then the Release will become fully effective.

(Id.)

The Release further requires the signer to acknowledge receipt of information about the

Program:

On the date that I received a copy of this Release, I also received a copy of the Program Information Booklet, and other written information which includes a description of:
(a) the group of Agents covered by the Program, the eligibility factors of the Program, and any time limits and conditions applicable to the Program and method used in arriving at the amount of consideration offered; and
(b) the job titles and ages of all individuals eligible and selected for the Program, and the ages of all individuals in the same job classification, who are not eligible and not selected for the Program.

(Id. at ARI 004102.)

Finally, following some state-specific announcements, the Release provides an Election

of Option and Signature section:

Election of Option and Acceptance of Release and Waiver

27

I have read and understand the Release, as well as the materials describing the Program, including the Program Information Booklet.  I voluntarily make the following election (choose one):

I understand that my employment as an Allstate Agent and R830 and R1500 Agent Agreement will terminate on or before June 30, 2000 (or if in Delaware, December 31, 2000).  I accept the Program and agree to be bound by its terms and the terms of this Release, including the Release and Waiver set forth above by choosing one of the following options: . . . [list of options described above]

(Id. at ARI 004103.)

Allstate's corporate designee, Mr. Hutton, conceded that without the Release, Allstate would not have moved forward with the Preparing for the Future Program.  The Release was drafted by Allstate and the terms were completely non-negotiable.  Allstate further made clear that it would not accept any signed Releases that were marked up in any way, either with language crossed our or additional terms or notes added to the Release by hand.  Indeed, Plaintiffs Romero, Kelly, T. Kearney, and Wiktor submitted Releases to their managers with modifications and Allstate declined to accept them.

### 6.    The OWBPA Disclosure

Also in November 1999, Allstate provided its agents with a written document entitled "Age Discrimination in Employment ('ADEA') Waiver Information."  This document was issued in an effort by Allstate to comply with the requirement of the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1)(H), that employers seeking a release of ADEA claims as part of an employment termination program provide the employees with the job titles and ages of those selected, and those that are not selected, for the program.  Under that statute, the list of individuals not eligible or selected for the program must include only individuals "in the same job classification

28

or organization unit" as those employees who are eligible or selected for the program.  Id.

Allstate's document stated:

All Allstate R830 and R1500 Agents are eligible for the options described in the "Preparing For The Future" - R830 and R1500 Agent Information Booklet For the Group Reorganization Program ("Program Information Booklet"), except Montana and New Jersey Agents who will be covered in separate programs with different options available to them.  Please consult the Program Information Booklet for more detailed information about the Program.

(Heinz Decl., Ex. 74 ("Age Discrimination in Employment Waiver Information"), at ARI 003839.)  The document went on to list, by contract, the number of agents from each age that were eligible and selected for the Program and the number of agents from each age that were not-eligible and not selected for the Program.  The document remarked that nine R830 and eleven R1500 agents from Montana were not selected for the Program, and that 175 R830 agents from New Jersey were not selected for the Program.  The document did not disclose (a) that R830 and R1500 employee agents in West Virginia hired on or after June 8, 1984 were "not eligible and not selected" for the Program; (b) that at least four R830 employee agents from other states did not have their contracts terminated; (c) and that Allstate's associate and R3000 agents were "not eligible and not selected" for the Program.[6]  Moreover, in February 2000, subsequent to the issuance of this document, Montana agents, who were listed on the original document as "not eligible and not selected," became eligible and selected for the Program.  Only the Montana R830 and R1500 agents received an updated February 2000 OWBPA disclosure listing them as "eligible and selected."  Ultimately, the document indicates that 6,526 agents were made eligible

---

[6]  As noted above, both associate agents and R3000 agents were R3001 trainee agents and a part of Allstate's Exclusive Agency Program, not the employee agent program.  By November 1999, the company had decided to stop hiring associate agents and was considering eliminating the R3000 program as well, in favor of a new program.

and selected for the Program.

### 7.   State-Specific Issues

#### a.   New Jersey

As of October 1999, the average age of the R830 agents employed by Allstate New Jersey was fifty-nine years old.  Allstate determined that New Jersey employee agents in the Program were ineligible for inclusion in the Program because (1) they were employed by Allstate New Jersey Insurance Company, a separate company under a different management structure and compensation system than the rest of the employee agents in the United States and (2) New Jersey had unique state insurance withdrawal laws, which could have been triggered in the event of a decrease in the number of agencies in New Jersey.

#### b.   Montana

Allstate considered Montana agents for the Program and listed them as not eligible and not selected on the OWBPA disclosure.  Allstate avers that it listed them as ineligible on the November 16, 1999 disclosure because of certain unidentified Montana state laws.  By February 2000, however, Allstate ultimately determined that Montana agents were eligible for the Program.  On February 15, 2000, Allstate included Montana agents in the Program and distributed the Program materials with an updated disclosure to the Montana agents.  The Montana-specific version of the Preparing for the Future Information Booklet informed Montana agents that they had until September 1, 2000 to consider whether to accept one of the Options available under the Program and that their contracts would be terminated no later than September 30, 2000.  Thereafter, Montana agents were moved to the eligible category in the revised ADEA Waiver Information distributed only to Montana agents.

c.      **West Virginia**

West Virginia employees who entered into their Allstate contracts on or after June 8, 1984 could not be terminated as part of the Program.  Allstate nonetheless included them as eligible because each of them was, according to Allstate, offered consideration in exchange for entering into the Release.  In turn, it included the ages of West Virginia employee agents hired on or after June 8, 1984 in the list of eligible agents on the OWBPA disclosure.

d.      **Delaware**

Under a Delaware statute requiring twelve months' notice to terminate an insurance agency contract, Delaware agents were given until December 1, 2000 to sign the Release or have their relationship with Allstate terminated.  Thus, the Delaware-specific version of the Preparing for the Future Information Booklet informed Delaware agents that they had until December 1, 2000 to consider whether to accept one of the Options available under the Program and that their contracts would be terminated no later than December 31, 2000.

8.      **Alleged Misrepresentations by Allstate about the Program**

a.      **Confidentiality and Non-Compete Restrictions**

Allstate informed agents that Allstate customer lists were the property of Allstate and that the names, addresses, and ages of these customers were confidential information and the exclusive property of Allstate.  Specifically, in a March 23, 2000 set of Questions and Answers ("Q&As") regarding the Program and Release, Allstate explained:

> Q:     If an agent ends his/her agency relationship and goes to work selling a non-insurance product, can the agent contact his/her prior Allstate customers regarding the new product?
>
> A.     No.  Although this is not a violation of the noncompete provision, it is a violation of the confidentiality provision.  The Allstate customer list is

Allstate's property and cannot be used by a former agent for any purpose including marketing non-insurance products.

(Declaration of Erica B. Zolner ("Zolner Decl."), Ex. 102 ("Preparing for the Future Questions and Answers #8"), Q20 at ARI 094111.)  Another Q&A, issued on June 7, 2000, stated:

> Q:      Can a former agent keep a list of his/her Allstate customers and, after the non-compete period has elapsed, use that list to contact them for the purpose of selling insurance or other products?
>
> A.      No.  This would be a violation of the confidentiality provision contained in the agent's agreement and the Agent Transition Severance plan (If the agent selected the enhanced severance option).  A former agent can never use a list of Allstate customers for any purpose regardless of how much time has passed since the agency relationship ended.  All customer lists are considered confidential information and are the exclusive property of Allstate.

(Zolner Decl., Ex. 156 ("Preparing for the Future Questions and Answers #10"), Q1 at ARI 090472.)  If agents eligible for the Program left Allstate, they could only sell products or services to Allstate customers if a "customer initiate[d] contact with his/her prior agent" or "if the customer responds to general advertising that is not considered a solicitation." (Id. Q4 at ARI 090473.)  Both the R830 and R1500 established the confidential nature of customer lists and contained a mandate that when an employee leaves Allstate, all records pertaining to Allstate policyholders shall be returned to Allstate and not be divulged.  Neither contract, however, contained an express non-competition agreement prohibiting contact with former clients for commercial purposes.

### b.      Rehire Policy

Plaintiffs claim that, on the day the Program was announced and thereafter, Allstate represented to employees and agents that employee agents who were terminated could find employment elsewhere in the company.  Plaintiffs also allege that local managers made similar

32

statements about the opportunity for re-employment and encouraged employee agents to apply. In fact, some Plaintiffs actually applied and interviewed for non-agent positions at Allstate, but were not hired. Allstate contends, however, that these new job opportunities referenced non-agent employees who were terminated as part of a reduction in force, rather than R830/R1500 employee agents eligible for the Program. It further explains that it did not begin to consider a potential rehire policy related to the Program until September 2000.

It is undisputed that, on September 26, 2000, Allstate formally adopted and implemented the Rehiring Moratorium. This Moratorium prohibited Allstate from offering re-employment to former employee agents who left Allstate as a result of the Program, and that such former employee agents would be eligible for re-employment when they reached the one year anniversary of their termination or were no longer receiving enhanced severance payments, whichever was longer. This policy had the effect of preventing any employee agent who left Allstate as a result of the Program from satisfying the continuous service requirement that would entitle them to early retirement and/or the "beef up" provisions for purposes of pension benefits. Indeed, Allstate took the position that a former employee agent's service as an R3001 exclusive agent did not count towards the continuous service requirement to be eligible for retiree medical or life insurance benefits. Nor could an employee agent who converted to the R3001 agent contract either grow into the retiree medical benefits or participate in the subsidized retiree medical benefits while he/she was an EA agent.

The Moratorium was a change in Allstate's policy. From January 1, 1990 to June 1, 2000, former employee agents—other than retirees—whose records of prior employment were satisfactory, were eligible for re-employment with Allstate and did not have to wait any period

after separation from Allstate before being considered for rehire.  Notably, non-agent employees

terminated in reductions-in-force announced in November 1999, at the same time as the Program,

were able to rejoin Allstate immediately, consistent with the company's normal rehire policy.

### c.    Commission Rates

As part of the Program, Allstate provided each R830/R1500 agent a personalized

information worksheet.  In several of the Plaintiffs' worksheets, Allstate represented that the

commission income paid to the agents under the R3001 contract was the equivalent to and/or

exceeded the combined commission and OEA reimbursements that employee agents previously

received under either an R830 or R1500 contract.  Plaintiffs contend that the same thing

happened with many if not all of the terminated employee agents.  These worksheets did not

quantify the value of the benefits that employee agents were losing as a result of the conversion

to the R3001 contract.

In addition, Allstate did not advise employee agents that Allstate intended to reduce

commissions paid to R3001 agents and Plaintiffs contend that, during the time that agents were

deciding among their choices under the Program, Allstate affirmatively represented that it was

not planning on cutting commissions.  Allstate avers, however, that it did not first begin to

consider commission rate changes for Exclusive Agents until October 2001, at which time it

announced to all Exclusive Agents that it would begin reviewing agent revenue and

compensation.  On September 25, 2002, Allstate gave notice to Exclusive Agents that

commission changes would take effect on January 1, 2003.  Allstate ultimately reduced

commission rates for Exclusive Agents on that date, at which point the new property commission

rates payable to R3001 agents went from twenty percent to ten percent.  Allstate denies that it

34

had been evaluating commission rate reductions since work began on the Program.  Plaintiffs produce evidence, on the other hand, that beginning in the summer of 1999, each of Allstate's analyses assumed some reduction in the commission rates.  Indeed, a change of commission rate beginning in 2001 was presented to the Board of Directors on November 9, 1999—just one day before the Program was announced—but there is no evidence that that particular commission rate discussion was ever implemented.

### d.      Expected Results for R3001 Agents

Allstate informed Plaintiffs on numerous occasions that they would be required to meet certain business objectives as R3001 Exclusive Agents, but, according to Plaintiffs, Allstate did not disclose that it would hold agents to significantly higher standards under the R3001 contract than under the R830 or R1500 contracts.  Allstate's Program Information Booklet provided that R3001 agents "will be expected to achieve certain results."  (Heinz Decl., Ex. 52 ("Program Information Booklet"), at ARI 000806.)  Agents were reviewed periodically and if an agency did not achieve the Expected Results, the agency had twenty-four months to effectively address the problem in order to avoid termination.  Allstate claims that agents that it made agents aware of the precise sales targets during EA conversion meetings.

On August 9, 1999, prior to the announcement of the Program, the Channel Integration Team had another "Winning in the New Century" meeting, at which time the team recommended placing five percent of agencies on probation each year for not meeting its new expected results. Under that plan, the underperforming or "GAP" agencies would have six months to improve and meet newly-imposed quotas or they would receive a ninety-day termination notice.  Although Plaintiffs claim that agents were never informed of this plan, Allstate asserts that this portion of

the presentation was never implemented and, thus, there was no plan for Allstate to share with agents.

Nonetheless, for the year 2000, Allstate evaluated agents based on expected results and those agents who did not meet the expectations were notified that they were expected to address the deficiencies.  Beginning in late 2001, on a quarterly basis, Allstate sent notices to the worst performers in each region informing them that they faced termination unless they demonstrated sufficient improvement in the next quarter.  In addition, it sent notices to the next lowest performers that their jobs were in danger.  According to Plaintiffs, they did not anticipate such stringent standards.

### e.    Allstate's Level of Control Over Exclusive Agents

Allstate told agents that "R3001 Exclusive Agents have more freedom and flexibility in operating their agencies."  (Meehan Decl., Ex. 141 ("November 16, 1999 Preparing for the Future Presentation"), at ARI 000327.)  Allstate further explained this statement to agents in the November 1999 Agent Presentation by stating that "EAs have greater tax planning flexibility," and EAs have "total freedom to decide who to hire, how many people to hire, and what type of relationship to have with them."  (Id.)  In comparison, "NOAs have limitations on deductibility of unreimbursed employee business expenses," NOA "[s]upport staff and rent expenses must be within available OEA," and "NOAs may only secure support staff through an approved staffing vendor."  (Id.)  Moreover, Exclusive Agents had some control over their office hours.  Indeed, when the EA Program was first introduced, R3001 agents had significantly more control over their hours.

The EA contract after the announcement of the Program was somewhat different.  Via

36

letter dated January 17, 2000, Allstate expressly informed agents that, effective March 20, 2000, agencies would be expected to be open a minimum of forty-four hours per week and must be open during the "core hours" of 9:00 a.m. to 5:00 p.m. Monday through Friday.  (Zolner Decl., Ex. 176 ("January 17, 2000 Agency Service Standards Memorandum"), at ARI 40444.)  In addition, agencies needed to remain open at least four additional hours, to be scheduled at the agents' discretion.  (Id.)  R3001 agents also had to use Allstate computers and equipment and forward their business phone calls to a centralized "call center" when the agency was closed. (Id.)  Additionally, employee agents were required to attend periodic "training sessions" to ensure that they had the necessary skills.  (Id.)  Many Plaintiffs felt as if they were not receiving the entrepreneurial benefits that they were promised.

## C.    The *Romero* Plaintiffs

### 1.    General Information

Plaintiffs, in this case, were all Allstate employee agents as of June 30, 2000.  Plaintiff Gene R. Romero was, on that date, fifty-one years of age and had been employed by Allstate for more than thirteen years under an R1500 contract.  Plaintiff Joseph L. Benoit was forty-eight years old and had been employed by Allstate for more than eighteen years under an R830 contract.  Plaintiff James T. Beer was forty-one years old and had been employed by Allstate for more than nineteen years under an R830 contract.  Plaintiff Roger T. Boyd was fifty-five years old and had been employed by Allstate for more than twelve years under an R1500 contract. Plaintiff Richard A. Carrier was forty-two years old and had been employed by Allstate for more than nineteen years under an R830 contract.  Plaintiff Paul R. Cobb was fifty-two years old and had been employed by Allstate for more than fifteen years under an R1500 contract.  Plaintiff

Craig K. Crease was forty-eight years old and had been employed by Allstate for more than seventeen years under an R830 contract.  Plaintiff Sylvia Kelly was fifty-four years old and had been employed by Allstate for more than nineteen years under an R830 contract.  Plaintiff Dwight English was fifty-three years old and had been employed by Allstate for more than eleven years under an R1500 contract.  Plaintiff Ronald Harper was forty-eight years old and had been employed by Allstate for more than ten years under an R 1500 contract.  Plaintiff Michael Kearney was forty-five years old and had been employed by Allstate for more than sixteen years under an R830 contract.  Plaintiff Thomas A. Kearney was forty-nine years old and had been employed by Allstate for more than twenty-one years under an R830 contract.  Plaintiff Larry H. Lankford, Sr. Was fifty-three years old and had been employed by Allstate for more than twenty-eight years under an R830 contract.  Plaintiff David C. Lawson was fifty-seven years old and had been employed by Allstate for more than fourteen years under an R1500 contract.  Plaintiff Nathan R. Littlejohn was fifty-one years old and had been employed by Allstate for more than nine years under an R1500 contract.  Plaintiff Rebecca R. Maslowski was fifty years old and had been employed by Allstate for more than sixteen years under an R830 contract.  Plaintiff Craig A. Millison was fifty-two years old and had been employed by Allstate for more than thirteen years under an R1500 contract.  Plaintiff James E. Moorehead was fifty-three years old and had been employed by Allstate for more than sixteen years under an R830 contract.  Plaintiff Edwin T. Murray, III was forty-four years old and had been employed by Allstate for more than fifteen years under an R1500 contract.  Plaintiff Carolyn Penzo was fifty-three years old and had been employed by the company for more than thirty-one years, twelve of which were under an R1500 contract.  Plaintiff Christopher L. Perkins was forty-one years old and had been employed by

38

Allstate for more than sixteen years under an R830 contract.  Plaintiff Richard E. Peterson was fifty-one years old and had been employed by Allstate for more than sixteen years under an R830 contract.  Plaintiff James P. Pilchak was fifty-four years old and had been employed by Allstate for more than thirty-one years under an R830 contract.  Plaintiff Paula Reinerio was forty-five years old and had been employed by Allstate for more than ten years under an R1500 contract. Plaintiff Paula M. Schott was fifty-eight years old and had been employed by Allstate for more than eighteen years under an R830 contract.  Plaintiff Paul L. Shirley was fifty-seven years old and had been employed by Allstate for more than nine years under an R1500 contract.  Plaintiff Donald L. Trgovich was fifty-six years old and had been employed by Allstate for more than seventeen years under an R830 contract.  Plaintiff Richard S. Wandner was fifty-one years old and had been employed by Allstate for more than seventeen years under an R830 contract. Plaintiff Timothy Weisman was forty years old and had been employed by Allstate for more than eleven years under an R1500 contract.  Plaintiff Anthony Wiktor was forty-two years old and had been employed by Allstate for more than sixteen years under an R830 contract.  Plaintiff John W. Willman was forty-nine years old and had been employed by Allstate for more than twenty-six years under an R830 contract.  Finally, Plaintiff Ralph J. Wolverton was forty-six years old and had been employed by Allstate for more than seventeen years under an R830 contract.  Many, but not all of the Plaintiffs attended college and have business or professional degrees.

Many of the Plaintiffs mortgaged their homes, depleted their savings and 401(k)s and invested significant amounts of money into their agencies.  In addition, many Plaintiffs had their family members working in their agencies for little to no compensation.  Multiple Plaintiffs contend that they did so at Allstate's urging and under a belief that they had a proprietary interest

and the job security to realize long-term returns on those investments. Allstate, on the other hand, contends that Plaintiffs' expenditures of out-of-pocket funds were to increase sales and income from commission, not because of any vested interest in the business they wrote as agents.

A multitude of Plaintiffs believed that they had no other job to fall back on, given their age and length of service with Allstate. Moreover, during their tenure, Plaintiffs were contractually barred from doing any work other than for Allstate without Allstate's written consent. As employee agents, Plaintiffs also had contractual non-compete covenants that barred them for soliciting or selling insurance in certain areas and to certain people. Specifically, the R830 contract provided:

> For a period of two years immediately following the termination of your employment under this agreement, you agree that you will not solicit or sell insurance of any kind:
>
> (A) with respect to any person, company or organization to whom you previously sold an Allstate policy, or
>
> (B) within one mile from any Allstate location from which you solicited or sold insurance during the year immediately preceding such termination.

(Heinz Decl., Ex. 10 ("R830 Agreement"), Part Four, § XIII.) The R1500 contract stated:

> Covenant Not To Compete: Following the termination of this Agreement, you agree that, for a period of one year following termination, you will not solicit the purchase of products or services in competition with those sold by the Company:
>
> (1) with respect to any person, company or organization to whom you sold insurance or other products or services on behalf of the Company and who is a customer of the Company at the time of termination of the Agreement;
>
> (2) with respect to any person, company or organization who is a customer of the Company at the time of termination of this Agreement and whose identity was discovered as a result of our status as a Company employee or as a result of your access to proprietary information of the Company; or
>
> (3) from any office or business site located within one mile of any Company location

40

from which you solicited or sold insurance or other products or services during the year immediately preceding termination of this Agreement.

(Heinz Decl., Ex. 11 ("R1500 Agreement"), ¶ 13.)  These restrictions posed a problem for the many Plaintiffs who had leased the office in their own name, or even purchased the building in which their office was located, since the non-compete provisions precluded them from selling insurance in those buildings.  Although Allstate had originally told agents that if they refused to sign the Release, then they would be responsible for the remaining lease payments on their offices, Allstate modified that requirement in February 2000 and agreed to stand in for an agent's lease payment obligations if the agent chose the Base Severance Option.  Nonetheless, Allstate maintained that it owned the employee agents' phone numbers and that it would preclude agents from using those numbers if they left Allstate without signing the Release, even though the phone number was in the agent's name and paid for by the agent.

### 2.  Plaintiffs' Consultations Regarding the Program and Release

A majority of the Plaintiffs consulted with an attorney prior to selecting an Option under the Program and entering into the Release, and numerous Plaintiffs discussed the Release with attorneys at the EEOC.  Certain Plaintiffs did not consult an attorney regarding the Program and Release, several of whom indicated that they believed it was futile and would not do any good to consult an attorney because they felt that they had no choice but to sign the Release.  It is undisputed that the terms of the Release were non-negotiable and Allstate would not accept any Release that was modified in any way.  Many Plaintiffs also consulted with accountants prior to signing the Release or making a selection among the Program Options, including Plaintiffs Bever, Carrier, Crews-Kelly, English, Michael Kearney, Thomas Kearney, Maslowski, Millison,

41

Moorehead, Reinerio, Schott, Shirley, Trgovich, Wandner, and Wiktor, although they did not necessarily discuss the precise Program Options with their accountant.

### 3.    Plaintiffs' Program Option Selections

Thirty-one of the Romero I and Romero II Plaintiffs signed the Release upon electing one of the first three Program Options.  One named Plaintiff, Joseph Benoit, chose the Base Severance Option, declined to sign the Release, and left Allstate's service.

### a.    The EA Option

Seventeen of the Plaintiffs took the first option, the EA Option, including Plaintiffs Bever, Carrier, Cobb, Crease, Harper, Michael Kearney, Lawson,[7] Littlejohn, Maslowski, Millison, Murray, Penzo, Peterson, Weisman, Wiktor, Wittman, and Wolverton.  In connection with taking that Option, all of them had to sign the Release.  Each of these Plaintiffs received a conversion bonus of at least $5,000—some received more—as part of their transition.  In addition, each had the opportunity to enter the EA Program and convert to independent contractor status.

Plaintiffs who took this option and converted to the R3001 contract for independent contractors acquired a transferable economic interest in the books of business they serviced that could be sold to an Allstate approved buyer after two years as an EA.  Thirteen of the Plaintiffs who selected the EA Option later sold the economic interest in the books of business they produced and serviced, and kept the sales proceeds.  The sales, which occurred between 2002 and

---

[7] There is a dispute of fact regarding Plaintiff Lawson.  Plaintiffs contend that Lawson took Option Two.  Defendants aver—and the evidences establishes—that although Lawson originally checked the box next to Option Two on the Release, he could not complete the sale by the sale deadline and continued to work for Allstate as an EA until January 2002, when he sold his book of business.

42

2012, ranged in amounts from $100,000 to $910,000.

Allstate forgave Plaintiffs who selected the EA Option for any outstanding OEA advance they owed to Plaintiff.  The greatest amount forgiven was $1,250 and the mean among the seventeen Plaintiffs was about $250.  For seven of the Plaintiffs who converted to the EA Program, there were no OEA advances to forgive.

  **b.**   <u>**The Sale Option**</u>

Twelve Plaintiffs signed the Release and elected the second Option of the Program—the Sale Option.  These individuals included Plaintiffs Crews-Kelly, English, Thomas Kearney, Lankford, Moorehead, Perkins, James Pilchak, Romero, Schott, Shirley, Trgovich, and Wandner. These agents acquired a transferable economic interest in the books of business they had produced and serviced as R830 and R1500 agents after serving as Exclusive Agents for only thirty days.  The sales proceeds ranged in amounts from $75,000 to $435,000.  Several of those sales agreements included non-compete agreements and other restrictive covenants with the purchasing entity.

Plaintiffs who selected the Sale Option received at least a $5,000 conversion bonus in connection with their transition to independent contractor status.  Allstate also forgave these Plaintiffs for an outstanding OEA advance they owed to Allstate.  The greatest amount forgiven was $42,000 and nothing was forgiven for six Plaintiffs.

  **c.**   <u>**The Enhanced Severance Option**</u>

Two Plaintiffs signed the Release and elected the Enhanced Severance Option following the announcement of the Program: Roger Boyd and Paula Reinerio.  Boyd received an enhanced severance payment of $42,462 and Reinerio received an enhanced severance payment of

$68,315, each of those payable over the course of twenty-four equal monthly installments. Plaintiffs also assumed a two-year non-compete restriction, as well as an ongoing non-solicitation obligation.

For these Plaintiffs, Allstate forgave any outstanding OEA advance they owed Allstate. The value of each agent's OEA advance was then included as taxable compensation in the agent's final employee payment.  Although Plaintiffs were permitted to submit unreimbursed business expenses to Allstate in order to offset all or a portion of the advance that would be counted as taxable income, Plaintiffs dispute that Allstate ever told them that fact.  Nevertheless, Plaintiff Reinerio submitted business expenses to Allstate to offset her OEA advance.

### d.      The Base Severance Option

Overall, less than twenty-five agents elected not to enter into a Release.  The only Plaintiff included among that group is Joseph Benoit.  Benoit declined to sign the Release, elected the Base Severance Option, and received a thirteen-week severance payment of approximately $23,200, paid out in six equal monthly installments.  Had the other Plaintiffs taken this option, their base severance would have ranged anywhere from approximately $7,600 to approximately $116,000, with a mean figure of about $29,000.

### 4.      Rationales' for Plaintiffs' Program Selections

Allstate characterizes Plaintiffs' various Program option selections as rationally-based, calculated choices depending on their financial needs at the time and what worked best for themselves and their families.  In support of these allegations, Allstate cites to various portions of Plaintiffs' deposition testimony.  In response, however, Plaintiffs cite to other portions of their testimony to demonstrate that although none of the options were optimal, they were forced into

44

making an election and taking the option that would best provide for their families.  Indeed, it is agreed that many Plaintiffs simply did not have the money to start over or support their families if they opted to leave Allstate under the Base Severance Option.

What remains undisputed is that many Plaintiffs spent their careers building up their customer base and that many of Plaintiffs' customers were people whom they had brought to Allstate because of their pre-existing relationships with them or because of their efforts to develop them as clients.  These customers included family members, neighbors, business associates, church members, parents of friends of his/her children, parents of children on sports teams that the employee agent had sponsored, and other friends and associates developed from many years spent in the communities they served.  Plaintiffs who left Allstate could have no business contact, even to sell non-insurance products, with these former customers unless the customer initiated contact with the former agent or the customer responded to general advertising that was not considered a solicitation.  Allstate advised all agents eligible for the Program that it intended to enforce the non-compete and non-solicitation provisions if a violation occurred.

### 5.    EEOC Charges

As a legal matter, agents could file EEOC charges against Allstate regardless of whether they entered into the Release.  Nothing in the Release, however, explicitly instructs that employee agents who signed it could file a charge with the EEOC related to the termination of their employment or challenge the validity and enforceability of the Release.  At least one Plaintiff—Plaintiff Kelly—withdrew an EEOC Charge that she filed on June 5, 2000 because she believed the Release barred it, but she re-filed on August 25, 2000.  Allstate did, however, advise Plaintiff Gene R. Romero that he could file EEOC charges.  Ultimately, all Plaintiffs filed

charges against Allstate with the EEOC.  Those agents were still given the full benefits of their chosen Program Option.

Plaintiff Romero filed his charge of discrimination with the EEOC on March 24, 2000. In a May 2, 2000 letter directed to Defendants Allstate and Liddy, the EEOC preliminarily ruled that Allstate's Release requirement was unlawful and requested that Allstate suspend its use under the Program.  In responsive letters dated May 15, 2000 and May 30, 2000, Allstate rejected the EEOC's assessment and urged the EEOC to reconsider its preliminary position.  Allstate refused to suspend the release-signing requirement.  On September 19, 2000, the EEOC issued a letter of determination that Allstate had violated the ADEA and other federal non-discrimination statutes by requiring that employee agents execute the Release as a condition of continuing in Allstate's service as part of the Program.

### D.    Procedural History

In light of the EEOC's finding, Plaintiffs initiated the action in federal court on August 1, 2001, and, on October 18, 2001, Plaintiffs filed their First Amended Complaint ("Romero I"). The First Amended Complaint set forth seven Counts, as follows:

> Count I sought a declaratory judgment (both individually and for the class) declaring the Release invalid under Section 510 of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1140, the Age Discrimination in Employment Act, 29 U.S.C. § 623, and common law.

> Count II alleged individual and class claims of interference with employment and retaliation in violation of Section 510 of ERISA with respect to the Plaintiffs' attainment and receipt of pensions and benefits under various employee benefit plans.

> Count III alleged individual and class claims for retaliation in violation of Section 510 of ERISA.

> Count IV claimed "Discriminatory Termination and Retaliation in Violation of 29

U.S.C. § 623(a) and (d)" for both individuals and the class.

Count V asserted individual and class claims for breach of the R830 contract, which governed the employment relationship between Allstate and a subclass of Plaintiffs.

Count VI alleged individual and class claims for breach of the R1500 contract, which governed the employment relationship between Allstate and a different subclass of Plaintiffs.

Count VII set forth individual and class claims for breach of fiduciary duty.

(Am. Compl. No. Civ.A.01-3894 ("Romero I"), ¶¶ 132-189.)

About four months later, the Romero I Plaintiffs, joined by four other Plaintiffs, brought a separate ERISA action against Allstate and the Administrator of the Agents Pension Plan ("Romero II"). In Romero II, Plaintiffs sought the recovery of retirement benefits that they were improperly denied because Allstate and the Administrator: (a) violated the "anti-cutback" provisions of ERISA by improperly phasing out the beefed-up early retirement benefits and amending the requirements for retirement benefits under the Agents Pension Plan; and (b) violated the fiduciary duty requirements of ERISA by making material representations and omissions about Plaintiffs' eligibility for retirement benefits. (Am. Compl., No. Civ.A.01-6746 ("Romero II").)

Lastly, on December 27, 2001, the United States Equal Employment Opportunity Commission brought its own action against Allstate alleging that Allstate unlawfully retaliated against all employee agents, in violation of the ADEA and other federal employment statutes, by refusing to permit them to continue as Allstate employees unless they signed the Release ("EEOC v. Allstate"). Like Plaintiffs, the EEOC seeks a declaratory judgment that the Release is invalid. (Am. Compl., No. Civ.A.01-7042 ("EEOC v. Allstate").)

47

Discovery began in April 2002 and, over the course of the next several years, the parties engaged in extensive motion practice, including the filing of cross-motions for summary judgment and the debate over class certification issues.  On March 30, 2004, the Honorable John Fullam, of the United States District Court for the Eastern District of Pennsylvania, entered a Declaratory Judgment holding, in part, that the Releases signed by the employee agents were voidable so long as the employee agents tendered back all benefits received in connection with signing those Releases (the "tender back" requirement).  Romero v. Allstate Ins. Co., Nos. Civ.A. 01-3894, 01-6764, 01-7042, 2004 WL 692231, at *3-4 (E.D. Pa. Mar. 30, 2004).  Plaintiffs filed a timely motion for reconsideration challenging only the propriety of the "tender back" requirement imposed by the Court.  While that reconsideration motion was still pending, Allstate filed a second motion for summary judgment in December of 2005, as to all of Plaintiffs' underlying causes of action.  That motion remained undecided until March 2007, when Judge Fullam announced his intentions to reverse his original finding as to the validity of the Releases. Romero v. Allstate Ins. Co., Nos. Civ.A.01-3894, 01-6764, 01-7042, 2007 WL 906158, at *1 (E.D. Pa. Mar. 21, 2007).  Ultimately, on June 20, 2007, Judge Fullam held that he erred in his 2004 Declaratory Judgment and vacated that decision.  Romero v. Allstate Ins. Co., Nos. Civ.A.01-3894, 01-6764, 01-7042, 2007 WL 1811197, at *1 (E.D. Pa. Jun. 20, 2007).  He further granted summary judgment in Allstate's favor on the entirety of Plaintiffs' actions in Romero I and Romero II, and in EEOC v. Allstate.  Id.

On November 26, 2007, Plaintiffs appealed this ruling to the United States Court of Appeals for the Third Circuit.  Reviewing the history of this case, the Third Circuit noted that Plaintiffs had not received the benefit of full discovery as to issues regarding the validity of the

Releases, and determined that these issues were dispositive as to the rest of Plaintiffs' claims.

Romero v. Allstate Ins. Co., 344 F. App'x 785, 793 (3d Cir. 2009) ("The plaintiffs had a relative

short period of class discovery, and . . . are entitled to discovery that is responsive to their

requests related to the specific release-related issues the plaintiffs raised with the district court in

their response to its March 21, 2007 Order.").  The court went on to order that the District Court

allow additional discovery and briefing, fully address whether the Releases are valid, and if the

Releases are deemed valid, decide all of the underlying claims and issues.  Id. at 794.

On January 29, 2010, after remand from the Court of Appeals in Romero I, the three

cases were reassigned to the docket of the undersigned.  Plaintiffs filed a Motion to Amend the

Complaint in Romero I and, on July 28, 2010, this Court granted the requested leave, resulting in

the filing of the Second Amended Complaint.  This document set forth seven claims, as follows:

(1) a request for a declaratory judgment on the invalidity of the Release under ERISA, the

ADEA, and common law; (2) interference with employment and retaliation in violation of

Section 510 on behalf of all Plaintiffs; (3) retaliation in violation of Section 510 on behalf of

Plaintiffs who did not sign the Release; (4) discriminatory termination and retaliation in violation

of 29 U.S.C. § 623(a) and (d); (5) breach of the R830 contract; (6) breach of the R1500 contract;

and (7) breach of fiduciary duty.  (§ Am. Compl., Romero I, No. Civ.A. 01-3894.)

Consistent with the Third Circuit's mandate, this Court then permitted discovery to

proceed in bifurcated fashion, with the parties limited to discovery only on the validity of the

Release.  During approximately the next three years, the parties engaged in this targeted

discovery and related motion practice.  On September 12, 2012, the Court consolidated Romero

I, Romero II, and EEOC v. Allstate for administrative purposes.  In compliance with the Court's

49

scheduling order, the parties began filing summary judgment motions in early April 2013. Briefing on those motions and related motions did not conclude until the end of August 2013. As of December 2013, this Court had ruled on all of the evidentiary motions associated with the summary judgment motions, leaving the latter motions ripe for judicial review.  At issue presently are Plaintiffs and Allstate's Cross-Motions for Summary Judgment as to the validity of the Release.

## III.    SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg

<u>Corp. v. Dow Corning Corp.</u>, 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." <u>Id.</u> at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. <u>Celotex</u>, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. <u>Anderson</u>, 477 U.S. at 249–50.

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending. <u>Lawrence v. City of Phila.</u>, 527 F.3d 299, 310 (3d Cir. 2008).  As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" <u>Id.</u> (quoting <u>Rains v. Cascade Indus., Inc.</u>, 402 F.2d 241, 245 (3d Cir. 1968)).

## IV.   DISCUSSION

The key issue before the Court in the present Cross-Motions for Summary Judgment is whether the Release signed by the Plaintiffs bars the substantive claims raised by the Second Amended Complaint in <u>Romero I</u> and the Amended Complaint in <u>Romero II</u>.  This issue gives

rise to two separate inquiries.  The first question is whether the Release, if valid, would bar all of the claims raised by the two cases.  Second, the Court must then consider whether the Release constitutes a valid and enforceable contract.  The Court will address each issue separately.[8]

**A.**     **Whether the Release Reaches All of The Claims Asserted in *Romero I* and *Romero II***

The parties initially dispute the scope of the Release and whether it is applicable to all of the claims at issue in Romero I and Romero II.  Allstate argues that the Release covers all of Plaintiffs' claims in both cases.  Plaintiffs, on the other hand, contend that the Release does not extend to ERISA claims in Romero I or Romero II.  The Court finds that Allstate's interpretation is correct and all asserted claims fall within the bounds of the Release.

**1.**     ***Romero I* Claims and Count II of *Romero II***

As a preliminary matter, the Release's coverage of the claims in Romero I and Count II of Romero II is dictated by the law of the case doctrine.  In Romero v. Allstate Ins. Co., 344 F. App'x 785 (3d Cir. 2009), the United States Court of Appeals for the Third Circuit overruled the decision by the District Court judge originally assigned to this matter, which found that the Release signed by the Plaintiffs was valid and barred all substantive claims.  Id. at 794.  In making this ruling, the Third Circuit stated:

> If the release is valid, **it bars the claims of the plaintiffs in *Romero I*, Count II of *Romero II***, and *EEOC [v. Allstate]*.  The plaintiffs, however, did not have sufficient discovery into the facts surrounding the signing of the releases, or sufficient time to produce it, given the court's about-face in 2007, and there is insufficient evidence in

---

[8]  The Court notes that the parties raise many tangential legal arguments and issues in their purported "Factual Summaries" or one of their hundreds of footnotes written in ten-point font.  The Court will presume that to the extent an argument is not fleshed out in the body of the "Argument" section of a brief, the parties did not intend for the Court to grant or deny the requested relief based on those arguments.

the record, let alone in the reasoning provided by the court, as to whether the releases were signed knowingly or voluntarily, or were unconscionable. If the releases are not valid, then the District Court needs to address a number of issues, namely the merits of all the claims in *Romero II* and the common law claims of breach of contract and breach of fiduciary duty in *Romero I*, that it must consider in the first instance. We will remand to the District Court for further discovery into the validity of the releases.

Id. at 790 (emphasis added) (footnote omitted). Later on in the opinion, the Third Circuit

explained its holding on the scope of the Release as follows:

If the release is valid, it bars the plaintiffs' claims in *Romero I*, where the plaintiffs allege violations of the ADEA and ERISA, as well as common law claims of breach of contract and breach of fiduciary duty. It would also bar the claims in EEOC that Allstate retaliated against the plaintiffs in violation of the ADEA. All of these claims are covered by the broad language of the release, which specifically mentions both those statutes and common law claims. It also bars the plaintiffs' claims in Count II of *Romero II*, where the plaintiffs claim violations of ERISA § 404, which provides an equitable remedy for a breach of fiduciary duty claim.

Id. at 793. Towards the end of its ruling, the appellate court again re-emphasized its position on

the scope of the Release:

If, after discovery and briefing on these issues, the District Court determines that the releases are valid, **then the claims in *Romero I*, Count II of *Romero II*, and *EEOC* are barred.** If, however, the District Court determines that the releases are not valid, the District Court needs to address all of the underlying claims and issues that it did not decide in its June 20, 2007, Order, some of which we referred to above, namely, the common law claims of breach of contract and breach of fiduciary duty and all the claims in *Romero II*.

Id. at 794 (emphasis added). Via a footnote, the Third Circuit then made clear that it was not

ruling on whether the Release covered Counts I and III of Romero II. Specifically, it held:

Counts I and III of *Romero II* deal with the plaintiffs' claims that Allstate's amendment of its retirement plan violates the anti-cutback provisions of ERISA § 204(g). The language of the release is very broad and covers ERISA claims, other than those claims to "any benefits to which I am entitled in accordance with any Allstate plan subject to ERISA by virtue of my employment with Allstate prior to my employment termination date." . . . We do not decide whether Counts I and III of

53

> *Romero II* fit within this exception. Rather, if the release is valid, the District Court must consider on remand whether the claims in Counts I and III of *Romero II* are claims for benefits to which the plaintiffs were entitled in accordance with any Allstate ERISA plan.

Id. at 793 n.11.

Reading this language as a whole, the Court finds that the Third Circuit intentionally and explicitly dictated that the broad language of the Release at issue covers all but Counts I and III of Romero II.  Little is left to interpretation by the Third Circuit's express statement that all common law, ADEA, and ERISA claims are "covered by the broad language of the release, which specifically mentions both those statutes and common law claims."  Id. at 793.

In both their Response to Allstate's Motion for Summary Judgment and their Reply Brief in support of their Motion for Summary Judgment, Plaintiffs contend that the Third Circuit's ruling is dicta and, thus, not the law of the case.  They reason that the Third Circuit merely held that this Court "'should reexamine the validity of the release, after [first] allowing further discovery into the facts surrounding the signing of the releases.'" (Pls.' Resp. Opp'n Mot. Summ. J. 98 (quoting Romero, 344 F. App'x at 793).)  In addition, they assert that "any statements by the Third Circuit about the scope of the Release and what claims it may and may not cover were not essential to this holding that Plaintiffs are first entitled to additional discovery.  And the Third Circuit's statements about whether the Release covers Plaintiffs' § 1140 claim in Romero I and breach of fiduciary duty claim in Romero II certainly were not based upon a complete factual record or full briefing on the broad 'any benefits' exception to the Release."  (Pl.'s Resp. Opp'n Mot. Summ. J. 98.)

The Court finds no merit to this argument.  The law of the case doctrine provides that

"when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation." In the Matter of Resyn Corp., 945 F.2d 1279, 1281 (3d Cir. 1991) (quotations omitted). In other words, "once an issue has been decided, parties may not relitigate that issue in the same case." Waldorf v. Shuta, 142 F.3d 601, 616 n.4 (3d Cir. 1998). It is equally well-established, however, that "[t]he doctrine does not apply to dicta." United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa., 316 F.3d 392, 397 n.4 (3d Cir. 2003).

The Third Circuit's ruling as to the scope of the Release in this matter was clearly not dicta. On three separate occasions in the opinion, the court made the unequivocal and definitive ruling that the Release covered all the claims in Romero I and Count II of Romero II. Moreover, it went on explain the basis for its ruling by noting that the language of the Release was broad and specifically named the statutory and common law claims raised in the barred counts. The court then took care to expressly except out from its ruling Counts I and III of Romero II—an unnecessary step if the court did not intend to issue an express ruling on the scope of the Release.

To the extent that Plaintiffs contend that this conclusion was not essential to the Third Circuit's ultimate holding, they are mistaken. The Third Circuit remanded the case with express instructions of what the District Court was required to do. Further discovery was ordered only as to the validity of the Release—nothing more. If the Release was ultimately deemed valid, then the District Court was only to decide whether Counts I and III of Romero II were covered since the other claims were clearly barred. Moreover, to the extent that Plaintiffs contend that the ruling was based on an incomplete factual record and incomplete briefing, Plaintiffs fail to recognize that interpretation of unambiguous contracts are a matter of law for the court. Panther Mountain Lodge, Inc. v. Waymart Windfarm, L.P., No. Civ.A.08-75, 2010 WL 4942262, at *3

55

(M.D. Pa. June 23, 2010).  Thus, the Third Circuit acted well within its province when ruling on the scope of the Release.

In short, the Third Circuit unequivocally held that the Release at issue barred all but Counts I and III of <u>Romero II</u>.  The appellate court remanded only for further consideration of whether the Release itself was valid and, if it was not, for substantive consideration of the underlying claims.  Nothing in the Third Circuit opinion suggests that this holding was dicta or that it did not intend for its ruling on the scope of the Release to have precedential value.  Bound by this ruling and by the law-of-the-case doctrine, this Court deems that if the Release is valid, it bars all the claims of <u>Romero I</u> and Count II of <u>Romero II</u>.[9]

### 2.   **Counts I and III of *Romero II***

As noted above, the Third Circuit explicitly declined to decide whether or not the Release, if valid, bars Plaintiffs' claims in Counts I and III of <u>Romero II</u>.  These claims deal with Plaintiffs' claims that Allstate's amendment of its retirement plan violates the anti-cutback provisions of ERISA § 204(g).  Specifically, Count I states:

100.   Each of the Converted Agent Plaintiffs provided compensated service to Allstate as an "employee agent" under an R830 or R1500 contract prior to July 1, 2000.

101.   Upon the termination of their employment contracts as part of the Mass Termination Program, each of the Converted Agent Plaintiffs continued to provide compensated service to Allstate as an "exclusive agent independent contractor" pursuant to an R3001S contract.

102.   Under the Pension Plan, any employee agent who completes twenty (20)

---

[9]  Plaintiffs also contend that the carve-out provision of the Release, which excepts a "claim for benefits to which [the employee] is entitled," applies to the breach of fiduciary duty claims under ERISA, thus rendering the Third Circuit's decision incorrect.  This Court obviously is in no position to reverse the Third Circuit.

years of continuous "service" with Allstate and who attains the age of 55 is entitled to receive early retirement benefits in the event he or she retires before reaching normal retirement age.

103.   Under Allstate's own interpretation of the Pension Plan (as well as its interpretation of the November 1991 amendments to that plan), and under section 402(e) of the Internal Revenue Code, any converted agent of Allstate who provides any kind of compensated service to Allstate following the termination of his or her employment contract with Allstate remains "in the service of Allstate" for purposes of determining eligibility for early retirement benefits.

104.   The express terms of the Pension Plan (prior to the unlawful and invalid December 1994 amendments) state that "[a]ll service" with Allstate "shall count as Credited Service." Accordingly, under the Pension Plan, any former employee agent of Allstate who, following the termination of his employment contract, continues to provide compensated "service" to the company under a contract creating an "exclusive agent independent contractor" relationship continues to accumulate "service" under the Pension Plan for purposes of determining eligibility for early retirement benefits.

105.   Under the December 1994 amendments to the Pension Plan, Allstate purported to alter the eligibility requirements for obtaining early retirement benefits by only counting "service" that agents performed in their capacity as Allstate "employees" towards the fulfillment of those requirements and excluding any "service" they provided to the company as an "exclusive agent independent contractor."

106.   In imposing requirements that made it more difficult for participants to meet the eligibility requirements for obtaining early retirement benefits under the Pension Plan, the December 1994 amendments violated the "anti-cutback" rule embodied in 29 U.S.C. § 1054(g)(2).

107.   Alternatively, even if "service" provided to Allstate as an "exclusive agent independent contractor" never counted as "service" for purposes of determining eligibility for early retirement benefits under the Pension Plan, the Converted Agent Plaintiffs are not truly "independent contractors." Since those plaintiffs began providing service to Allstate under the R3001S contract, Allstate has retained the right to control the manner and means through which they perform their jobs as "captive" agents. Moreover, since the time they converted to the R3001S contract, Allstate has actually exercised at least as much control over the Converted Agent Plaintiffs as it did prior to the purported termination of their employment status and R830

57

or R1500 contracts.  Accordingly, at all pertinent times, all of the Converted Agent Plaintiffs have been "employees" of Allstate within the meaning of 29 U.S.C. § 1002(6)

108.   By amending the Pension Plan to no longer count all "service" which the converted agent plaintiffs provide, for purposes of determining eligibility for early retirement, Allstate has caused the Pension Plan to violate the "anti-cutback" rule embodied in section 204(g) of ERISA.

(Am. Compl., No. Civ.A.01-6764, ¶¶ 100–08.)  Count III provides:

124.   Under the Pension Plan (prior to the unlawful and invalid November 1991 amendments), any employee agent who completes twenty (20) years of "service" with Allstate is entitled to receive "beefed-up" early retirement benefits upon reaching 55 years of age.

125.   In purporting to adopt the November 1991 amendments, and in "readopting" such amendments in December 1994 (retroactively to November 1991), Allstate purported to phase out and ultimately eliminate these "beefed-up" early retirement benefits by December 31, 1998.

126.   By amending the Pension Plan to phase out and eliminate "beefed-up" early retirement benefits for agents who have met or may in the future meet the eligibility requirements for early retirement, Allstate caused the Pension Plan to violate the "anti-cutback" rule embodied in 29 U.S.C. § 1054(g)(2).

(Id. ¶¶ 124–26.)  In other words, these claims seek to "repeal or set aside" both a 1994 amendment and a 1991 amendment to the Allstate Agents Pension Plan ("Pension Plan") wherein Allstate (a) purported to amend the Pension Plan to redefine "service" and then denied early retirement benefits to Plaintiffs who continued to work for Allstate after the Program under the R3001 contract; and (b) amended the Pension Plan to phase out "beefed up" early retirement benefits for employees who completed twenty years of service.  Allstate now contends that these claims are barred by the Release, whereas Plaintiffs assert that (1) these claims are exempted by the unambiguous language of the Release; (2) to the extent that the Release is ambiguous, it should be interpreted against Allstate; (3) the ERISA claims in Romero II arose after the

execution of the Release and, thus, are not covered; and (4) Plaintiffs cannot waive their claims for ERISA pension entitlements.  The Court considers each argument individually.

a.  **Whether the Language of the Release Excepts Out the Claims or Is Ambiguous and Should Be Construed in Plaintiffs' Favor**

It is well settled that a claim for benefits under ERISA § 502(a)(1)(B) is an assertion of a contractual right under the terms of plan.  Burstein v. Ret. Account Plan for Emps. of Allegheny Health Educ. & Research Found., 334 F.3d 365, 381 (3d Cir. 2003).  As such, the written terms of the plan documents are controlling.  In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 58 F.3d 896, 902 (3d Cir. 1995).  When a court considers claims under § 502(a)(1)(B), the plan is interpreted under principles of contract law.  Kemmerer v. ICI Ams., Inc., 70 F.3d 281, 288 (3d Cir. 1995).  These principles require that a court first look to the plain language of the document and, if that language is clear, it must disregard outside evidence.  Bill Gray Enters. v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001).  Extrinsic evidence may be used to aid in the interpretation of ambiguous plan provisions, although it may not be used "'to create an ambiguity where none exists.'"  Gritzer v. CBS, Inc., 275 F.3d 291, 298 (3d Cir. 2002) (quoting Int'l Union v. Skinner Engine Co., 188 F.3d 130, 145 (3d Cir. 1999)).  Any ambiguities in a contract are construed against the drafter.  In re F.H. McGraw & Co., 473 F.2d 465, 468 (3d Cir. 1973).

In construing the terms of a release, like any contract, the court must read the document in its entirety, giving effect to all of the contractual language if at all possible.  Whole Enchilada, Inc. v. Truckers Prop. Cas. Co. of Am., 581 F. Supp. 2d 677, 689–90 (W.D. Pa. 2008).  "The Court should not consider individual terms unmoored from their context, but should instead consider the entire contractual provision to determine the intent of the parties."  NorFab Corp. v.

59

Travelers Indem. Co., 555 F. Supp. 2d 505, 509 (E.D. Pa. 2005).  In addition, "'[n]o provision

within a contract is to be treated as surplusage or redundant if any reasonable meaning consistent

with the other parts can be given to it.'"  J.C. Penney Life Ins. Co. v, Pilosi, 393 F.3d 356, 364

(3d Cir. 2004) (quoting Sparler v. Fireman's Ins. Co. of Newark, N.J., 521 A.2d 433, 438 n.1

(Pa. Super. 1987)).

In the present case, the relevant language of the Release at issue states:

In return for the consideration that I am receiving under the Program, I hereby
release, waive, and forever discharge Allstate Insurance Company, its agents, parent,
subsidiaries, affiliates, employees, officers, shareholders, successors, assigns, benefits
plans, plan administrators, representatives, trustees and plan agents ("Allstate"), from
any and all liability, actions, charges, causes of action, demands, damages,
entitlements or claims for relief or remuneration of any kind whatsoever, whether
known or unknown, or whether previously asserted or unasserted, stated or unstated,
arising out of, connected with, or related to, my employment and/or the termination
of my employment and my R830 or R1500 Agent Agreement with Allstate, or my
transition to independent contractor status, including, but not limited to, *all matters
in law, in equity, in contract, or in tort*, or pursuant to statute, including any claim
for age or other types of discrimination prohibited under the Age Discrimination in
Employment Act of 1967, Title VII of the Civil Rights Act of 1964, the Americans
With Disabilities Act, *the Employee Retirement Income Security Act ("ERISA"),*
the Illinois Human Rights Act, and the West Virginia Human Rights Act as those
acts have been amended, or any other federal, state, or local law or ordinance or the
common law.  I further agree that if any claim is made in my behalf with respect to
any matter released and waived above, I hereby waive any rights I may have with
respect thereto and agree not to take any payments or other benefits from such claim.
*I understand that this release and waiver does not apply to any future claims that
may arise after I sign this Release or to any benefits to which I am entitled in
accordance with any Allstate plan subject to ERISA by virtue of my employment
with Allstate prior to my employment termination date.*

(Heinz Decl., Ex. 186 ("Release") (emphasis added).)

Plaintiffs contend that the anti-cutback claims in Romero II seek equitable relief

sufficient to cover their lost early retirement benefits.  Such claims are based upon Allstate's

amendments to the Pension Plan that took place prior to the Program's "employment termination date" and either made it more difficult to meet the eligibility requirements for obtaining early retirement benefits or eliminated certain retirement benefits.  According to Plaintiffs, because these cutback claims merely seek benefits to which Plaintiffs are entitled, they are not subject to the Release.

Allstate, on the other hand, contends that the phrase "any benefits to which I am entitled in accordance with an Allstate plan subject to ERISA" refers only to vested benefits as opposed to accrued benefits.  It goes on to reason that Counts I and III of <u>Romero II</u> do not seek "benefits" to which Plaintiffs are "entitled."  Rather, those claims seek to "repeal or set aside" a 1994 amendment and a 1991 amendment to the Pension Plan and, at best, attempt to recover accrued, not vested, benefits.

Based on a plain interpretation of the Release, the Court finds that Plaintiffs' claims in Counts I and III do not fall within the scope of the carve-out provision for two reasons.  First, Counts I and III are not claims for "benefits" because the ERISA provision under which Plaintiffs bring these claims cannot be used for benefits claims.  Second, even if Counts I and III can be construed as seeking "benefits," they do not seek benefits "to which [the Plaintiffs are] entitled."

### *(i)*      ***"Claim . . . to Benefits"***

Both Counts I and II set forth violations of 29 U.S.C. § 1054(g), which provides that:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title.

(2) For purposes of paragraph (1), a plan amendment which has the effect of–

(A) eliminating or reducing an early retirement benefit or a retirement-type

> subsidy (as defined in regulations), or
> (B) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.

29 U.S.C.A. § 1054(g).

Consistent with this statute, Plaintiffs' Prayer for Relief in <u>Romero II</u> seeks the following:

A.    That each of the proposed classes be certified pursuant to Rule 23(b)(2) and/or (3), and that counsel for plaintiffs be designated and appointed as counsel for the classes;

B.    That the practice of Allstate and the Administrator complained of herein be determined and adjudged to be in violation of the rights of plaintiffs and class members under ERISA, pursuant to 29 U.S.C. § 1132(a)(3);

C.    That the Court issue a permanent injunction under ERISA, pursuant to 29 U.S.C. § 1132(a)(3) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, compelling Allstate and the Administrator to:

    (1)    count any periods of service that converted and retired agents have provided to Allstate under the R3001 contract as "service" for purposes of determining their eligibility for early retirement benefits; and

    (2)    repeal or set aside the November 1991 and December 1994 plan amendments relating to early retirement and the "beef-up" retroactively to the dates those amendments were adopted, as a remedy for the statutory violations described in Counts I and III;

D.    That the Court enter judgment in favor of plaintiffs and all class members against:

    (1)    the Pension Plan and the Administrator pursuant to 29 U.S.C. § 1132(a)(3) for "make whole" or other equitable relief; and

    (2)    Allstate pursuant to 29 U.S.C. § 1132(a)(3) for "make whole" or other equitable relief, as a remedy for the violations of fiduciary obligations described in COUNT II.

E.    That the Court enter judgment in favor of plaintiffs and all class members

against the Pension Plan pursuant to 29 U.S.C. § 1132(a)(1)(B) after the Court has provided the relief set forth in paragraph C above.

F.      That a constructive trust or equitable lien be imposed over Allstate's assets sufficient to cover all losses suffered by the class members as a result of the violations of ERISA;

G.      That plaintiffs and class members be awarded such other and further relief as may be found just and appropriate;

H.      That plaintiffs and class members be granted their attorneys' fees, experts' fees and the costs and expenses of this litigation, pursuant to applicable law; and

I.      That the Court retain jurisdiction over Allstate, the Pension Plan and the Administrator until such time as it is satisfied that the remedied the practices [sic] complained of are remedied and are determined to be in full compliance with the law.

(Am. Compl., Romero II, No. Civ.A.01-6764, Prayer for Relief.)

Notably, in this Prayer for Relief, Plaintiffs rely primarily on 29 U.S.C. § 1132(a)(3). This section provides that a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  It is well established that this section is limited to "traditional equitable relief" and may not be used to award "traditional legal relief (i.e., money damages)."  Graden v. Conexant Sys., Inc., 496 F.3d 291, 300 (3d Cir. 2007); see also Mertens v. Hewitt Assoc., 508 U.S. 248, 256–63 (1993).  A request for plain money damages—i.e., benefits—under § 1132(a)(3) is inappropriate and must be dismissed.  See Varity Corp. v. Howe, 516 U.S. 489, 490 (1996); Eichorn v. AT&T Corp., 484 F.3d 644, 655–56 (3d Cir. 2007).  Thus, to the extent that Plaintiffs

seek relief under § 1132(a)(3), they have not asserted a "claim . . . to benefits"

Plaintiffs offer two responses.  First, they contend that the phrase "claims . . . to any benefits" in the Release's carve-out does not confine the carve-out to only claims for monetary damages under ERISA, but rather allows for the assertion of *any* claims for violations of *any* ERISA provision.  The cases Plaintiff cites in support, however, are inapposite in that the releases in those matters either did not include ERISA claims in the waiver provision or had a broader carve-out for claims that affected the employees' benefits.[10]  In this case, the Release specifically provided that all matters in equity or tort under ERISA were waived except claims "to benefits to which [the employee is] entitled," making the carve-out significantly narrower.  To ignore the term "benefits" would render the general release of ERISA claims meaningless.  See Stargel v. SunTrust Banks, Inc., __ F. Supp. 2d __, 2013 WL 4775918, at *5 (N.D. Ga. Aug. 7, 2013) (release stated that it "includes, but is not limited to, any claim or entitlement to pay, benefits or damages arising under any federal law (including but not limited to . . . the Employee Retirement Income Security Act . . .) . . . I understand by signing this Release I am not releasing any claims for benefits under the Motorola employee benefits plan"; The court found that to ignore the language "for benefits under the Motorola employee benefits plan," would render large portions of the release "meaningless.").  Accordingly, this Court rejects this portion of Plaintiffs'

_____

[10]  See, e.g., Nelso v. Ipalco Enters., No. Civ.A.IP02477, 2005 WL 1924332, at *5–6 (S.D. Ind. Aug. 11, 2005) (release provided that "[t]his Agreement shall not affect Employee's benefits under the Thrift Plan"); Brieger v. Tellabs, Inc., 473 F. Supp. 2d 878, 881, 885–85 (N.D. Ill. 2007) (holding that release, which stated that it does not extend to "any vested benefits under the Tellabs Advantage Program" did not bar claim that signatory received lower level of vested benefits due to breach of fiduciary duty); Amara v. CIGNA Corp., 534 F. Supp 2d 288, 314, 316 (D. Conn. 2008) (release did not mention a waiver of ERISA claims and then  included an exception for "any claims for benefits under any retirement, savings, or other employee benefit programs.").

argument.

Alternatively, Plaintiffs contend that, in their Prayer for Relief, they also specifically request damages under § 1132(a)(1)(B) "after the Court has provided the relief set forth in paragraph C above." (Am. Compl., Prayer for Relief ¶ C.)  Such requested relief, however, is improper under § 1132(a)(1)(B).  As the Supreme Court explained in CIGNA Corp. v. Amara, 131 S. Ct. 1866 (2011), section 1132(a)(1)(B) may provide relief when a plan participant or beneficiary seeks to "enforce" the "terms of the plan," but will not provide relief when a participant or beneficiary seeks to change those terms.  See 131 S. Ct. at 1876–77.  The district court in CIGNA found that changes to a retirement plan violated various ERISA provisions, including § 1054(h).  See 131 S.Ct. at 1874–75. The district court then "ordered relief in two steps," relying entirely on § 1132(a)(1)(B).  Id. at 1875–76.  In "Step 1" it "ordered the terms of the plan reformed."  Id. at 1876.  In "Step 2" it "ordered the plan administrator . . . to enforce the plan as reformed."  Id.  The Supreme Court reversed, holding that § 1132(a)(1)(B) did not authorize the two-step relief that the district court had ordered:

> One can fairly describe step 2 as consistent with § [1132](a)(1)(B), for that provision grants a participant the right to bring a civil action to "recover benefits due . . . under the terms of his plan." . . . And step 2 orders recovery of the benefits provided by the "terms of [the] plan" *as reformed*.
>
> But what about step 1? Where does § [1132](a)(1)(B) grant a court the power to *change* the terms of the plan as they previously existed? The statutory language speaks of *"enforc[ing]"* the "terms of the plan," not of *changing* them.  The provision allows a court to look outside the plan's written language in deciding what those terms are, i.e., what the language means . . . . But we have found nothing suggesting that the provision authorizes a court to alter those terms, at least not in present circumstances, where that change, akin to the reform of a contract, seems less like the simple enforcement of a contract as written and more like an equitable remedy.

Id. at 1876–77 (emphasis in original) (citations omitted).  Instead, the Court suggested that the remedies ordered by the district court likely fit under § 1132(a)(3) because they resembled traditional equitable remedies.  Id. at 1878–80.  The Court concluded that although "this relief takes the form of a money payment, [that fact] does not remove it from the category of traditionally equitable relief."  Id. at 1880; see also Virtue v. Int'l Bhd. of Teamsters Ret. & Family Protection Plan, 886 F. Supp. 2d 32, 36 (D.D.C. 2012) (holding that "remedying a violation of § 1054(g) requires changing—not simply enforcing—the terms of the plan," meaning that a plaintiff seeking to amend the terms of a plan and then enforce the plan as amended must proceed under § 1132(a)(3) and not § 1132(a)(1)).

Likewise, in the present case, Plaintiffs seek a two-step remedy.  In step one, they seek to repeal the November 1991 and December 1994 plan amendments that they allege violate the anti-cutback provisions of ERISA.  In step two, they seek to enforce the plans as reformed and obtain any monetary benefits to which they are entitled under such reformed plans.  According to CIGNA and its progeny, both steps of such relief are properly pursued under § 1132(a)(3) as equitable relief, not under § 1132(a)(1) as benefits.  See Clark v. Feder, Semo & Bard, P.C., 808 F. Supp. 2d 219, 226 (D.D.C. 2011) (holding that a plaintiff "may proceed only under § 1132(a)(1)(B) or § 1132(a)(3), not under both provisions.").  Accordingly, any relief sought by Plaintiffs is equitable relief and not a claim "for benefits."  In turn, Counts I and III of Romero II cannot fall within the carve-out provision of the Release.

### (ii)   *"Benefits to which I am entitled"*

Even if the Court were to find that Counts I and III of Romero II constituted claims for "benefits," such claims would still not fall within the "carve-out" provision of the Release as they

66

are not benefits to which Plaintiffs are "entitled."  As argued by Defendants, Counts I and III of

Romero II seek to repeal a November 1991 and December 1994 Plan amendment based on

purported violations of ERISA § 204(g)—ERISA's anti-cutback provision.  The anti-cutback

provision states that "[t]he accrued benefit of a participant under a plan may not be decreased by

an amendment of the plan."  29 U.S.C.  § 1054(g)(1).  The Release, however, refers to a carve-

out to a claim for benefits to which the employee is "entitled."  As "entitled" refers to vested, not

accrued, benefits, Allstate asserts that the anti-cutback claims do not fall within the carve-out

and, in turn, are subject to the Release.  Plaintiffs, on the other hand, assert that the distinction

between vested and accrued benefits appears nowhere in the Release, which applies to "any

benefits" to which Plaintiffs are "entitled," without defining the term "entitled."

At first blush, the parties' competing arguments as to the interpretation of the carve-out

provision seem to suggest a contractual ambiguity.  Upon closer scrutiny, however, the Court

must agree with Allstate.  As noted above, it is well established that the Court is required to

interpret the Release so as to give meaning to all of its provisions.  Were the Court to accept

Plaintiff's reading of the carve-out, the Release would not cover any of the employee agents'

claims to any benefits in accordance to an Allstate plan subject to ERISA.  Such an interpretation

would effectively read out the phrase, "to which I am entitled" and render it meaningless.  Basic

contract principles do not permit such a result.

This conclusion, however, begs the question of what constitutes "benefits to which I am

entitled."  The Court finds guidance in general ERISA case law.  One of the purposes of ERISA

is to protect pension rights by ensuring "that if a worker has been promised a defined pension

benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a

67

vested benefit—he actually will receive it." Nachman Corp. v. Pension Ben. Guar. Corp., 446 U.S. 359, 375 (1980).  In the ERISA context, "'accrued benefits refer to those normal retirement benefits that an employee has earned at any given time during the course of employment.'" McClain v. Retail Food Emp'rs Joint Pension Plan, 413 F.3d 582, 584 (7th Cir. 2005) (quoting Vallone v. CNA Fin. Corp., 375 F.3d 623, 635 n. 5 (7th Cir. 2004)).  By contrast, "'[v]ested benefits . . . refer to those normal retirement benefits to which an employee has a nonforfeitable claim.'" Id. (quoting Vallone, 413 F.3d at 584).  "In short, an employee's vested benefits are the accrued benefits that the employee is actually '***entitled to keep.***'" Id. (quoting Vallone, 413 F.3d at 584) (emphasis added); see also McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund, 320 F.3d 151, 156 (2nd Cir. 2003) ("'Accrued' benefits refer to those normal retirement benefits that an employee has earned at any given time during the course of employment . . . . 'Vested' benefits, on the other hand, refer to those normal retirement benefits to which an employee has a 'nonforfeitable' claim; in other words, those accrued benefits he is ***entitled to keep.***") (emphasis added).

In Stargel v. SunTrust Banks, Inc., ___ F. Supp. 2d ___, 2013 WL 4775918 (N.D. Ga. Aug. 7, 2013), the court faced the interpretation of a broad release that waived "all Claims under [ERISA], and Claims under any SunTrust employee benefit plan," but preserved "Claims related to Stargel's entitlement to receive any vested benefits earned under any SunTrust employee benefit plan." Id. at *4.  The court agreed with Defendants' interpretation that the release "merely preserve[d] Stargel's right the benefits ***she was entitled to*** under the terms of the SunTrust's employee benefit plans at the time she signed the Release." Id.  Notably, the court equated the term "vested" with the term "entitlement."  Consistent with this ruling, several courts

68

have held that "vested benefits" are defined as "benefits [an employee] is ***entitled*** to keep."  See McClain, 413 F.3d at 584 (emphasis added); McDonald, 320 F.3d at 156; see also Hakim v. Accenture U.S. Pension Plan, 718 F.3d 675, at 681–82 (7th Cir. 2013) ("An ***entitlement***, as its name would suggest, ***refers to vested benefits*** to which a plaintiff is entitled under the terms of the pension plan itself.") (emphasis added); Gilley v. Monsanto Co., Inc. 490 F.3d 848, 859 (11th Cir. 2007) (noting that at the time a challenged amendment to a pension plan was put into place, plaintiff was not "entitled to any benefits," because he "could not have earned ten years of Vested Service until after that date."); Hein v. TechAm. Grp., Inc., 17 F.3d 1278, 1280 (10th Cir. 1994) ("Thus, an interest in a pension benefit program is 'vested' if the employee is ***entitled to retain benefits*** even if his or her employment is terminated prior to retirement.") (emphasis added). Consistent with this jurisprudence, this Court finds that the term "to which I am entitled" references vested, not accrued benefits.[11]

In short, while Allstate could have avoided some dispute by using the term "vested

---

[11]   Plaintiffs aver that the Third Circuit has held that ERISA § 204(g) (the anti-cutback provision) "can protect an entitlement to benefits, but it cannot create an entitlement to benefits when no entitlement exists under the terms of the Plan."  Hein v. F.D.I.C., 88 F.3d 210 (3d Cir. 1996).  They reason that because the Third Circuit interprets the anti-cutback rule as protecting an "entitlement to benefits," and because even Allstate concedes that the anti-cutback rule protects "[t]he accrued benefit of a participant," the only possible construction of the "any-benefits-to-which-I-am-entitled" carve out is that it preserves, at a minimum, claims for accrued benefits under the anti-cutback rule.  (Pls.' Am. Mem. Resp. Allstate's Mot. Summ. J.103.) While creative, this argument is a far stretch.  In Hein, the Third Circuit noted that one of the conditions imposed by the pension plan at issue was that plaintiff reach age fifty-five while employed in order to qualify for unreduced retirement benefits.  Id. at 217.  "Had [plaintiff] met this criterion, ERISA § 204(g) would have protected his benefit from termination.  But [plaintiff] did not satisfy the Plan requirement, and we cannot read ERISA to change the terms of the Plan and vest Hein with a benefit for which he never qualified."  Id.  At no point did the Third Circuit purport to equate an "entitlement" to benefits to "accrued" rather than vested benefits.

benefits" in lieu of "benefits to which I am entitled,"[12] Plaintiffs' efforts to infuse the Release

with ambiguity by capitalizing on this term are unconvincing.  The meaning of these phrases

remains the same.  The carve-out to the Release includes this language with the obvious intent of

modifying the singular term "benefits."  An entitlement to benefits for purposes of ERISA and

the anti-cutback rule has repeatedly been linked to vested benefits, not accrued benefits.  As

Plaintiffs' anti-cutback claims do not seek benefits, let alone vested benefits, the Court must find

that such claims do not fall within the scope of the carve-out and, hence, are covered by the broad

Release provision.[13]

### b.    Whether Counts I and III Arose After the Execution of the Release

In an alternative argument, Plaintiffs seek to invoke the "future claims" carve-out in the

Release.  This provision states, "I understand that this release and waiver does not apply to any

future claims that may arise after I sign this Release . . ."  (Heinz Decl., Ex. 186 ("Release"), at

ARI 04101 (emphasis added).)  Plaintiffs contend that their rights to early retirement benefits did

not arise until they turned fifty-five and had twenty years of continuous service.  Thus, they could

not know that the amendments adopted in the 1990s affected them adversely under § 1054(g)'s

anti-cutback protections until either they had reached fifty-five and had at least twenty years of

continuous service or they had reached fifty-five and had acted in a manner that prevented them

from reaching the twenty-year milestone.

---

[12]  The Court presumes that Allstate used the term "entitled" in keeping with the anti-alienation provision of ERISA, 29 U.S.C. § 1056(d)(1), which is discussed in more detail below.

[13]  Notably, in reaching this conclusion, the Court finds that the Release is not ambiguous.  As such, Plaintiffs are not entitled to a presumption that the contract must be interpreted in their favor.

This argument is misplaced.  Counts I and III of <u>Romero II</u> seek to repeal amendments to the Pension Plan that were adopted in December 1994 and November 1991 respectively. Whether Plaintiffs' rights under those Plans had yet accrued is irrelevant.  Rather, the relevant question is when "the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim."  <u>Romero v. Allstate Ins. Co.</u>, 404 F.3d 212, 222 (3d Cir. 2005).  In the case of amendments to a pension plan, the Third Circuit rejected "[a] rule that unwaveringly ties the date of accrual to the date of amendment" since that "would have the undesirable effect of requiring plan participants and beneficiaries 'likely unfamiliar with the intricacies of pension plan formulas and the technical requirements of ERISA, to become watchdogs over potential [p]lan errors and abuses'" and "would impose an unfair duty of clairvoyance on employees . . . who allege that an amendment's detrimental effect on them was triggered not at the time of its adoption, but rather at some later time by a subsequent event."  <u>Id.</u> at 224 (internal quotations omitted).  Instead, the Third Circuit concluded that "when an ERISA plan is amended but the fact that the amendment actually affects a particular employee or group of employees cannot be known until some later event, the cause of action of the employee will not accrue until such time as the employee knew or should have known that the amendment has brought about a clear repudiation of certain rights that the employee believed he or she had under the plan."  <u>Id.</u> at 223.

In this case, Plaintiffs knew that the 1991 and 1994 amendments to the Pension Plan repudiated rights that they had under the Plan, at the latest, in 1999 when they signed the Release and converted to independent contractors.  As noted above, with respect to Count I, the Program Information Booklet advised Plaintiffs, in November 1999, that their service under the R3001

71

contract would not count toward obtaining early retirement benefits and that they would cease accruing future benefits under the Plan as of their date of their termination. Similarly, as to Count III, the 1991 amendment eliminated the "beefed-up" benefits at year end of 1999, meaning that Plaintiffs knew, prior to or by the time they signed the Release, that they would not be entitled to such benefits. Accordingly, the Court finds that these claims did not arise after the Releases were executed and, thus, do not fall with the Release's carve-out provision.[14]

### c.   Whether Plaintiffs' ERISA Claims Are Protected by ERISA's Anti-Alienation Provision

In a final effort to argue that Counts I and III of Romero II (as well as the ERISA claims in Romero I) do not fall within the scope of the Release, Plaintiffs contend that the ERISA claims are protected by the anti-alienation provision of ERISA and cannot be waived by the Release. The Court disagrees.

---

[14] The case relied upon by Plaintiffs is unconvincing. In Schumacher v. AK Steel Corp. Retirement Accumulation Plan, 711 F.3d 675 (6th Cir. 2013), the plaintiffs had signed a release that did not apply to future claims. Id. at 680. The claims raised by the plaintiffs were "whipsaw" claims which challenged the formula used to calculate the benefits to which the plaintiffs were already entitled and the plaintiffs had not received their benefits statement showing said calculations until sixty to ninety days after signing the release. Id. at 679–80. The court noted that such "whipsaw" claims "arise[] when participants opt to 'cash out' their hypothetical accounts before they reach normal retirement age." Id. at 684 (quotations omitted). The court found that "the whipsaw claim could not possibly arise until the moment a class member opted to cash out her pension in lump-sum form. Because none of the Class members requested a lump-sum payment until after the execution of the Severance Agreements, their claims had not accrued." Id. at 684. In other words, the plaintiffs could not have possibly known about the facts giving rise to their claims until after they signed the releases.

In the present case, the amendments challenged by the claims occurred years before the Release and did not involve benefits to which the Plaintiffs were already entitled. Moreover, Plaintiffs should have known that these amendments affected them prior to or, at the latest, at the time they signed the Release. Nothing in the record reflects that Plaintiffs could not have been sure of their loss of early retirement and "beefed-up" benefits at the time they converted to the R3001 contract.

The relevant provision of ERISA states that, "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). "Pension entitlements are, without exception, subject to the anti-alienation provision of ERISA." Lynn v. CSX Transp., Inc., 84 F.3d 970, 975 (7th Cir. 1996) (citing Patterson v. Shumate, 504 U.S. 753, 760 (1992)).[15] "A release may prevent a plan participant from asserting claims based on a settlement agreement, but may not bar claims based on pension entitlements." Id.

Crucially, however, "an entitlement, as its name would suggest, refers to vested benefits to which a plaintiff is entitled under the terms of the pension plan itself." Hakim v. Accenture U.S. Pension Plan, 718 F.3d 675, 681 (7th Cir. 2013). Repeatedly, the term "[p]ension entitlements" has repeatedly been interpreted to mean vested benefits. See, e.g., Kickham Hanley P.C. v. Kodak Ret. Income Plan, 558 F.3d 204, 213 (2nd Cir. 2009) (noting that ERISA's anti-alienation provision is irrelevant to claims regarding non-vested pension benefits); Lumpkin v. Envirodyne Indus., Inc., 933 F.2d 449, 455 (7th Cir. 1991) ("The anti-alienation provision . . . clearly manifest[s] Congress's intent to protect workers from unknowingly signing away their *vested* pension benefits. . . .") (emphasis added).

Plaintiffs now contend that ERISA's anti-alienation provision does not distinguish between vested pension entitlements and accrued pension entitlements, but rather prohibits waiver of any ERISA claims. To accept this interpretation, however, would mean that ERISA claims may never be waived by a release—a result contrary to well-settled jurisprudence. Indeed, a general release of all claims has been held to include all ERISA claims even if ERISA

---

[15] Plaintiffs' mistakenly attribute this quote directly to the Supreme Court opinion in Patterson. (Pls.' Mem. Supp. Mot. Summ. J. 43.)

is not specifically mentioned  See, e.g., Howell v. Motorola, Inc., 633 F.3d 552, 559 (7th Cir. 2011) (holding that severance agreement barred plaintiff's claim that his pension account would have been worth more but for defendant's breach of ERISA fiduciary duties); Cavitti v. Anthony & Sylvan Pools Corp., 351 F. App'x 651, 654–55 (3d Cir. 2009) (upholding waiver of ERISA claims under a release); Taylor v. Visteon Corp., 149 F. App'x 422, 426 (6th Cir. 2005) (upholding dismissal of ERISA claim waived by release agreement given in exchange for enhanced severance package); Chaplin v. Nationscredit Corp., 307 F.3d 368, 372–73 (5th Cir. 2002) (holding that a general release bars claims for ERISA benefits even if ERISA is not specifically mentioned); Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181–82 (1st Cir. 1995) (upholding finding that ERISA claims were waived under general release signed by plaintiff).[16]

In short, ERISA's anti-alienation provision—by its plain language and as interpreted by multiple courts of appeals—only prohibits waiver of claims to vested ERISA benefits.  The Release in this case honors that statutory dictate by creating a carve-out for benefits to which the employees were entitled.  As Counts I and III of Romero II seek only to repeal amendments to the Pension Plan and set forth claims for benefits to which Plaintiffs' entitlements have not yet vested, the anti-alienation provision does not apply.

---

[16]  Plaintiffs cite the Third Circuit case of Coar v. Kazimir, 990 F.2d 1413, 1420 (3d Cir. 1993) for the proposition that, under the only available legislative history, the objective of the anti-alienation provision was "[t]o further ensure that the employee's accrued benefits are actually available for retirement purposes . . . ." Id. (quoting H.R.Rep. No. 807, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4734).  This scant and somewhat ambiguous legislative history does not undermine the well-established principle that ERISA claims may be waived by a valid release, but claims to vested ERISA benefits may not.

### 3.     Conclusion Regarding the Scope of the Release

Having engaged in a lengthy analysis regarding the interpretation of the Release, the Court finds that all claims in <u>Romero I</u> and <u>Romero II</u> are encompassed by the Release's broad waiver provision.  As to all claims in <u>Romero I</u> and Count II of <u>Romero II</u>, the Third Circuit unequivocally and affirmatively held that they were covered by the Release.  As such a holding constitutes the precedential law of the case, the Court may not deviate from this finding.  As to Counts I and III of <u>Romero II</u>, the Court determines that these claims do not fall within the specific carve-out provision of the Release since (a) they are not claims for benefits, let alone vested benefits; (b) they arose prior to the signing of the Release; and (c) they are not encompassed by ERISA's anti-alienation provision.  In turn, they are covered by the Release's broad waiver provision.

### B.     Whether the Release Is Valid

Having found that the language of the Release covers all of Plaintiffs' claims in <u>Romero I</u> and <u>Romero II</u>, the Court must now consider the validity of the Release.  Plaintiffs offer two broad arguments in support of their claim of invalidity.  First, they contend that the Release is invalid as to all of their ADEA claims because Allstate failed to comply with the requirements under the Older Workers Benefit Protection Act.  Second, they claim that the Release is invalid as to all of their federal law claims under ADEA and ERISA because Allstate cannot show that it was executed knowingly and voluntarily.  Finally, Plaintiffs assert that the Release is unconscionable and therefore does not bar Plaintiffs' common law claims such as breach of

contract and breach of fiduciary duty.[17]

## 1.    Compliance with the OWBPA Disclosure Requirements

In 1990, Congress amended the ADEA by passing the Older Workers Benefit Protection

Act ("OWBPA").  OWBPA provides that:

> An individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary . . . . [A] waiver may not be considered knowing and voluntary unless at a minimum—
>
> > (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
> >
> > (B) the waiver specifically refers to rights or claims arising under this chapter;
> >
> > (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
> >
> > (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual is already entitled;
> >
> > (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
> >
> > (F)      (i) the individual is given a period of at least 21 days within which to consider the agreement; or

---

[17]  Plaintiffs also assert that the Release was retaliatory because it allowed Plaintiffs to sign the R3001 contract only if they entered into the Release, and that Allstate retaliated against terminated employees who did not enter into the Release by not offering them the same opportunity to sign the R3001 contract.  They further contend that Allstate's unlawful threats of retaliation coerced the remaining Plaintiffs into giving up their rights and signing the Release.  This argument, however, is the subject of entirely separate cross-motions for summary judgment between Allstate and the Equal Employment Opportunity Commission, which Plaintiffs have joined.  Plaintiffs offer no separate argument in their own summary judgment motion.

The Court does not address this argument in this opinion as we intend to write separately on the cross-motions between Allstate and the EEOC.  Those motions deal with entirely different arguments that are best discussed in a separate opinion.

(ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;

(H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to—

(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1).  The United States Supreme Court has interpreted this statute to impose rigid requirements: "Congress imposed specific duties on employers who seek releases of certain claims created by statute.  Congress delineated these duties and without qualification: An employee 'may not waive' an ADEA claim unless the employer complies with the statute. Courts cannot with ease presume ratification of that which Congress forbids."  Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998).  It went on to note that "[t]he statute creates a series of prerequisites for knowing and voluntary waivers and imposes affirmative duties of disclosure and waiting periods."  Id.  Moreover, it remarked that "[t]he OWBPA governs the effect under federal law of waivers or releases on ADEA claims and incorporates no exceptions or

77

qualifications.  The text of the OWBPA forecloses the employer's defense, notwithstanding how general contract principles would apply to non-ADEA claims." Id.  Notably, "[t]he party asserting the validity of a waiver shall have the burden of proving . . . that a waiver was knowing and voluntary . . ." 29 U.S.C. § 626(f)(3).  "The absence of even one of the OWBPA's requirements invalidates a waiver." Butcher v. Gerber Prods. Co., 8 F. Supp. 2d 307, 314 (S.D.N.Y 1998).

Allstate asserts that the Release fully complies with all of OWBPA's dictates.  In response, Plaintiffs contend that Allstate failed to comply with at least three OWBPA requirements: (1) the requirement for the minimum of what must be disclosed ("disclosure requirements") provided at 29 U.S.C. § 626(f)(1)(H); (2) the requirement that the release be understandable to the average employee subject to the Program ("understandability requirement") provided at 29 U.S.C. § 626(f)(1)(A); and (3) the requirement that the release be supported by consideration in addition to anything of value to which the individual is already entitled ("consideration requirement"), provided at 29 U.S.C. § 626(f)(1)(D).[18]

### a.    The Disclosure Requirements

As set forth above, the disclosure requirements mandate that when an employer seeks a waiver of ADEA claims in connection with an "employment termination program," it must inform affected employees as to (1) "any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such

---

[18]  Plaintiffs do not dispute that the Release referred to claims under the ADEA, 29 U.S.C. § 626(f)(1)(B); did not waive claims arising after its execution, id. § 626(f)(1)(C); advised employee agents to consult an attorney, id. § 626(f)(1)(D); gave agents at least forty-five days to consider the agreement, id. § 626(f)(1)(F), and provided at least seven days to revoke after execution.  Id. § 626(f)(1)(G).

program;" and (2) the job titles and ages of all individuals eligible or selected for the program,

and the ages of all individuals in the same job classification or organizational unit who are not

eligible or selected for the program." 29 U.S.C. § 626(f)(1)(H). An "employment termination

program" takes place when a group or class of employees are involuntarily terminated and

"offered additional consideration for their decision to sign a waiver." 29 C.F.R. §

1625.22(f)(1)(iii)(A). "Typically, an involuntary termination program is a standardized formula

or package of benefits that is available to two or more employees. . . ." Id. §

1625.22(f)(1)(iii)(B).

 "The terms 'class," 'unit,' or 'group' in section 7(f)(1)(H)(I) of the ADEA and 'job

classification or organizational unit' in section 7(f)(1)(H)(ii) of the ADEA refer to examples of

categories or groupings of employees affected by a program within an employer's particular

organizational structure." 29 C.F.R. § 1625.22(f)(3)(i)(A). Thus, "[w]hen identifying the scope

of the 'class, unit, or group,' and 'job classification or organization unit,' an employer should

consider its organizational structure and decision-making process." Id. § 1625(f)(3)(i)(B). The

"decisional unit" for purposes of section 7(f)(1)(H)(I) is "that portion of the employer's

organizational structure from which the employer chose the persons who would be offered

consideration for the signing of a waiver and those who would not be offered consideration for

the signing of a waiver." Id. When identifying the decisional unit for purposes of the statute, the

employer must act on a case-by-case basis. Id. § 1625(f)(3)(ii)(A).

 The OWBPA Disclosure in this case defined its decisional unit as follows:

 All Allstate R830 and R1500 Agents are eligible for the options described in the
 "Preparing For The Future" - R830 and R1500 Agent Information Booklet For the
 Group Reorganization Program ("Program Information Booklet"), except Montana

> and New Jersey Agents who will be covered in separate programs with different
> options available to them.  Please consult the Program Information Booklet for more
> detailed information about the Program.

(Heinz Decl., Ex. 74 ("Age Discrimination in Employment Waiver Information"), at ARI

003839.)  It went on to list ages and job titles for the various agents who were eligible and

selected and not eligible and not selected for the Program.  Plaintiffs now contend that Allstate

cannot show that its OWBPA Disclosure strictly complied with § 626(F)(1)(H) for four reasons.

The Court addresses each separately.

### (i) Voluntary and Involuntary Terminations

First, the EEOC regulations provide that, "[i]f an employer in its disclosure combines

information concerning both voluntary and involuntary terminations, the employer shall present

the information in a manner that distinguishes between involuntary and involuntary

terminations."  29 C.F.R. § 1625.22(f)(4)(iv).  According to Plaintiffs, however, Allstate did not

comply with this requirement, but rather, using a category of "eligible and selected," the

OWBPA disclosure lumped together (a) R830 and R1500 agents who were involuntarily

terminated as part of the Program; and (b) the West Virginia and the other R830 agents of

Allstate who were not terminated, but had the choice to remain in their contracts or voluntarily

participate in the Program.  Thus, Plaintiffs contend they could not discern how many R830 and

R1500 agents were not being terminated and what their ages were.

The Court agrees that Allstate's disclosure does not precisely follow the letter of this

requirement.  A review of the undisputed facts of record reveals that, of the more than 6,300

employee agents listed as "eligible and selected" for the Program, (a) fourteen of them were from

West Virginia and were offered incentives to sign the Release, but did not have their contracts

80

involuntarily terminated, and (b) four of them were R830 agents that did not have their contracts involuntarily terminated, but were also offered incentives to sign the Release.  In the OWBPA disclosure itself, Allstate did not indicate that these eighteen agents were not having their agreements terminated as of the date specified by the Program.

Allstate responds that the Informational Notice distributed to all agents as part of the Program specified the date by which Allstate terminated its employee agent contracts, and informed all agents that "[t]his does not apply to R830 or R1500 agents whose agreements were executed in the State of West Virginia on or after June 8, 1984."  (Zolner Decl., Ex. 68 ("Informational Notice"), at ARI 003845.)  This statement,  however, did not clearly inform Plaintiffs that these approximately eighteen agents were not having their contracts terminated. Primarily, the disclosure was in the Program Information Booklet, not in the OWBPA disclosure. Second, the disclosure was couched within a small footnote in small print.  Third, the statement to which the footnote was appended stated, "Your employment as an Allstate Agent and your R830 Agent Compensation Agreement or R1500 Agent Employment Agreement shall terminate no later than the close business on June 30, 2000 (or if in Delaware, no later than close of business on December 31, 2000)."  (Id.)  A plain reading of this text does not indicate to a reasonable reader that the West Virginian agents were *never* having their contracts terminated, only that their contracts were not terminating on the date specified above.  Moreover, it did not reference the four other agents who were exempted from termination.

In addition, Allstate's disclosure fails to separately list the ages for those agents whose contracts were not being involuntarily terminated.  The regulations state that the disclosure must provide "[t]he job titles and ages of all individuals eligible or selected for the program, and the

81

ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program."  29 C.F.R. § 1625.22(f)(1)(ii).  The regulations go on to note that "[i]nformation regarding ages should be broken down according to the age of each person eligible or selected for the program and each person not eligible or selected program."  Id. § 1625.22(f)(4)(ii).  As noted above, however, "[i]f an employer in its disclosure combines information concerning both voluntary and involuntary terminations, the employer shall present the information in a manner that distinguishes between voluntary and involuntary terminations." Id. § 1625.22(f)(4)(iv).  Undisputedly, Allstate failed to do so.[19]

Notwithstanding this failure, Allstate argues that its disclosures complied with the spirit of the regulations in that Plaintiffs were not deprived of any information needed to decide whether to sign the Release or to accurately assess whether they had a possibly valid discrimination claim.  This is particularly true in that the eighteen agents who were not terminated "represent an infinitesimal percentage of the total number of agents eligible for the

---

[19]  Allstate argues that these two provisions of the regulations should be read separately and that it was not required to separately list ages for voluntary and involuntary terminations. Rather, Allstate asserts that the regulations only require that ages be broken down "according to the age of each person eligible or selected for the program and each person not eligible or selected for the program."  29 C.F.R. § 1625(f)(4)(ii).  An "eligible and selected" employee is one "offered consideration for the signing of a waiver."  Id. § 1625(f)(3)(i)(B).  In further support of this proposition, Allstate cites Ricciardi v. Elec Data Sys. Corp., No. Civ.A.03-5285, 2007 WL 576323 (E.D. Pa. Feb. 20, 2007), which provided that "[t]he OWBPA requires a workforce listing to include the job titles and ages of all the individuals selected to receive consideration in exchange for executing a release."  Id. at *4.

Notably, however, unlike the Program here, the program at issue in Ricciardi did not involve any voluntary terminations.  Moreover, Allstate's argument completely disregards the regulations' clear dictate that "[i]f an employer in its disclosure combines information concerning both voluntary and involuntary terminations, the employer *shall present the information in a manner that distinguishes between voluntary and involuntary terminations.*" 29 C.F.R. § 1625.22(f)(4)(iv) (emphasis added).  "Information" would necessarily include age.

Program" and that fourteen of those agents were over the age of forty.  (Allstate's Resp. Opp'n Mot. Summ. J. 39–40.)

The Court must agree.  While the Supreme Court has made clear OWBPA is a "strict, unqualified statutory stricture on waivers" and that "[a]n employee 'may not waive' an ADEA claim unless the employer complies with the statute," Oubre, 522 U.S. at 426–27, the Supreme Court did not address the standard for determining whether an employer's attempted compliance meets the requirements of OWBPA.  Indeed, courts have noted that the disclosure required under § 626(f)(1)(H) is "so imprecise, it cannot possibly require strict application."  Ribble v. Kimberly-Clark Corp., No. Civ.A.09-643, 2012 WL 589252, at *5 (E.D. Wis. Feb. 22, 2012). "In light of the OWBPA's imprecise terms, some violations may be so technical as to be de minimis, and thus may not invalidate an otherwise valid release of ADEA claims."  Am. Airlines, Inc. v. Cardoz-Rodriguez, 133 F.3d 111, 118 n.6 (1st Cir. 1998). "Holding an employer strictly accountable for what might be a technical violation of these imprecise terms [such as 'job title,' 'job classification,' and 'organizational unit'], with no indication that this would facilitate the provisions purpose and might even hamper it, is untenable and would elevate form over substance."  Raczak v. Ameritech Corp., 103 F.3d 1257, 1260 (6th Cir. 1997); see also Adams v. Ameritech Servs., Inc., 231 F.3d 414, 431 (7th Cir. 2000) ("[A] literal approach to the statute could lead to hypertechnical requirements that have little to do with the purpose of the law.") Thus, "while an employer must comply with the requirements of the OWBPA in order to obtain a valid waiver, the imprecise language of the statute requires that compliance be measured in relation to the purpose underlying the act."  Ribble, 2012 WL 589252, at *5.

In this case, the OWBPA requirements as to employee ages and decisional units have a

defined purpose.  They are intended to "permit older workers," who might otherwise "have no information at all regarding the scope of the [employment termination] program or its eligibility criteria [,] . . . to determine whether the program gives rise to a valid claim under the ADEA."  S. Rep. No. 101-263, at 32 (1990), reprinted in part in 1990 U.S.C.C.A.N. 1509, 1537–38; see also Burlison v. McDonald's Corp., 455 F.3d 1242, 1247 (11th Cir. 2006) (holding that the purpose of this provision is "to ensure that older employees are provided with information necessary to evaluate any potential ADEA claims they may have before deciding to release them.").  Thus, in evaluating whether the employer's § 626(f)(1)(H) disclosure was sufficient, the relevant question is whether the employees were "provided with the age and job-title information that would be relevant if the employees were to bring an age discrimination claim arising out of their termination."  Adams v. Moore Bus. Forms, Inc., 224 F.3d 324, 329 (4th Cir. 2000).

Under the particular facts of this case, Allstate has complied with the spirit of this requirement.  Allstate informed Plaintiffs that over 6,300 agents were "eligible and selected" for the Program and gave the ages and job titles for each of these agents.  The undisputed evidence shows that many Plaintiffs easily understood that approximately ninety percent of those agents were over forty years of age, thus allowing the Plaintiffs to evaluate whether they had a potential age discrimination claim against Allstate.  The mere fact that eighteen agents (fourteen from West Virginia and four other R830 agents from other states) were not having their contracts involuntarily terminated, but were merely offered the same Program options, did not affect the calculus, as this group made up less than one percent of the total number of agents "eligible and selected" for the Program.  Moreover, as noted by Allstate, a disclosure of the fact that these agents were not having their contracts terminated would not have affected the analysis of whether

an ADEA claim was possible, given that fourteen of the eighteen agents were over forty years old.  To completely invalidate the Release based on such a de minimis violation of ambiguous OWBPA standards would elevate form over substance with no indication that stricter compliance would have further advanced OWBPA's purpose.[20]  Accordingly, the Court rejects this argument as a ground for invalidating the Release.

### (ii)    Montana Agents

The second error in Allstate's OWBPA disclosure identified by Plaintiffs is the alleged inaccurate statement that Allstate's Montana R830 and R1500 were not subject to the Program but were covered by a "separate program[]" with "different options."  Plaintiffs contend that from the start, Allstate wanted to terminate these agents as part of the Program and ultimately did so, rolling out the same Program in Montana in February 2000.  All Plaintiffs and non-employee Montana agents had until June 1, 2000 to sign the Release.  Although Allstate provided the Montana agents with an OWBPA disclosure showing all agents eligible and selected for the Program, it failed to provide all other agents, including Plaintiffs, with an updated disclosure reflecting the selection of its Montana agents for termination as part of the Program.  According to Plaintiffs, this failure constituted a violation of § 626(f)(1)(H), which, if condoned, would encourage employers seeking to get rid of older employees to intentionally delay announcing the

---

[20]  Plaintiffs argue that condoning Allstate's violation of 29 C.F.R. § 1625.22(f)(4)(iv) "would have serious public policy implications because it would give employers *carte blanche* to select for group termination only their oldest employees, but hide their discrimination by making employees under age 40 eligible to voluntarily participate in the program and by not distinguishing between the two groups in its OWBPA disclosure."  (Pls.' Reply Br. 10 n.7.)  The Court does not share Plaintiffs' concerns.  The ruling in this case is limited to the unique facts of this matter where Allstate improperly labeled only eighteen out of approximately 6,300 terminated agents.  Of those eighteen, only four were under the age of forty.  This mislabeling cannot be construed as an effort by Allstate to hide age discrimination.

group termination of many of its oldest employees until after announcing a first wave of

terminations.  In turn, this would prevent the employees who received the initial disclosure from

discerning if they had an age discrimination claim.

In response, Allstate argues that when it announced the Program in November 1999, it

was faced with uncertainty about the Program's application in Montana because of unique

circumstances brought about by Montana state laws.  As a result, in the November 16, 1999

ADEA Waiver Information sheet, Allstate stated that "[a]ll Allstate R830 and R1500 are eligible

for the options described in the 'Preparing for the Future'—R830 and R1500 Agent Information

Booklet For the Group Reorganization Program ('Program Information Booklet'), except

Montana and New Jersey Agents who will be covered in separate programs with different options

available to them."  (Heinz Decl., Ex. 74, ("Age Discrimination in Employment Waiver

Information"), at ARI 003839.)  Allstate subsequently offered its Montana agents a "separate

program" wherein they were given Montana-specific materials and did not become eligible until

February.  Although, according to Allstate, the Program as implemented in Montana was largely

the same as the Program announced in November 1999, the Montana Program had different

options.  For example, agents selecting the EA Option in Montana could only enter into the

R3001C contract, which was designed for corporations, whereas agents in the other states could

enter into either an R3001S contract as sole proprietors or the R3001C contract.  (Zolner Decl.,

Ex. 124 ("Preparing for the Future R830 and R1500 Agent Information Booklet for Montana

Agents"), at ARI 195088–ARI 195089; Zolner Decl., Ex. 65 ("Preparing for the Future R830 and

R1500 Agent Information Booklet").)  Moreover, Allstate asserts that it had no duty to re-

distribute the Montana ADEA Waiver Information to agents in other states who had been eligible

86

for the Program since November 1999.  Even if it had, the February 2000 Montana ADEA

Waiver Information did not provide new information that agents eligible for the Program did not

already have, since the original November 1999 disclosure form listed the ages of the twenty

Montana agents.  Of those, seventeen were over the age of forty and three were under the age of

forty.

   The parties now dispute whether the Montana program was a "separate program" or

simply a continuation of the same Program, whether the Montana agents were part of the same

decisional unit as the original terminated agents, and whether the original agents were entitled to

updated disclosure when the Montana agents were added to the Program.  This dispute may be

easily resolved by reference to the EEOC regulations.  Under 29 C.F.R. § 1625.22(f)(4)(vi):

> An involuntary termination program in a decisional unit may take place in successive
> increments over a period of time. Special rules apply to this situation. Specifically,
> information supplied with regard to the involuntary termination program should be
> cumulative, so that later terminees are provided ages and job titles or job categories,
> as appropriate, for all persons in the decisional unit at the beginning of the program
> and all persons terminated to date. ***There is no duty to supplement the information
> given to earlier terminees so long as the disclosure, at the time it is given, conforms
> to the requirements of this section.***

Id. (emphasis added).

   Parsing the language of this regulation, the Court finds that Allstate acted within the

confines of OWBPA.  Allstate structured its Program to take place in successive increments over

a period of time.  The original stage of the Program that affected approximately 6,200 agents was

announced in November 1999, required the affected agents sign the Release as of June 30, 2000,

and stated that their contracts would terminate as of that date.  Allstate fully informed those

agents not only as to the ages and job categories for that group, but also informed them as to the

ages and job categories of the Montana agents, whom Allstate defined as being subject to a "separate program."[21]  The Program that affected the Montana agents—whether characterized as a "separate program" or the second stage of the original Program—had separate release-signing dates and separate termination dates.  As such, the Montana agents were "later terminees" for purposes of the regulation.  Consistent with the mandates of this provision, the Montana agents received cumulative information, such that they learned of the ages and job titles/categories for all persons in the decisional unit at the beginning of the program and all persons terminated to date.  Also consistent with this provision, Allstate did not supplement the disclosure given to the earlier terminees.

Plaintiffs offer two arguments to undermine reliance on this regulation.  First, they note that 29 C.F.R. § 1625.22(f)(4)(vi) provides that there is no duty to supplement an earlier disclosure "so long as the disclosure, at the time it is given, conforms to the requirements of this section."  Plaintiffs now claim that the OWBPA Disclosure did not otherwise satisfy § 626(f)(1)(H), for the reasons set forth elsewhere in their brief.  The Court deals with those arguments separately and, to the extent there is a violation of § 626(f)(1)(H), the Release will be invalidated on those grounds.

Second, Plaintiffs devote substantial, but unwarranted, attention to the word "terminees." They contend that "the approximately 5,600 agents who were subject to the Program, but had not yet decided their fate as of February 2000, were not 'terminees'—they were still active Allstate

---

[21]  The parties strenuously dispute whether the Montana program was a "separate program" from the original program.  This, however, is a distinction without a difference.  The regulations did not require that the Montana agents be noted as being under any program in November 1999.  They only required that the ages and job titles of the Montana agents be listed and that Allstate indicate that they were not eligible and not selected for that program.

employees with at least four months to go before the Release-signing deadline.  Without complete and accurate information, these agents' waivers of ADEA claims were not knowing." (Pls.' Reply Supp. Summ. J. 13.)  This interpretation misunderstands the regulation.  As of February 2000, the remaining 5,600 agents were still "terminees" in that they were expressly informed that their employment contracts were to be terminated, irrespective of whether or not they signed the Release or what option they chose under the Program.  The mere fact that the terminations had not officially taken place as of February 2000 is irrelevant.  To interpret the word "terminee" as Plaintiffs suggest would result in an inconsistent meaning being given to the term "later terminees."  In other words, if "terminee" is defined as one already terminated, then the "later terminees" would have also had to have been terminated—albeit at a later time—prior to their ever receiving their requisite disclosures.  The more appropriate interpretation of this term is that once an employee is expressly told that their contract will be terminated under the Program, he/she becomes a "terminee" for purposes of OWBPA.

In short, the Court finds no error in the failure to disclose to the original participants in the Program, via an amended document, that the Montana agents later became eligible and selected for the Program, so long as the Montana agents were provided with a cumulative disclosure.  Accordingly, the Court declines to invalidate the Release on this ground.

### (iii)     *Exclusion of R3000 Agents from the List of Those Not Eligible or Selected*

Next, Plaintiffs argue that Allstate's OWBPA Disclosure did not identify the proper decisional unit for the Program because it excluded associate and R3000 agents from the list of those not eligible or selected.  Plaintiffs claim that the proper decisional unit for the Program was

Allstate Insurance Company's captive employee agency force, which included not only R830 and R1500 agents, but also associate and R3000 agents who had the same role, same job, and same managers.  Thus, according to Plaintiffs, Allstate's exclusion of associate and R3000 agents from its OWBPA Disclosure left Plaintiffs in the dark about the total number and ages of employee agents spared from termination.

As noted above, section 1625.22 explains that the terms "class," "unit," "group," "job classification," and "organizational unit" refer to examples of categories affected by a program within an employer's  particular organizational structure, and that the scope of such terms is "determined by examining the 'decisional unit' at issue."  29 C.F.R. § 1625.22(f)(1)(iii)(C).  The regulation goes on to state:

> When identifying the scope of the "class, unit, or group," and "job classification or organizational unit," an employer should consider its organizational structure and decision-making process.  A "decisional unit" is that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver.  The term "decisional unit" has been developed to reflect the process by which an employer chose certain employees for a program and ruled out others from that program.

Id. § 1625.22(f)(3)(i)(B).  Notably, "if an employer seeks to terminate employees by exclusively considering a particular portion or subgroup of its operations as a specific facility, then that subgroup or portion of the workforce at that facility will be considered the decision unit."  29 C.F.R. § 1625.22(f)(3)(ii)(D).  Nonetheless, "[e]ach information disclosure must be structured based upon the individual case, taking into account the corporate structure, the population of the decisional unit, and requirements of section 7(f)(1)(H) of the ADEA."  29 C.F.R. § 1625.22(f)(4)(vii)

90

Plaintiffs dispute the appropriate decisional unit in this case.  They vigorously contend that the appropriate unit was Allstate's entire captive employee agency force.  In turn, they assert that the R3000 and associate agents should have been included within this decisional unit and their information should have been disclosed in the OWBPA Disclosure.

The Court, however, does not find this argument persuasive.  As noted above, a "decisional unit" is that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver.  To accept Plaintiffs' argument that the decisional unit was the entire captive agent workforce, Allstate would have had to include all R3001 independent contractors who were part of the Exclusive Agency Program. Yet, as all parties agree, the Program sought to either convert the employee agents to an R3001 contract, allow them to sell their book of business, or otherwise take an enhanced severance in return for signing a Release.  To include agents who were already under R3001 contracts in the decisional unit would make little sense as such agents were already independent contractors and already had the right to sell their book of business.  Accordingly, the Court finds no evidentiary support for a finding that the appropriate decisional unit was anything other than what Allstate says it was—all employee agents of Allstate.

This finding then raises the question of whether R3000 and associate agents were appropriately part of the employee agent force and, thus, a part of the decisional unit for which Allstate was required to disclose information.  The Court finds that they were not.  Both the associate agents and the R3000 agents were employee agents whose contracts *automatically terminated* after eighteen months, after which they could apply to become R3001 independent

contractors.  They did not have the option to then enter into an R830 or R1500 contract.

Accordingly, they would not have been part of any decision as to which employees would be

terminated under the Program and offered the opportunity to become R3001 agents along with

the signing of a Release.  While Plaintiffs make much of the fact that the R3000 and associate

agents were part of the captive employee agent force, Plaintiffs disregard that such agents were

only temporary employees with no entitlement to any of the same long-term benefits available to

the R830 and R1500 contracts.  Section 626(f)(1)(H) applies only if a waiver is requested in

connection with an exit incentive or other employment termination program offered to a group or

class of employees the employer.  As the R3000 and associate agent contracts were subject to

automatic termination with no further action, there was no logical reason for them to be

considered for participation in the Program.  Therefore, the Court finds no basis for requiring that

Allstate reveal their ages and job titles in the OWBPA Disclosure.

### (iv)    Inclusion of New Jersey Agents

The final alleged failure in the OWBPA disclosure identified by Plaintiffs is Allstate's

inclusion of New Jersey agents in the Program decisional unit.  Specifically, the OWBPA

Disclosure aggregated the employee agents of Allstate New Jersey and Allstate Insurance

Company into one decisional unit.  According to Plaintiffs, nothing in OWBPA or its governing

regulations suggests that multiple corporations can be combined into one decisional unit for

disclosure purposes.  As Allstate New Jersey was a "separate company" from Allstate Insurance

Company and had a different compensation agreement with its employee agents than Allstate

Insurance Company did in the rest of the country, it was improper for Allstate to treat the New

Jersey agents as part of its decisional unit for the Program.  Because the New Jersey agents were

not subject to the Program and were, on average, several years older than the R830 and R1500 agents subject to the Program, their inclusion as part of the same decisional unit artificially reduced the apparent adverse impact on older agents.

Relying on Allstate's definition of the decisional unit—all R830 and R500 agents in the United States—the inclusion of the Allstate New Jersey Agents subject to those contracts was correct. At its core, the term "decisional unit" is intended to reflect the reality of "the process by which an employer chose certain employees for an exit incentive or termination program and ruled out others." 29 C.F.R. § 625.22(f)(3)(i)(B). Although the Court cannot always take an employer's description of decisional units at face value since it may be self-serving, Ribble v. Kimberly-Clark Corp., 717 F. Supp. 2d 820, 822 (E.D. Wis. 2010), "[t]he plain language of the regulations indicates the decision belongs to the employer." Ribble v. Kimberly-Clark Corp., No. Civ.A.09-643, 2012 WL 589252, at *12 (E.D. Wis. Feb. 22, 2012). "Assuming that the employer's identification of class, unit or group of employees from which the employees selected for separation were chosen reasonably describes an existing organizational unit within the company, the employer's designation should stand." Id. at *13. This is particularly true when a an employer chooses relevant and reasonable objective bases—such as geography, education level, job title, seniority, and current job focus—as opposed to "[s]quishy, manipulable, subjective criteria." Id. Here, the use of a nationwide geographic location together with the specific employment contracts constituted an objective description from which Allstate selected its employees for separation.

Plaintiffs, however, contend that Allstate New Jersey was a "separate company" and had "a different compensation arrangement" than Allstate Insurance Company did with the rest of the

93

country.  As such, they claim that it was improper for Allstate to treat the New Jersey agents as part of its decisional unit for the Program.  In support of this argument, they cite to the case of Pagliolo v. Guidant Corp., 483 F. Supp. 2d 847 (D. Minn. 2007) where the court found that "OWBPA requires employees to provide information about only those workers within a departing employee's 'decisional unit' and not job titles and ages of all employees nationwide who were terminated." Id. at 859.  In that case, the defendants were Guidant Corporation and several of its subsidiaries throughout the United States.  Id. at 851.  The Guidant employees worked at eighty-four different facilities; the plaintiffs worked at nine of those facilities.  Id.  A centralized senior management committee decided to implement cost reductions to meet the corporation's financial goals and concluded that all of its United States-businesses would participate in a reduction in force ("RIF").  Id.  Working with several human resource executives of the various businesses, the corporate vice president implemented the RIF on a company-wide basis and selected employees for the RIF at the local level based on job performance and criticality of jobs to the future success of the organization.  Id.  Ultimately, after considering more than 8,700 employees for the RIF, more than 700 were terminated and required to take advantage of certain options.  Id. at 852.  The OWBPA disclosure defined the decisional unit as including the company and its subsidiaries and affiliates that "are incorporated in the United States, and . . . are owned, directly or indirectly, at least 80% by the Company."  Id. at 858.

The court determined that there were six separate employers and each one should have been a separate decisional unit.  Id. at 859.  Further, it determined that the decisional unit should have been limited by facility, given that there were eighty-four domestic facilities.  Id.  It noted that because local vice presidents and managers played a key role in the termination decisions,

94

the various facilities constituted the appropriate decisional levels.  Id.

Pagliolo is distinguishable on several levels.  First, the RIF in that case involved six separate companies at eighty-four separate locations.  This case involves only a parent company and a single subsidiary, with all employee agents doing the same type of work.  Second, in Pagliolo, multiple local managers were used to make decisions regarding the RIF, whereas in the present case, the parties do not dispute that there was a single task force—the Channel Integration Team—who, along with the Board of Directors, formulated and implemented the Program.  The sole evidence of record reveals that Ed Liddy and Rick Cohen were responsible for ultimately making the termination decision and choosing to exclude Allstate New Jersey employees.[22]  Third, the employer in Pagliolo relied on a subjective assessment of job criticality and performance—criteria that were unique to each facility—when deciding whether employees within the defined decisional unit would be terminated.  Id. at 859.  In this case, however, Allstate simply designated all R830 and R1500 employee agents as the decisional group and terminated all of them—save for several clearly-defined, state-based groups—with no individual or subjective decisions being rendered.[23]  Fourth, it is notable that the district court in Pagliolo

_____

[22]  Plaintiffs cite to Allstate's Rule 30(b)(6) designee on OWBPA who testified that "New Jersey is a separate company, and they have a different compensation arrangement with their agents than we do in the rest of the country.  It's a different company" (Meehan Decl., Ex. 85, ("Rule 30(b)(6) Deposition of Barry Hutton, January 22, 2003"), 388:5–8.)  This testimony does not, however, undermine other testimony from Barry Hutton, the 30(b)(6) designee that Liddy and Cohen considered and included R830 and R1500 agents employed by both Allstate Insurance Company and Allstate New Jersey Corporation for the Program.  Plaintiffs do not cite to any other testimony that would identify any other executive that was responsible for making decisions for Allstate New Jersey.

[23]  For the same reason, the Court does not find Plaintiffs' reliance on Burlison v. McDonald's Corp., 455 F.3d 12142 (11th Cir. 2006) relevant.  In that case, the defendant's decisional unit was nationwide.  Id. at 1248.  The court noted that this was not representative of

recognized that there were substantial grounds for difference of opinion on its ruling regarding the decisional group and certified the matter for appeal to the Eighth Circuit. <u>Pagliolo v. Guidant Corp.</u>, No. Civ.A.06-943, 2007 WL 1567617, at *3 (D. Minn May 29, 2007). No appellate decision was ever rendered.

Finally, the Court must again return to the principle discussed earlier that this provision of OWBPA is so ambiguous that requiring hypertechnical compliance could undermine its fundamental purpose, which is to "permit older workers," who might otherwise "have no information at all regarding the scope of the [employment termination] program or its eligibility criteria [,] . . . to determine whether the program gives rise to a valid claim under the ADEA." S. Rep. No. 101-263, at 32 (1990). Undoubtedly, the inclusion of the New Jersey agents satisfied that purpose. Plaintiffs were clearly informed that all R830 and R1500 agents were considered for the Program and, with minimal exceptions discussed above, all of them (more than 6,000 agents) were being involuntarily terminated. Any reasonable person of average knowledge would recognize that the largest group of R830 and R1500 agents that were not being terminated (175 in total) came from a single state, thereby signaling that circumstances other than age were at play. Their inclusion neither created confusion about eligibility criteria nor undermined the fundamental purpose underlying the OWBPA disclosure.[24] Accordingly, the Court declines to

---

the pre-termination workforce; "[t]his is especially true here where *local* managers played key roles in the decision. Such a circumstance is not terribly far removed from comparing the average age of those fired from the Appellee's decisional unit to the average age of those fired from an entirely different corporation." <u>Id.</u> (emphasis in original). It concluded that "[b]ecause the local authorities controlled the decision, the localities accordingly constitute the appropriate scope of the informational requirements." <u>Id.</u>

[24] Plaintiffs contend that Allstate "seems to have recognized" that New Jersey agents should have been excluded from the decisional unit because Allstate "excluded from the

invalidate the Release on this ground.

### b.        The "Understandability" Requirement

Plaintiffs' second broad challenge to the OWBPA disclosure focuses on the

understandability requirement set forth at 29 U.S.C. § 626(f)(1)(i)(A).  This section states that:

"Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary

unless at a minimum . . . (A) the waiver is part of an agreement between the individual and the

employer that is written in a manner calculated to be understood by such individual, or by the

average individual eligible to participate."  Id.  The regulations go on to clarify as follows:

> (3) Waiver agreements must be drafted in plain language geared to the level of understanding of the individual party to the agreement or individuals eligible to participate. Employers should take into account such factors as the level of comprehension and education of typical participants.  Consideration of these factors usually will require the limitation or elimination of technical jargon and of long, complex sentences.

> (4) The waiver agreement must not have the effect of misleading, misinforming, or failing to inform participants and affected individuals. Any advantages or disadvantages described shall be presented without either exaggerating the benefits or minimizing the limitations.

29 C.F.R. § 1625.22(b)(3–4).

Plaintiffs' understandability challenge takes two forms.  First, Plaintiffs contend that the

"Release and Waiver" section is a complex, run-on sentence comprised of incomprehensible

legal jargon.  Second, they assert that the waiver purports both to prohibit an individual from

filing a challenge to the validity of the waiver and to interfere with the employees' rights to file a

---

decisional unit the captive employee agents of Allstate Canada," which is also a separate company.  (Pls.' Mem. Supp. Mot. Summ. J. 51.)  Canadian agents, however, are not part of the "nationwide" group of employee agents.  Moreover, they operate under CR830, CR1500, and CR150 Agreements, which are different than the R830 and R1500 contracts.  Finally, there is no evidence that they were ever considered for the Program and subject to involuntary termination.

charge with the EEOC.

### *(i)* *Complex Language*

Plaintiffs first contend that the "Release and Waiver" section of the Release is "largely comprised of one complex, run-on sentence of over 200 words."  (Pls.' Mem. Supp. Mot. Summ. J. 53.)  In addition, Plaintiffs argue that uses extensive legal jargon, which Allstate never explained or clarified to agents.  For this reason, Plaintiffs claim to not have fully understood the waiver language in the Release.

In interpreting any release, a court must begin with the release's plain language.  Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 289 (3d Cir. 2003).  As set forth above, the relevant Release language stated:

> In return for the consideration that I am receiving under the Program, I hereby release, waive, and forever discharge Allstate Insurance Company, its agents, parent, subsidiaries, affiliates, employees, officers, shareholders, successors, assigns, benefits plans, plan administrators, representatives, trustees and plan agents ("Allstate"), from any and all liability, actions, charges, causes of action, demands, damages, entitlements or claims for relief or remuneration of any kind whatsoever, whether known or unknown, or whether previously asserted or unasserted, stated or unstated, arising out of, connected with, or related to, my employment and/or the termination of my employment and my R830 or R1500 Agent Agreement with Allstate, or my transition to independent contractor status, including, but not limited to, all matters in law, in equity, in contract, or in tort, or pursuant to statute, including any claim for age or other types of discrimination prohibited under the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act, the Employee Retirement Income Security Act ("ERISA"), the Illinois Human Rights Act, and the West Virginia Human Rights Act as those acts have been amended, or any other federal, state, or local law or ordinance or the common law.  I further agree that if any claim is made in my behalf with respect to any matter released and waived above, I hereby waive any rights I may have with respect thereto and agree not to take any payments or other benefits from such claim.
> . . .

(Heinz Decl., Ex. 186 ("Release"), at ARI 00424 (emphasis added).)  Undoubtedly, the Release's

use of one long sentence, consisting of 203 words, is hardly the model of clarity and certainly is less preferable to the use of several shorter sentences.  Nevertheless, the Court finds nothing in that language deprives it of its requisite understandability.  The cited language is not buried at the bottom of a contract, but rather is highlighted for the employee.  Moreover, the provision says what it means—the employee releases Allstate from any type of suit or claim related to his/her employment and/or the termination of employment and conversion to independent contractor status.  The meaning was further clarified by the Informational Notice provided to each employee agent that stated:

> If you sign the Release, you will be waiving your rights to any claims or potential claims arising out of your employment, termination of employment or transition to independent contractor status which have been, or could be filed against Allstate, or its affiliates pursuant to any local state or federal law.  Therefore, we advise you to consult with an attorney before you elect one of the options available to you and release and waive any legal claims.

(Heinz Decl., Ex. 62 ("Informational Notice"), at ARI 003845.)  Thus, the mere fact that the Release was long and contained legalese does not, in and of itself, render it incomprehensible. See Ridinger v. Dow Jones & Co., Inc., 717 F. Supp. 2d 369, 274 (S.D.N.Y. 2010) ("While the Agreement is nevertheless scarcely a model of 'plain English' draftsmanship, it adequately conveys the limitations that Ridinger accepted in exchange for enhanced severance pay.  There also is no indication that any of the undertakings set forth in the Agreement were couched in terms too complicated for Ridinger to understand."), aff'd, 651 F.3d 309 (2d Cir. 2011).

Plaintiffs' efforts to inject confusion into this language are unavailing.  **First**, Plaintiffs cite to the testimony Allstate's own Rule 30(b)(6) designee, Barry Hutton, who stated as follows:

> Q.    I understand there's a lot of legal language here and you're not a lawyer.  I'd like to tell you—ask you to tell me what Allstate's understanding of the term

99

"charges" is.

A.   I don't know.  I think you said it best.  This paragraph is full of legal language.  I don't know what the term "charges" means.

Q.   You have no idea what the term "charges" mean?  What did Allstate intend the term to mean.

A.   I can tell you what Allstate intended the release for.

Q.   No.  I'm asking you what—Allstate used the term "charges" in the release, and I want to know what Allstate intended that term to mean.

A.   I don't know.

Q.   Have you ever asked anyone at Allstate what that term meant?

A.   No.

Q.   Did you understand I was going to ask you questions here today about the wording of the release, the meaning of terms in the release.

A.   I understood you were going to ask me questions about the release.

Q.   So I take it you wouldn't know what the term "claims for relief" meant as used in the release?

A.   This is loaded with legal language.  I can tell you what the company intended. I can tell you what we thought was released.

Q.   Let's take it a step at a time, if we can.  What is a charge?

A.   In what context?

Q.   In the context of this release.

A.   I don't know.  I just stated that.  I don't know the legal meaning of all these terms.
. . .
Q.   Do you know what a claim for remuneration is?

A.   Again, those are legal terms.  I don't know precisely what that means.

Q.     Do you know the difference between an action and a charge?

A.     No.

Q.     Do you know the difference between liability and action?

A.     Not precisely in the legal terms there.

Q.     Do you know the difference between a charge and a cause of action?

A.     No.

Q.     Do you know if Allstate understands the difference?

A.     I don't know how to answer that question.

Q.     You've never asked anyone, for example, what Allstate understood the term cause of action to mean?

A.     No, I don't believe I did.

Q.     Do you know whether, as used in this release, the term charges is intended to be something different than a claim for relief for remuneration of any kind whatsoever?

A.     No, I don't.

(Meehan Decl., Ex. 85 ("Rule 30(b)(6) Deposition of Barry Hutton, Jan. 22, 2003"),

498:21–501:21.)  Based on this testimony, Plaintiffs contend that if Allstate's corporate designee

could not understand the Release language, then the language was not written in a manner to be

understood by the average agent.

Hutton's understanding, while perhaps informative as to how the "average individual

eligible to participate" would have understood the Release, bears little on the analysis and is

certainly not controlling.  "OWBPA's understandability requirement is couched in objective

terms (the agreement between the parties must be 'written in a manner calculated to be

understood by such individual, or by the average individual eligible to participate.'[)]."  <u>Rupert v.</u>

<u>PPG Indus., Inc.</u>, Nos. Civ.A.07-705, 08-616, 2009 WL 596014, at *43 n.8 (W.D. Pa. Feb. 26,

2009) (quoting 29 U.S.C. § 626(f)(1)(A)).  Thus, "it is unnecessary to consider extrinsic evidence

as to how the Releases allegedly were in fact understood."[25]  <u>Id.</u>  Moreover, to the extent Hutton

could not legally define what certain terms meant does not mean that they were not

understandable.  Certainly, almost every release, waiver, disclaimer, etc. contains some legal

jargon that the average reader cannot parse or individually define.  That alone does not invalidate

a release.  Rather, the proper inquiry before the Court is whether the agreement as a whole can be

understood by the average individual eligible to participate.

The Plaintiffs, in this case, were all businesspeople.  They were agents for Allstate,

handling complicated insurance contracts for anywhere from nine to thirty-one years.  Many had

attended at least some college and some had business or professional degrees.  Allstate was not

dealing with individuals of below average intelligence or who were inexperienced with

contractual language.  Certainly, the language of the Release was not so complicated as to be not

understandable to the average signee.

**<u>Second</u>**, Plaintiffs cite to standardized "readability" tests, which conclude that the waiver

language was objectively "impossible to comprehend," "EXTREMELY difficult to read," and

---

[25]  Allstate contends that Plaintiffs each represented to Allstate when they entered into the
Release that: "I have read this Release, and I understand its legal and binding effect," and "I have
read and understand the Release, as well as the materials describing the Program, including the
Program Information Booklet."  (Zolner Decl., Ex. 69 ("Release"), at ARI 004101, ARI 004103.)
Moreover, Allstate notes that numerous Plaintiffs testified under oath—and contrary to their
current Declarations—that they understood what the Release said and meant.  For the same
reasons that the Court does not find Hutton's testimony to be dispositive, the Court does not
deem this evidence controlling.

not understandable by an average person with an education below graduate level.  Plaintiffs, however, obtained these results by entering the text from the waiver section of the Release in the free readability tools available at http://www.readabilityformulas.com/free-readability-formula-tests.php.  The website then uses seven "popular readability formulas" to produce results.  Given that Plaintiffs have produced no expert testimony to vouch for the reliability of this free online test,[26] the Court declines to consider this "evidence."

In short, the Court deems the language of the Release to be understandable as a whole and typical of an enforceable waiver.  As such, Plaintiff's argument in this regard is rejected.

> ### (ii)  Whether the Release Created the False Impression that Agents Could Not Challenge Its Validity or File EEOC Charges

Alternatively, Plaintiffs allege that the Release impinges on another of the OWBPA regulations.  Specifically, 29 U.S.C. § 626(f)(4) states, "[n]o waiver agreement may affect the [EEOC's] rights and responsibilities to enforce this chapter.  No waiver may be used to justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the [EEOC]."  This provision is clarified by the regulations, which state that "[n]o waiver agreement may include any provision prohibiting any individual from:  (i) Filing a charge or complaint, including a challenge to the validity of the waiver agreement, with EEOC, or (ii) Participating in any investigation or proceeding conducted by EEOC." 29 C.F.R. § 1625.22(i)(2).  Yet, according to Plaintiffs, this is exactly what the

---

[26]  The cases cited by Plaintiffs in support of the readability scores—United States. v. City of New York, 637 F. Supp. 2d 77, 122–23 (E.D.N.Y. 2009) and Foggs v. Block, No. Civ.A. 81-0365, 1983 U.S. Dist. LEXIS 18288, at *9–12 (D. Mass. Apr. 6, 1983)—involved expert testimony regarding readability, not a free online service.

Release purports to do since it to "release[s]" and "waive[s]" any "charges," without any

corresponding language informing employee agents of their non-waivable right to challenge the

validity of the Release as to ADEA claims and to bring EEOC charges.

The assessment of this argument is not a simple one in light of the somewhat conflicting

jurisprudence on the matter.  Allstate relies heavily on the Third Circuit decision in Wastak v.

Lehigh Valley Health Network, 342 F.3d 281, 284 (3d Cir. 2003).  In that matter, the release

stated that:

> Wastak . . . herein agrees that *[he will not] file a charge, complaint, lawsuit or other*
> *claim against [Lehigh Valley]* . . . for any acts, omissions or statements arising out
> of any aspect of Wastak's employment or termination of Wastak's employment with
> [Lehigh Valley].  By way of example only and without limiting the immediately
> preceding sentence, Wastak promises not to file a claim or lawsuit under Title VII of
> the Civil Rights Act of 1964, the Age Discrimination in Employment Act (29 U.S.C.
> § 621), Section 1981 of the Civil Rights Act of 1866, the Equal Pay Act of 1963, the
> Rehabilitation Act of 1973 and Civil Rights Act of 1991, Pennsylvania Human
> Relations Act, Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*,
> and any other state or federal equal employment opportunity law or statute. In
> addition, Wastak agrees not to file any cause of action or claim relating to the breach
> of an oral or written contract, misrepresentation, defamation, interference with
> contract and intentional or negligent infliction of emotional distress, and any other
> common law claims and all claims for counsel fees and costs.

Id. at 284 (emphasis added).  The Third Circuit found that the release did not violate §

626(f)(4)'s dictates, reasoning that "[a]t most, the statutory language [of § 626(f)(4)] can be read

to mean only that a provision that purports to, for example, alter the EEOC's rights to pursue and

investigate a claim that is filed, is unenforceable."  Id. at 289.  It went on to find that "the statute

is clear that any attempt by an employer to *enforce* a contractual provision prohibiting an

employee from filing a charge or participating in an EEOC investigation would be ineffectual,

but there is no indication that the mere presence of that contractual language would void an

otherwise knowing and voluntary waiver." Id. at 290 (emphasis in original). Relying on that interpretation of the statute, the Third Circuit remarked that "[a]lthough the [plaintiff] is clearly correct to the extent it asserts that the agreement purports to deny [the employee] a right he actually had, it has not offered a convincing rationale as to how that misstatement renders the agreement not understandable." Id. at 292.

This Court does not deem Wastak controlling, however, as it was based on an interpretation of the statute without the benefit of the subsequently enacted 29 C.F.R. § 162.22(i)(2). Indeed, the Third Circuit acknowledged that that regulation would alter its statutory interpretation and would clearly preclude the inclusion of provisions that prohibit resort to the administrative process. Id. at 293 n.6 (citing 29 C.F.R. § 1625.22(i)(2) ("No waiver agreement may include any provision prohibiting any individual from . . . [f]iling a charge or complaint, including a challenge to the validity of the waiver agreement, with [the] EEOC.")). The Court further opined that "[t]he presence of such a prohibition in a waiver agreement that is subject to this regulation could certainly lead a court to find, under proper circumstances, that the waiver 'ha[d] the effect of misleading, misinforming, or failing to inform' the plaintiff, 29 C.F.R. § 1625.22(b)(4), thus rendering the waiver not 'knowing and voluntary,' and, therefore, invalid." Wastak, 342 F.3d at 293 n.6.

More recent district court decisions have dealt with the impact of this newer regulation on the issue of whether the inclusion of a provision precluding an individual from challenging the validity of the waiver runs afoul of the understandability requirement. In Rupert v. PPG Industries, Inc., Nos. Civ.A.07-70, 08-616, 2009 WL 596014 (W.D. Pa. Feb. 26, 2009), the district court construed the aforementioned regulations and observed that a release written in a

manner that reasonably could be understood to bar a challenge to its validity fails to satisfy the

understandability requirement of the OWBPA and would be ineffective as a waiver of ADEA

claims.  Id. at *49.  In reaching this conclusion, the court considered the agency commentary

accompanying 29 C.F.R. § 1625.23 and concluded that two comments published in the Federal

Register controlled the interpretation.  Id. at *47.  The first comment stated that:

> Employers therefore must take precautions in drafting covenants not to sue so that
> employees understand that the covenants do not affect their right to test the knowing
> and voluntary nature of the agreements in court under the OWBPA. By investing,
> [']court[s] of competent jurisdiction['] with the authority to resolve [']any dispute
> that may arise over . . . the validity of a waiver,['] Congress manifested in the plain
> language of the statute its intention to permit an employee who signed an ADEA
> waiver, to sue his or her employer upon the belief that the waiver did not comply
> with the OWBPA. *Thus, any provision in a waiver agreement that would cause an
> employee to believe that he or she could not seek a judicial determination of the
> validity of the waiver misrepresents the rights and obligations of the parties to the
> agreement. Such a misrepresentation conflicts with the OWBPA requirement that a
> valid waiver agreement must be [']written in a manner calculated to be
> understood['] by the employee [']or by the average individual eligible to
> participate.['] 29 U.S.C. 626(f)(1) (A).[']*

Id.  (quoting Waiver of Rights and Claims: Tender Back of Consideration, 65 Fed. Reg. 77438,

77443-44 (Dec. 11, 2000) (emphasis in original)).  The second comment provided:

> The final regulation does not address the question of severability because the NPRM
> did not present the issue, and the record on it is very limited. The Commission
> believes, however, that contrary to the position advanced by the employer, there is
> a strong argument that inclusion of an invalid provision in an ADEA waiver
> agreement—such as a tender back clause or a damages provision—should invalidate
> the entire waiver. Under this point of view, inclusion of such provisions in a waiver
> would make the agreement misleading in a material sense and thus violate the
> OWBPA's requirement that waivers be calculated to be understandable by the
> individual or by the average individual eligible to participate.

Id. at *47 (quoting Waiver of Rights and Claims: Tender Back of Consideration, 65 Fed. Reg. at

77441).  The court reasoned that these comments supported the invalidation of the entire

agreement rather than just the specific provisions that purported to bar EEOC claims.

The Rupert court then turned to the language of the specific release at issue, which stated

that:

> Employee . . . unconditionally *releases* [Defendant] from *any and all claims and demands of any kind*, known or unknown, which he/she may have against [Defendant] as of the date Employee signs this Agreement, and any claims relating to his/her employment as of his/her Separation Date.  This release includes a waiver (a giving up) of any legal rights or claims Employee may have or may have had *based upon any federal, state* or local statutes or ordinances, *specifically including but not limited to* . . . the [ADEA], all as amended, and any other claim or cause of action under federal, state or local statutory or common law. . . . . All such claims (including claims for related attorneys' fees and any litigation and court costs) are forever barred by this Agreement.

Id. at *41 (emphasis in original).  "Significantly," in addition to the broad claims release

provision, the releases also contained, in the next subparagraph, a separate covenant not to sue

stating that "Employee agrees never to file a lawsuit or become a member of a class asserting any

claims that are released by Employee in this Agreement."  Id.  As such, the court remarked that,

> The risk of misunderstanding by the average eligible participant that the Release language operates to bar a challenge under the OWBPA to the legal effectiveness of the Release is heightened in the instant case, where the scope of the covenant not to sue in paragraph 6(b) extends to "any claims that are released by Employee in this Agreement", which necessarily requires reference to the broad claims release language in paragraph 6(a) that applies to "any and all claims and demands of any kind,' including but not limited to 'any legal rights or claims Employee may have or may have had based upon . . .  the [ADEA] . . .  as amended."

Id. at *42.  It thus concluded that, "the challenging of the effectiveness under the OWBPA of the

Releases and the bringing of an ADEA claim lawsuit are, or reasonably could have been

understood under the circumstances by the average eligible participant as being, intertwined and

interconnected as a practical matter and included within the scope of the paragraph 6(a) broad

affirmative claims release, of the paragraph 6(b) covenant not to sue, and/or of both in their

combination." Id.  Hence, "reading in conjunction the paragraph 6(a) claims release and the

paragraph 6(b) covenant not to sue, the average eligible participant reasonably could have

understood that the Release barred a challenge to the effectiveness or enforceability under the

OWBPA of his or her Release."  Id.

The same issue was reached in Bogacz v. MTD Products, Inc., 694 F. Supp. 2d 400

(W.D. Pa. 2010).  The release in that matter stated that the plaintiff must, among other things:

> waive, release, and promise never to assert any or all claims that you have or might
> have against the Company, it's [sic] predecessors, parent corporations, subsidiaries,
> affiliates, related entities, officers, directors, shareholders, agents, attorneys,
> employees, successors, or assigns, arising from or related to your employment and/or
> the termination of your employment.  These claims include, but are not limited to,
> any and all claims, causes of action, suits, claims for attorneys' fees, damages or
> demands; all claims of discrimination, on any basis, including, without limitation,
> claims of race, sex, age, ancestry, national origin, religion, and/or disability
> discrimination; any and all claims arising under federal, state and/or local statutory,
> or common law, such as, but not limited to, Title VII of the Civil Rights Act as
> amended, including the amendments to the Civil Rights Act of 1991, the Americans
> with Disabilities Act, the Age Discrimination in Employment Act of 1967, the Older
> Workers Benefit Protection Act, Ohio's laws against discrimination; any and all
> claims arising under any other state and/or local anti-discrimination statute and the
> law of contract and tort; and any and all claims, demands and causes of action
> including, but not limited to, claims of breach of public policy, unjust discharge or
> breach of contract.  You further waive, release, and promise never to assert any such
> claims, even if you presently believe that you have no such claims.

Id. at 402–03.  Following the reasoning of Rupert and acknowledging the inapplicability of

Wastak, the Bogacz court remarked that "[t]he first sentence of [the waiver provision] reads very

broadly and extends to any claims that 'you have or might have against the Company . . . arising

from or related to your employment and/or the termination of your employment.'"  Id. at 411.  It

noted that [t]he Release obviously related to the termination of plaintiff's employment.  This first

sentence taken together with the later clause proposing to bar 'any and all claims arising under

federal, state and/or local statutory, or common law, such as . . . . the Age discrimination in

Employment Act of 1967, [and] the Older Workers Benefit Protection Act' could cause

confusion about whether an enforceability action was barred." Id.  The court went on to

conclude that:

> Since the only practical avenue available to plaintiffs when challenging the validity
> of a release as ineffective under the OWBPA is to file a lawsuit against the employer
> asserting age discrimination claims and in that context to assert their OWBPA
> compliance challenge, the bringing of any claims under the ADEA, as amended by
> the OWBPA, could reasonably have been understood to be intertwined with a
> challenge to the validity of a waiver.  It would be reasonable to conclude that the
> Release barred a challenge to the effectiveness of plaintiff's Release.  Under those
> circumstances, the Release is written in a manner calculated to be understood by the
> individual employee as barring a challenge to the validity of the Release.   As such,
> the Release is invalid and summary judgment cannot be granted in favor of
> defendants.

Id. (footnote omitted).  Although the court acknowledged that the plaintiff in that case had

"acquired a belief that the release was invalid from an individual at the EEOC, determined to

sign the agreement despite this belief, and planned to sue defendants," the court deemed that to

be of no moment since OWBPA "does [not] contain an exception to the eight statutory

requirements.  A release must meet the minimum statutory requirements to be a valid waiver of

ADEA rights." Id. at 408–09.

By contrast, the district court, in Ribble v. Kimberly-Clark Corp., No. Civ.A.09-643,

2012 WL 589252 (E.D. Wis. Feb. 22, 2012), found that a broad release, while using the word

"charges," did not violate OWBPA's prohibitions.  The plaintiff in that matter argued that the

release language equated to an improper attempt to bar the filing of EEOC charges.  Id. at *6.

The court remarked that "unlike the other information § 626(f)(1) requires the employer to

convey to the employee, there is no requirement that the ban against waivers of EEOC charges be

set forth in the waiver agreement."  Id.  at *7.  It went on to note that "simply because the language could have been clearer [regarding the right to pursue a charge with the EEOC] does not mean that the language impermissibly *prohibited* a signing employee from later filing a charge with the EEOC.  Indeed, many of the plaintiffs in this action both signed the waivers with the disputed language and still filed EEOC charges; over seventy-five percent of plaintiffs signed waivers and later filed EEOC charges."  Id. (emphasis in original).  The court commented that "[t]his fact demonstrates that even many plaintiffs themselves did not believe the waiver prohibited them from filing a charge with the EEOC.  It also undermines any argument plaintiffs may have that [defendant's] waiver language was not written in such a manner calculated to be understood by the average individual eligible to participate."  Id.  In fact, the waiver included the language, "the above release . . . excludes any other claim which cannot be released by private agreement"—"[n]othing in the regulations or controlling law requires a separation agreement to list, by name, each of the non-waivable claims."  Id. at *8.

In the present case, the Release language is not quite akin to Rupert and Bogacz.  The releases in those cases contained both releases of claims *and* covenants not to sue.[27]  The Release at issue contained simply a release of claims.  On the other hand, the language of the Release is distinguishable from Ribble's release, which contained a specific statement that the above release excluded any other claim which could not be released by private agreement.  The question

---

[27]  "A Covenant not to sue is a formal agreement or promise 'in which a party having a right of action agrees not to assert that right in litigation.'"  Ricciardi v. Elec. Data Sys. Corp., No. 03–5285, 2007 WL 576323, at * 5 n.3 (E.D. Pa. Feb. 20, 2007) (quoting Black's Law Dictionary 369 (7th ed.1999)).  "Black's Law Dictionary defines 'release' as 'the act of giving up a right or claim to the person against whom it could have been enforced.'"  Id. (quoting Black's Law Dictionary 1202 (7th ed.1999)).

therefore turns on whether the words "actions" and "charges" would mislead an employee into believing that he or she was waiving his/her rights to challenge the validity of the waiver or to file a charge with the EEOC.

Upon closer scrutiny, the Court does not find such language misleading for several reasons.  First, while the term "charges" standing alone could potentially be read as meaning administrative charges, when taken in context of the phrase "actions, charges, causes of action, demands, damages, entitlements or claims for relief or remuneration of any kind," it is easily understood, particularly by businesspeople in Plaintiffs' positions, to constitute legal charges filed in a court of law.  Second, the Release goes on to note that these "actions, charges, etc." include "all matters in law, in equity, in contract, or in tort, or pursuant to statute, including [under the ADEA, Title VII, the ADA, ERISA and several state statutes], or any other federal, state, or local law or ordinance or the common law."  No mention is made of any prohibition on filing any administrative action, nor does the Release contain language similar to that found problematic in Bogacz barring claims under the Older Workers Benefit Protection Act—which is the logical means by which a plaintiff would bring a challenge to the validity of a Release.  Third, the prohibited claims are those "arising out of, connected with, or related to, my employment and/or the termination of my employment and my R830 or R1500 Agent Agreement with Allstate, or my transition to independent contractor status."  The Release does not purport to bar claims challenging the validity of the Release itself.  Fourth, unlike the language in Rupert, the Release at issue here does not contain an covenant not to sue, thereby eliminating the heightened "risk of misunderstanding" identified by the Rupert court.  Finally, the proper standard of review for such language is whether the "average individual eligible to participate"

would have misunderstood or been misled by the language. While this is an objective standard, the Court would be remiss to disregard the fact that all thirty Plaintiffs in this case filed an EEOC charge—eight of whom filed prior to signing the Release—and Allstate did not interfere with or retaliate against any such Plaintiffs.[28]

In sum, OWBPA contains no requirement that the ban against waivers of EEOC charges or challenges to the validity of the Release be expressly set forth in the waiver agreement. Ribble, 2012 WL 589252 at *7. The simple fact that the language of the Release at issue could have been made clearer by eliminating the single word "charges" does not render the entire Release misleading regarding the right to bring EEOC charges or claims challenging the validity of the Release. Overall, the Court finds that the average individual eligible to participate in this Release would not have been misled or misinformed as to the right to pursue these various causes of action. Therefore, the Court denies Plaintiffs Motion on this ground.

### c.    The Consideration Requirement

OWBPA states that a release is valid only if "the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual is already entitled." 29 U.S.C. § 626(f)(1)(D). As defined by the corresponding regulations, "'[c]onsideration in addition' means anything of value in addition to that to which the individual is already entitled in the absence of a waiver." 29 C.F.R. § 1625.22(d)(2). Plaintiffs now

---

[28] Plaintiffs cite to evidence that they originally believed that the Release barred their EEOC claims. Moreover, they argue that some of the eight Plaintiffs that filed their charges prior to signing the Release did so out of a concern that they would not be able to do so after they had signed. Finally, they note that one Plaintiff actually withdrew her EEOC charge out of a belief that she was not permitted to bring it and then subsequently re-filed it. Ultimately, however, the fact remains that all thirty Plaintiffs filed an EEOC charge suggesting that the average individual subject to the Release was not misled by the language.

contend that they did not receive the requisite consideration for several reasons. First, they assert that they were not at-will employees and, therefore were entitled to continued commissions and benefits without having to sign a release. Second, even if they were at-will employees, a reasonable factfinder could conclude that nothing received by those who signed the Release exceeded that to which they were already entitled. With some hesitation, the Court must disagree.[29]

### (i)     Whether Plaintiffs Were Entitled to Continued Employment and Employment Benefits

Plaintiffs first aver that Allstate breached their R830 and R1500 agreements when it involuntarily terminated them as part of the Program. They reason that the R830 and R1500 contracts allow only for termination for cause and after an employee agent has had the opportunity to cure the unsatisfactory work performance and have any involuntary termination reviewed by an Agent Review Board. Moreover, Plaintiffs argue that they provided extra consideration to Allstate—in the form of personal investments in the business, a preclusion on selling other insurance products, and covering office expenses—that was more valuable than anything offered through the Program and prevented them from being terminated at will.

This argument is mistaken on several points. First, the R830 and R1500, by their express terms, were at-will contracts. The R1500 Agreement contained the following termination provision:

> Your employment and this Agreement will automatically terminate upon your death, retirement, loss or relinquishment of our insurance agent license, or failure to return

---

[29] Plaintiffs do not move for summary judgment on this ground. Rather, they simply argue that Allstate has failed to prove that it provided adequate consideration, as it is required to do under OWBPA, and thus cannot succeed on its Motion for Summary Judgment.

to work upon expiration of a leave of absence.  In addition, ***your employment and this Agreement may be terminated at will by either party, subject only to such limitations and restrictions as may be imposed by law, and in accordance with Company rules and procedures.***  Termination shall be effective upon giving notice of termination orally or in writing, delivered personally or mailed to the last known address of the other.  Upon termination, you agree not to act or represent yourself in any way as an employee, agent or representative of the Company, except as otherwise agreed to in writing by you and the Company.

(Heinz Decl., Ex. 11 ("R1500 Agreement"), at 3 ¶ 11 (emphasis added).)  The R1500 contract does not require any review procedures upon termination.[30]  The R830 Agreement stated as follows:

This agreement will automatically terminate upon your death.  ***Either you or Allstate have the right to terminate this agreement upon mailing to the other, at his or its last known address, written notice of termination.***  After such termination you agree not to act or represent yourself in any way as our agent.  The Company will not terminate your employment because of unsatisfactory work unless you have been notified that your work is unsatisfactory and that your job is in jeopardy and unless you have been given a reasonable opportunity to bring your performance up to satisfactory standards. . . . ***In no event shall an employee be released for any reason without the following review and approval procedure having been adhered to*** . . .

(Heinz Decl., Ex. 10 ("R830 Agreement"), at Part Four ¶ XI (emphasis added).)

Undisputedly, employees who signed the R830 contract had the right to have any involuntary termination reviewed by the Agent Review Board.  Notably, however, courts have repeatedly interpreted this contract to provide only for at-will employment.  Hudson v. Allstate Ins. Co., 93 F.3d 296, 300 (7th Cir. 1996) (interpreting Allstate's R830 contract to conclude that

---

[30]  Plaintiffs reference the R1500 Manual which states that Allstate "will not terminate the agent's employment because of unsatisfactory work unless the agent has been notified that his/her work is unsatisfactory and that his/her job is in jeopardy and unless he/she has been given a reasonable opportunity to bring his or her performance up to satisfactory standards."  (Meehan Decl., Ex. 56 ("R1500 Manual"), at PCO7857.)  Notably, however, none of the Plaintiffs here were terminated because of unsatisfactory work.  Rather, they were terminated under a group termination program.

"[w]e find nothing in the contract that limits Allstate's underlying right to terminate for any reason at all except the unsatisfactory performance ground listed at the beginning of Section XI. The fact that the agreement goes out of its way to specify that notice is not required if the basis of termination is a criminal or dishonest act (as opposed to any myriad of other reasons that do not amount to 'unsatisfactory work,' but are neither criminal nor dishonest) cannot be transformed into a general rule requiring Allstate to demonstrate that its reason for termination qualified as 'good cause' in all cases"); Gonzalez v. Allstate Ins. Co., No. 87-6101, 862 F.2d 877 (11th Cir. November 7, 1988) (unpublished order) (same); Stack v. Allstate Ins. Co., 606 F. Supp. 472, 477 (S.D. Ind. 1985) (finding that R830 contract was at-will contract); Almada v. Allstate Ins. Co., 153 F. Supp. 2d 1108, 1113 (D. Ariz. 2000) (holding that R830 was at-will contract terminable for any reason), aff'd, 285 F.3d 798 (9th Cir. 2002).[31]

More importantly, even if the R830 and R1500 contracts were not at-will contracts, that fact would not lend support to Plaintiffs' consideration argument. Had the Program and Release purported to offer Plaintiffs a return to their R830 and R1500 contracts in exchange for signing the Release, Plaintiffs' claims may have held more weight. The Program and Release, however, did not offer such an option. Rather, the Program offered Plaintiffs continued employment under an R3001 contract (among other options) in exchange for signing the Release. Plaintiffs' contention that the termination of R830 and R1500 contracts was unlawful because Allstate did

---

[31] Plaintiffs rely on the Illinois Appellate Court case of Linker v. Allstate Ins. Co., 794 N.E.2d 945 (Ill. App. Ct. 2003), which construed the language of the R830 contract that provided for internal review and found that the contract was not at will. Id. at 953–57. By its own admission, however, Linker stood against the weight of authority at the time it was decided. Id. at 954. The Court notes only one other case that has reached a similar conclusion—Morales v. Allstate Insurance Co., No. Civ.A.95-02308, 1995 WL 616654 (N.D. Cal. Oct.13, 1995).

not comply with certain notification and review procedures does not bear on whether adequate

consideration was given in return for the Release.  Rather, it gives rise to a separate breach of

contract claim regarding whether Allstate complied with its obligation under the R830 or R1500

contracts prior to the termination.[32]

---

[32]  Plaintiffs' claim that they provided extra consideration to Allstate, precluding them
from being terminated at will is mistaken.  The cases cited by Plaintiff in support deal with a
plaintiff's efforts to rebut the legal presumption that, absent an express contract setting forth the
length of employment, employment is deemed to be terminable at will—not with the situation, as
in this case, where there is a contract that expressly states that employment is terminable at any
time.  See Bravaman v. Bassett Furniture Indus., Inc., 552 F.2d 90, 92–93 (3d Cir. 1977) (holding
that furniture manufacturers' sales representative, in breach of contract action, adduced evidence
sufficient to support jury finding either that all parties understood that employment contract was
not terminable at will or that there was no express understanding, but that representative gave
manufacturers such additional consideration as made duration of employment agreement a
reasonable period of time); McNulty v. Borden, Inc., 474 F. Supp. 1111, 1119 (E.D. Pa. 1979)
("Under Pennsylvania law an employment contract which contains no specific provision
respecting duration or termination is presumed to be terminable at will by either party for any or
no reason, unless the party asserting a contrary construction can offer evidence to rebut the
presumption. The plaintiff may overcome this presumption by showing the intent of the parties
that the contract last for some definite period of time or for a reasonable time, or by showing that
the plaintiff-employee gave the defendant-employer consideration in addition to the employee's
normal services, such as sacrificing other employment opportunities."); Littell v. Evening Star
Newspaper Co., 120 F.2d 36, 36–37 (D.C. Cir. 1941) ("The rule is that unless the parties reveal
an intent to enter into a contract for permanent employment, it will be regarded as terminable.
Where the intent is not clearly revealed by the express terms of the agreement, the courts will
look to evidence of surrounding circumstances to determine what was in the minds of the
contracting parties.  Thus, when one who enters into a contract of employment, promises not only
that he will give his services but also additional consideration—as, for example, by making an
investment in the business, by resigning from government service, by giving up his own
business, or by relinquishing an acknowledged right to recover for injury which he has
suffered—such facts may be sufficient, in each case, to show the intent of the parties to enter into
a contract for permanent employment.").

> ### (ii)    *Whether Allstate Provided Plaintiffs With Any Consideration in Addition to That to Which They Were Already Entitled*

Even assuming that they were not entitled to continued employment and benefits,

Plaintiffs argue that the Release still fails for lack of consideration because Allstate did not give

Plaintiffs anything of value beyond that to which they were otherwise entitled in exchange for

signing the Release.  Allstate, on the other hand, asserts that it offered the following to signing

employee agents:

- **EA Option:** Seventeen Plaintiffs elected the EA Option and received a conversion bonus of at least $5,000, and a new, transferable economic interest in the books of business employee agents had produced and serviced as R830 and R1500 agents.  Under the Program, after two years, the agent could then sell that economic interest to an Allstate-approved buyer and retain the sale proceeds.  Allstate also forgave any outstanding OEA advance that the agent owed Allstate. . . .

- **Sale Option:** Twelve Plaintiffs elected the Sale Option and received a conversion bonus of at least $5,000, and a new, transferable economic interest in the books of business employee agents had produced and serviced as R830 and R1500 agents after serving as an EA for only thirty days.  The economic interest then became immediately transferable to an Allstate-approved buyer, with the agent retaining the sale proceeds. Allstate also forgave any outstanding OEA advance that the agent owed Allstate. . . .

- **Enhanced Severance Option:** Two Plaintiffs . . . chose the Enhanced Severance Option and received enhanced severance payments of $44,462 and $68,314 respectively. . . . Allstate also forgave any outstanding OEA advance that the agent owed Allstate. . . . Had they not entered into the Release, they would have received $9,798.86 and $11,823.68 in base severance payments. . . .

(Allstate's Mem. Supp. Summ. J. 17–18.)  Plaintiffs dispute that any of these items suffice as

consideration for the Release.

<u>**First**</u>, Plaintiffs challenge Allstate's assertion that employee agents subject to the

117

Program were given the option of entering the EA Program in return for signing the Release. Plaintiffs contend that the ability to enter the EA Program was not any special consideration[33] because (a) employee agents had the ability to voluntarily convert to the R3001 contract without signing a release since the time it was introduced at Allstate; (b) Allstate had encouraged Plaintiffs and other employee agents to convert without a release for years; and (c) as of mid-1998, Allstate eliminated the substantive production and performance requirements to convert and did not reject any employee agents' request for conversion.  According to Plaintiffs, Allstate simply took away employee agents' ability to convert without signing a release, then purported to offer it back as "consideration."  Such a promise of continued employment at Allstate was illusory because they were at-will employees under the R3001, meaning they could be fired at any time after signing the Release.

Allstate responds that the test is not whether Plaintiffs may have received greater consideration by converting to the EA Program at an earlier time, but whether, at the time of termination, they were *entitled* to conversion without signing the Release.  In support they rely on the case of Davis v. Eastman Kodak Co., No. Civ.A.04-6098, 2007 WL 952042 (S.D.N.Y. Mar. 29, 2007), wherein the court held that it was within the employer's discretion to modify the termination assistance plan to require a release before dispensing severance benefits, even though

---

[33]   The Court gives little credence to Plaintiffs' reliance on the Rule 30(b)(6) testimony of Barry Hutton.  Plaintiffs contend that Hutton admitted that the ability to convert to the EA Program was not "any special consideration."  This is a mischaracterization of his testimony. Mr. Hutton was asked why Allstate did not require a release in 1998 when it eliminated the production requirement as part of the application to convert.  In response, he stated that Allstate was not then providing "any special consideration."  (Heinz Decl., Ex. 181 ("Rule 30(b)(6) Deposition Testimony of Barry Hutton, Jan. 20, 2003"), 382:5–18.)  Mr. Hutton was not, at that time, discussing the terms of the Program or Release now at issue.

it had previously given those benefits without requiring a release.  Id. at *10.  The court reasoned that, "[s]imply put, at the time of their separation from Kodak, plaintiffs were no longer entitled to the severance benefits that were in effect at the time they were hired and the fact that during their employment [defendant] implemented a release requirement does not establish that they received inadequate consideration for that release."  Id.

In the present case, the record reveals that up until the time of the Program announcement, employee agents had the right to convert to the EA Program without signing a Release.[34]  In November 1999, however, via a move concurrent with the announcement of the Program, Allstate declined to allow any additional conversions without execution of a Release, meaning that Allstate took something away from the employee agents only to immediately offer it back so long as a release was executed.  At first blush, this action appears to be expressly prohibited under 29 C.F.R. § 1625.22(d)(3), which states that "[i]f a benefit or other thing of value was eliminated in contravention of law or contract, express or implied, the subsequent offer of such benefit or thing of value in connection with a waiver will not constitute 'consideration' for purposes of 7(f)(1)(A) of the ADEA."  29 C.F.R. § 1625.22(d)(3).  On closer inspection, however, the record is devoid of evidence demonstrating that the right to convert to the EA

---

[34]  Allstate makes much of the fact that during their employment, employee agents could *apply* to convert to the EA Program, but Allstate reserved sole discretion to approve or deny such an application.  This "application" process, however, appears to be nothing more than a mere formality.  As of June 1998, Allstate eliminated minimum production levels as one of the requirements for conversion, and simply required employee agents to have an acceptable updated business plan, to pay back any OEA or OEF advances, to be current on any outstanding amounts owed to outside service providers, and to complete the seven-step conversion process outlined in the EA Conversion Guide.  (Meehan Decl., Ex. 117 ("Field Communication Package, March 26–27, 1998"), at ARI 187891.)  These were largely perfunctory requirements.  Although final approval was at Allstate's sole discretion, it is undisputed that Allstate approved almost all conversions and that it actually engaged in a campaign to encourage employee agents to convert.

contract—while perhaps available and encouraged by Allstate—was inherent in any contract or legal provision, or that its elimination violated any law or contract.  Indeed, as in Davis, at the time the Release requirement was put into place, Plaintiffs no longer had any right to convert to the EA contract.  While the Court finds such tactics morally suspect, the promise of guaranteed conversion—in turn resulting in continued employment with Allstate—constituted adequate consideration.

**Second**, Plaintiffs ask this Court to reject Allstate's claims that Plaintiffs who converted to the R3001 contract under the first or second options of the Program received, as consideration for signing the Release, a "new, transferable economic interest in the books of business employee agents had produced and serviced as R830 and R1500 agents."  (Allstate Mem. Supp. Summ. J. 17.)  Plaintiffs contend that this contention fails for three reasons.  Initially, they claim that all exclusive agents, including those who converted from the employee agents prior to the Program, received the "economic interest" described in the R3001 contract and EA manual.  Moreover, to the extent that Allstate claims that it shortened the waiting period from five to two years for converting agents to sell the economic interest in the portion of their books of business, Plaintiffs assert that this reduction in the waiting period was adopted by November 1, 1999 and applied to all R3001 exclusive agents who had converted to the R3001 contract, even those who converted prior to the Program.  Finally, they claim that Allstate itself paid nothing in connection with Plaintiffs' sales of their agencies and, in fact, retained discretion to approve a buyer, meaning that the proceeds realized by those Plaintiffs who converted as part of the Program and then sold their books of business could not serve as consideration.

The Court finds partial merit to both parties' positions.  To the extent that any employee

agents elected the first option, the Court agrees with Plaintiffs.  As noted above, both the R830

and R1500 Agreements provided that employee agents had no vested interested in any business

produced under the terms of those agreements.  For those R830 or R1500 agents who converted

to the EA Program, prior to November 1999, the economic interest in the book of business

serviced while an employee agent became transferable after five years, subject to Allstate's

approval.  As of November 1, 1999, however, Allstate shortened the transferability waiting

period for *all* R3001 agents, including those who converted prior to the Program without signing

the Release and those who converted in connection with the Program with the Release-signing

requirement.  (Meehan Decl., Ex. 331 ("Exclusive Agency Independent Contractor Manual"), at

ARI 54903, ARI 154905.)  Those who executed the Release did not have any special vested

interest beyond the typical R3001 employee.   Accordingly, the Court finds that the shortened

waiting period was not given in consideration for signing the Release, but rather was attendant to

the ability to become an Exclusive Agent.[35]

 To the extent an employee agent elected the second option—the sale option—the Court

finds that the inheritance of an economic interest in the book of business did indeed provide

consideration.  In exchange for signing the Release, Option Two individuals would convert to the

EA contract and, after only thirty days, could immediately transfer that book of business to an

---

[35]  The parties debate whether, prior to the Program, employee agents could realize the value of their economic interest in their agency immediately upon conversion.  As Allstate observes, however, this "immediate interest" was gained pursuant to scheme devised by an outside lawyer to avoid the contractual provisions of the EA contract (the "Gracie Scheme"). Merely because Plaintiffs had discovered a way to skirt the time provisions on sales of agencies and simply because Allstate may have acquiesced in some of these transactions does not mean that employee agents ever had a "right" to an immediate interest in their agency upon conversion to an EA contract.  Indeed, Allstate could have contractually put a stop to this practice.

Allstate-approved buyer, with the agent retaining the sale proceeds.  This option was not available to any EA agent who converted prior to the Program and was clearly not available unless a Release was signed.  As such, it constituted a benefit greater than that to which those agents were already entitled.[36]  Undoubtedly, Plaintiffs who elected option two under the Program received something of value.

**Third**, Plaintiffs challenge Allstate's contention that, under the first and second Program options[37] requiring a release, the employee agents were given a conversion bonus of at least $5,000 and forgiveness of OEA advances.  Plaintiffs, however, argue that these items cannot constitute consideration on several grounds.  Primarily, they argue that Allstate represented to agents that this bonus was being paid to help agents transition to independent contractor status, not as consideration for the Release.  Moreover, they claim that the conversion bonus under the first two options combined with the OEA forgiveness was, for many Plaintiffs, less than what they could have received in base severance if they did not sign the Release.

Plaintiffs engage in an incorrect analysis on this point.  The relevant comparison is not what an employee agent would have received under either the conversion option or sale option versus the base severance option.  The comparison is what the employee agent would have

---

[36]  The Court finds little merit in Plaintiffs' argument that the right to sell the agencies could not constitute consideration because it did not involve any transfer of funds to or from Allstate.  Under the R830/R1500 contracts, Allstate was entitled to the proceeds of any book of business, not the employee agent.  Under the standard EA contract, Allstate was entitled to delay any sale of a book of business.  In both scenarios, Allstate surrendered something.  Moreover, consideration focuses not on what the demanding party gives up, but rather what the signing party gains.

[37]  Notably, Plaintiffs appear to concede that the third Program option—the enhanced severance option—was supported by adequate consideration.

received under either the conversion option or sale option versus a complete refusal to participate in the Program at all.  Under the former comparison, an employee agent may have potentially received more liquid cash under the base severance option and would have been able to avoid signing the Release, but would have made the choice to forego any possibility of continuing employment with Allstate and realizing an economic interest in his or her book of business, and would have undertaken additional non-compete restrictions.  Under the latter comparison—the relevant comparison for purposes of the consideration analysis—an R830/R1500 employee agent choosing to not participate in the Program and retain his/her rights under the Release would have received nothing.[38]  The record is clear that, upon termination of the R830 or R1500 Agreements pursuant to a group reorganization program—as opposed to for poor performance or for some other reduction in force—Plaintiffs were not otherwise entitled to any benefits under their specific contracts or under any existing Allstate severance plan.  While Plaintiff asserts that there are genuine issues of fact as to whether these pre-existing severance plans could be construed to entitle Plaintiffs to benefits under them,[39] the Court finds that the plain language of those plans belies such an assertion.[40]  In short, the conversion bonus and OEA forgiveness, in conjunction

---

[38]  It is undisputed that an EA agent who converted prior to the Program was not entitled to a conversion bonus.

[39]  The cases cited by Plaintiffs, unlike the present case, involved genuine disputes of material fact as to whether the terminated employees were entitled to severance pay independent of the release plan.  See Commonwealth of Mass. v. Bull HN Info. Sys., Inc., 143 F. Supp. 2d 134, 150 (D. Mass. 2001); Gorman v. Earmark, Inc., 968 F. Supp. 58, 62–63 (D. Conn. 1997); Berner v. Tesseract Corp., No. Civ.A.94-1717, 1994 WL 559138, at *4 (N.D. Ill. Oct. 7, 1994).

[40]  As noted later on this Memorandum, the Court does take issue with Allstate's decision to characterize the Program as a "group reorganization," thereby depriving employee agents of benefits under the Allstate Severance Plan.  The Court's skepticism about Allstate's motives and the effect of Allstate's structuring of the Program on the voluntariness of the Release, however,

with the other portions of the first and second options, provided something more than the

benefits to which terminated R830 and R1500 agents were entitled had they completely opted out

of the Program and the Release.[41]

### (iii)  Conclusion as to Consideration

While many of Plaintiffs' consideration arguments raise valid concerns about the

structuring of the Program, the Court finds that Allstate nonetheless provided adequate

consideration for the Release.  "[C]onsideration is relatively easy to show.  As long as the person

receives something of value in exchange for her own promise or detriment, the courts will not

inquire into the adequacy of the consideration."  Wagner v. NutraSweet Col., 95 F.3d 527, 532

(7th Cir. 1996).  Allstate's offer of transition to Exclusive Agency, as well as its provision of

conversion bonuses and OEA waivers, however minimal, constituted something more than what

Plaintiffs were entitled to without signature of the Release and participation in the Program.[42]

---

does not cast doubt on the legality of Allstate's characterization of the Program as a "group reorganization."

[41]  Plaintiffs contend that they were entitled to various benefits upon termination without having to sign a Release, as provided for in their R830 and R1500 contracts.  Plaintiffs, however, have produced no evidence that they did not receive their final contract payments.  Moreover, Allstate has provided the Declaration of Scott Proctor establishing that Allstate paid each Plaintiff for their last month of compensation.  (Decl. of Scott Proctor.)  Although Plaintiffs attempted to contradict that Declaration via separately-filed Objections, the Court rejected Plaintiffs' arguments.

[42]  Indeed, the EEOC reaches the same conclusion in its Motion for Summary Judgment in connection with its case against Allstate.  Specifically, it states that, "It is true that under [the Program] employee agents who signed the release received some benefits to which they were not otherwise entitled: (1) an absolute guarantee to convert to the R3001 contract; (2) receive a conversion bonus of at least $5,000; and (3) be forgiven OEA debt to Allstate."  (EEOC Mem. Supp. Mot. Summ. J., No. Civ.A.01-7042, at 14.)  While it goes on to argue that these benefits paled in comparison to what Allstate threatened to take, the Court cannot disregard that *some* consideration was given.

Therefore, although the Court struggles considerably with this factor, we ultimately find no genuine issue of material fact as to whether adequate consideration supported the Release at issue.

### d.      Conclusion as to the OWBPA Requirements

The statutory dictates of OWBPA, as explicitly interpreted by the United States Supreme Court, require that a release that purports to waive ADEA claims meet all eight of the statutorily-enumerated requirements.  Allstate has satisfied its burden of affirmatively demonstrating that the Release at issue meets all eight of these requirements.  As Plaintiffs have failed to create any contrary issue of material fact, the Court denies Plaintiffs' Motion for Summary Judgment on this ground.

### 2.      Whether the Release Was Knowingly and Voluntarily Executed Under the Totality of the Circumstances

Having determined that the Release satisfies the OWBPA provisions, the Court turns to Plaintiffs' next claim that Allstate cannot show that the Release was executed knowingly and voluntarily.  The Court finds that a genuine issue of material fact exists on this point.

An employee may validly waive claims of discrimination against an employer if the waiver is made knowingly and willfully.  Coventry v. U.S. Steel Corp., 856 F.2d 514, 521–22 (3d Cir. 1988) (citing Alexander v. Gardner–Denver Co., 415 U.S. 36, 52 (1974)); Potoski v. Wilkes Univ., No. Civ.A.06-2057, 2010 WL 3811973, at *13 (M.D. Pa. Sept. 22, 2010).  In determining the validity of a waiver, courts consider general principles of contract construction; however, "[i]n light of the strong policy concerns to eradicate discrimination in employment, a review of the totality of the circumstances, considerate of the particular individual who has executed the

125

release, is also necessary." Coventry, 856 F.2d at 522–23.  This totality of the circumstances

inquiry is made considering the following factors:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time the plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir. 1988) (citing Coventry, 856 F.2d at 523),

superseded by statute as stated in Long v. Sears Roebuck & Co., 105 F.3d 1529, 1539 (3d Cir.

1997) (holding that the Older Workers Benefit Protection Act supersedes Cirillo with respect to

the Age Discrimination in Employment Act of 1967).  "This list, however, is intended to be

illustrative rather than exhaustive."  Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8

(1st Cir. 2007).  The court "may also consider 'whether there is evidence of fraud or undue

influence, or whether enforcement of the agreement would be against the public interest.'"

Cuchara v. Gai-Tronics Corp., 129 F. App'x 728, 731 (3d Cir. 2005) (quoting W.B. v. Matula,

67 F.3d 484, 497 (3d Cir. 1995)).  These considerations are in addition to OWBPA's

requirements for "knowing and voluntary" waiver of ADEA claims.  See Long v. Sears Roebuck

and Co., 105 F.3d 1529, 1539 (3d Cir. 1997) (holding that OWBPA was enacted to "establish[] a

floor, not a ceiling") (quotations omitted); see also Bennett v. Coors Brewing Co., 189 F.3d

1221, 1228 (10th Cir. 1999) (holding that the statutory factors of the OWBPA are not exclusive

and other circumstances, in addition to the express statutory requirements, may impact whether a

waiver under the OWBPA is knowing and voluntary); 29 C.F.R. § 1625.22(3) (2010) (noting that

in addition to the minimum requirements set out by the OWBPA, "other facts and circumstances may bear on the question of whether the waiver is knowing and voluntary."). Notably, "as the issue of the release is an affirmative defense, the burden of proving that it was knowingly accepted is on [the party seeking to enforce it.]"  Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 782 (3d Cir. 2007).

Plaintiffs allege that the Release was not signed either knowingly or voluntarily. Accordingly, they assert that, under the totality of the circumstances test, the Release does not bar any of their federal claims.  The Court takes each of Plaintiffs' challenges separately.

### a.     Whether the Release Was Voluntarily Signed

Plaintiffs first contend that the voluntariness of the Release is in question because (1) the Release was not the product of any negotiation and they were placed in a "take it or leave it" predicament; (2) Allstate gave Plaintiffs' the ultimate "Hobson's choice"—either sign the Release or lose your livelihood; (3) Allstate's wrongful acts and threats left Plaintiffs with no reasonable alternative but to sign the Release.  As a result, they request that the Court invalidate the Release under the totality of the circumstances test.[43]

---

[43] Allstate's response to this portion of Plaintiffs' argument consists almost entirely of an argument about why state law contract defenses of duress and fraud fail.  As Plaintiffs note—and as this Court clearly recognizes—Plaintiffs are not moving for summary judgment based on allegations of fraud or duress.  Rather, Plaintiffs seek to invalidate the Release under a federal totality of the circumstances standard.  Thus, to the extent Allstate relies on state law defenses to a duress theory—i.e., alternative legal remedy and ability to consult an attorney—in an effort to defeat Plaintiffs' claim as a mater of law, the Court disregards these arguments.  See Long, 105 F.3d at 1539 ("We are convinced that in enacting the OWBPA, Congress intended to occupy he area of ADEA releases and, in doing so, to supplant the common law."); O'Hare v. Global Natural Res., Inc., 898 F.2d 1015, 1017 (5th Cir. 1990) (rejecting use of state law regarding duress and holding that a determination of whether a waiver of federal rights is knowing and voluntary should be determined under a federal common law totality of the circumstances test "because of the policies embedded in the federal statute should not be frustrated by state law.").

This issue gives the Court substantial pause.  On one hand, a review of six of the seven

factors enumerated by the Third Circuit weighs heavily in favor of Allstate's position.  First, as

discussed in detail above, the Court finds that the language of the Release is both clear and

specific as to precisely what the Plaintiffs were waiving upon executing the document.  Second,

as again set forth above, the Plaintiffs are not individuals of below average intelligence.  Indeed,

many of them had attended at least some college and several had advanced degrees.  Moreover,

all of them had extensive business experience running insurance agencies and selling complex

insurance policies.  Third, it is an undisputed fact that Plaintiffs had substantial time for

deliberation about the Release before signing it.  They were notified about the Program and the

Release in November 1999, but had until June 30, 2000 to make a decision about which Program

option they would select and whether or not they would sign the Release.  Fourth, Plaintiffs

clearly knew of their rights upon execution of the Release, as the Informational Notice provided

with the Release expressly stated that "[i]f you sign the Release, you will be waiving your rights

to any claims or potential claims arising out of your employment, termination of employment or

transition to independent contractor status which have been, or could be filed against Allstate, or

its affiliates pursuant to any local, state or federal law."[44]  (Heinz Decl., Ex. 62 ("Informational

Notice").)  Moreover, all of the Plaintiffs at some point filed charges with the EEOC.  Fifth, there

is no dispute of fact that Allstate explicitly advised the Plaintiffs to consult with an attorney

before electing one of the options available and releasing and waiving any legal claims.  A

majority of the Plaintiffs heeded this advice and actually consulted with a private attorney and/or

---

[44]  To the extent that Plaintiffs allege that certain misrepresentations by Allstate deprived
them of the ability to fully understand their rights, the Court addresses this below when deciding
whether the Release was "knowingly" signed.

attorneys at the EEOC prior to selecting an option under the Program and entering into the Release.  Sixth and finally, as discussed at length above, the consideration given in exchange for the waiver and accepted by the Plaintiffs exceeds the benefits to which Plaintiffs were already entitled by contract or law.

While, at first blush, these six factors, considered collectively, seem to suggest that the Release was signed voluntarily, limiting the analysis to such factors results in a myopic view of what may have actually occurred in this case.  Initially, it is notable that the remaining enumerated factor in the totality of the circumstances test—opportunity for negotiation—weighs in Plaintiffs' favor.  Defendants do not contest the fact that there was no opportunity for negotiation of the terms of the Release.  The Release was drafted by Allstate and Allstate made clear that it would not accept any signed Releases that were marked up in any way, either with language crossed out or additional terms or notes added to the Release by hand.  Indeed, Plaintiffs Romero, Kelly, T. Kearney, and Wiktor submitted Releases to their managers with modifications and Allstate declined to accept them.  Thus, despite the fact that Plaintiffs had the "opportunity" to consult with counsel, any advice by counsel as to the Release was rendered meaningless by Plaintiffs' inability to negotiate any of the Release's terms.

Moreover, and perhaps more importantly, the Court finds that Plaintiffs faced a proverbial "Hobson's choice"[45] as to whether to sign the Release.  This factor, while not specifically set forth as part of the "totality of the circumstances" test, has been, in some cases, a critical consideration in the voluntariness analysis.  In Coventry v. U.S. Steel Corporation, 856

_____

[45]  The Oxford English Dictionary defines a "Hobson's choice" as the appearance of choice when none in fact exists.  2 Oxford English Dictionary 369 (4th ed. 1978).

F.2d 514 (3d Cir. 1988), the Third Circuit was confronted with a plaintiff who had worked for more than thirty-five years for the defendant and, in July 1982, was laid off during a reduction in force due to a major cutback of operations.  Id. at 515–16.  Shortly thereafter, he filed a charge with the Equal Employment Opportunity Commission in which he alleged that he had been selected for lay-off because of his age, and that the defendant had retained a number of younger employees to do jobs that he had performed or was qualified to perform.  Id. at 516.  In October 1982, the plaintiff was advised that the defendant was permanently terminating his employment, but, in light of his service, he would qualify for the "70/80" mutual agreement pension benefit—which entitled an employee to benefits based on a combination of years and age of service—if he would execute a form entitled "Application and Release for 70/80 Retirement Under Mutually Satisfactory Conditions," which was commonly referred to as the "PF–116–B." Id.  The PF–116–B contained a release of all claims that an employee had against the defendant pursuant to the ADEA, Title VII, or other state or federal laws and a waiver of any such claims that might in the future be determined to exist.  Id.  During a subsequent meeting with his employer, the plaintiff was advised that he qualified for the 70/80 mutual option pension, but that he could not elect that option without executing the PF–116–B release.  Id.  Although the plaintiff expressed his desire to become eligible for the pension option, he refused to sign the PF–116–B.  Id.  Following additional meetings, Plaintiff eventually signed the election form for the 70/80 pension and, later, signed the PF-116-B release, but amended his EEOC charge to challenge the release.  Id.  The defendant refused to pay the pension because the plaintiff had failed to withdraw his age discrimination complaint.  Id. at 517.

On review, the Third Circuit deemed the release invalid under a totality of the

circumstances test.  It reasoned as follows:

> We note first in that regard that the decision with which [plaintiff] was presented in his meetings with [defendant] appears to have been little more than a "Hobson's choice."  [Plaintiff] testified that he was advised by [defendant] that his only options were accepting the mutual option pension benefits, and foregoing his claims, or being placed on automatic lay-off and losing his income and hospitalization benefits immediately. . . .  Moreover, in light of USS's policy of denying severance benefits to persons who were "otherwise eligible" for a pension plan, [plaintiff] could not opt to have his employment terminated completely and take severance benefits. "[Plaintiff's] choice," therefore, after thirty-five years of service, was between a lay-off of uncertain duration, that would bring the certain cessation of his income, and an early retirement plan that would make pension benefits available to him only if he agreed to forego his rights under the ADEA.  These circumstances illustrate that [plaintiff's] decision to sign the release was not the result of negotiation between him and his employer and, further, that [plaintiff] was placed in precisely the "take it or leave it" predicament that supports a finding that his decision was not knowingly and willfully made.

Id. at 524 (footnotes omitted).  The court also found significant the lack of any indication that the plaintiff was encouraged by the defendant to consult an attorney prior to the execution of the release, or that the plaintiff did in fact consult with an attorney.  Id.  The court remarked that "[w]e view this omission as particularly salient to this case in light of the fact that the release that [the plaintiff] signed was determined to be per se violative of the ADEA in a separate proceeding.  Id. at 524–25.  "On this record, the absence of assistance by an attorney makes the certainty that Hallas had that meaningful comprehension too doubtful for us to conclude that his waiver was knowingly executed."  Id.  Ultimately, the Third Circuit concluded that, "the record contains significant indicia that [the plaintiff's] decision to execute the waiver did not result from a volitional choice between real options, and that, for him, the absence of counsel resulted in a decision the legal significance of which he did not understand completely."  Id. at 525.

Likewise, in Torrez v. Public Service Company of New Mexico, 908 F.2d 687, 690 (10th

Cir. 1990), the plaintiff had been employed by the defendant for eight years and eleven months before he was notified that his position was being impacted as part of a downsizing of the company's workforce.  Id. at 688.  The notification letter also informed him that he had until April 30, 1986, to select early retirement, voluntary separation, or involuntary separation.  Id. Because he had been employed by defendant for less than nine and one-half years, he did not qualify for early retirement.  Id.  His election therefore was limited to either voluntary or involuntary separation.  Both of these packages provided for full salary until July 31, 1986, plus one week of salary for each year of service, career counseling, and health, life, and dental insurance coverage until November 30, 1986.  Id.  The primary difference between the two packages was that the voluntary package also provided for vesting of retirement benefits for an employee with five years of service.  Id.  The plaintiff chose the voluntary separation package to obtain the additional retirement benefits and, at that time, he signed a release which provided that he waived all claims against defendant as a result of the termination.

"In assessing the totality of the circumstances in this case," the Tenth Circuit concluded that "there are material issues of fact precluding summary judgment.  The language of the release, although clear and unambiguous, failed to mention specifically waiver of employment discrimination claims."  Id. at 690.  "Moreover, [the plaintiff] neither consulted with an attorney nor received encouragement from defendant to do so before he signed the release."  Id. Additionally, plaintiff "did not have the opportunity to negotiate the terms of the release, which was a standard form."  Id.  Finally, "[w]hen [the plaintiff] chose the voluntary separation package, he was required to sign the release.  The choice between the two separation packages was a 'Hobson's choice,' . . . because [the plaintiff] had to opt between a nearly-certain layoff

with no retirement benefits or obtaining the future retirement benefits available only if he signed the release."[46] Id.

While not precisely equivalent, the undisputed facts of record in this case present a similar scenario. Specifically, Allstate surely knew that many of the R830 and R1500 agents, including Plaintiffs, had spent their lives building Allstate and had invested substantial sums of their own money and resources into their agencies based on promises of financial and job security. Indeed, the Allstate compensation structure required up-front financial and time investments, which Plaintiffs expected to yield substantial returns in the form of renewal commissions and significant retirement benefits. As such, Plaintiffs were heavily reliant on their continuation of employment or ability to obtain some financial remuneration for their years of efforts and investments. Yet, Allstate purposefully structured the Program so that the only way Plaintiffs could either continue as Allstate agents—albeit under the Exclusive Agency program, which resulted in a substantial loss of benefits and pension options—or salvage some of their agency investments—by converting, selling their books, or taking half a year's pay in severance—was by signing the Release. For those who did not sign the Release, Allstate offered nothing more than a base severance option (thirteen weeks' pay, payable over six weeks) that made agents worse off than if they had been terminated for poor performance under Allstate's Service Allowance Plan (thirteen weeks' pay, payable in one lump sum). Moreover, even though the Program effectively terminated agents' employment with Allstate in a manner similar to a reduction in force, Allstate labeled the Program a "group reorganization." By doing so, it

---

[46] Plaintiffs also cite to Massi v. Blue Cross & Blue Shield Mutual of Ohio, 765 F. Supp. 904 (N.D. Oh. 1991). That case, however, involved an allegation of duress under state, which is not at issue here.

invoked the exception of the Allstate Severance Payment Plan—an exception that was included

in an amended version of the Plan only *two days* prior to the Program's announcement—that

precluded terminated employees from receiving severance pay if they were part of a group

reorganization plan,[47] and deprived agents of the enhanced severance of up to fifty-two weeks'

pay that they would have otherwise received under that Plan.  To make matters worse for

Plaintiffs, those who did not sign the Release and opted for the base severance were subject to

the additional non-compete obligations in the Agent Transition Severance Plan, which were more

stringent than those in the original R830 and R1500 contracts.  Failure to comply with those

more stringent non-compete arrangements resulted in the loss of even the minimal severance

pay.[48]

Compounding the absence of choice created by Allstate's structuring of the Program,

Allstate erected additional roadblocks for an employee who did not wish to sign the Release.

---

[47]  While the Court does not make any ruling as to whether Allstate's characterization of the Program as a "group reorganization" was legally wrongful, the Court notes that this amendment was conveniently self-serving and, from most perspectives, underhanded.  The Court does not address Plaintiffs' passing argument, made in a footnote in the "Factual Background" section of its Response Brief—that the amendment to the Allstate Severance Pay Plan was enacted under a conflict of interest.  (Pl.'s Resp. Opp'n Summ. J. 31, n.130.)  Certainly, however, Plaintiffs are free to raise the facts underlying this argument during a trial in this matter.

[48]  Allstate attempts to argue that these additional non-competition provisions were an "eligibility requirement" to receive severance pay.  Therefore, the "only consequence" of not adhering to that provision was the cessation of severance payments.  Because the base severance option payments occurred over the course of six months, the additional non-competition restriction only applied for the first six months after termination.  (Allstate's Resp. Opp'n Mot. Summ. J. 71–72.)

Allstate's effort to minimize the penalties associated with not signing the Release are unconvincing.  The fact remained that if an employee agent opted to not sign the Release, he or she was left with either (1) a base severance of thirteen weeks with additional non-compete restrictions or (2) no financial payment and the non-compete restrictions from the R830/R1500 contracts.

First, it told Plaintiffs that even if they refused to sign the Release or accept the base severance payment, Allstate would still sue to enforce the non-compete clauses of the terminated R830 and R1500 contracts.  This meant that agents could no longer sell insurance from their own offices or within a mile radius for one to two years.  While such representations by Allstate were not necessarily improper from a legal standpoint,[49] agents who opted to walk away with absolutely nothing from Allstate still faced the hurdle of not being able to continue to work in their location without the threat of suit.  Second, Allstate took away the agency telephone number that agents had paid for and used, which foreclosed the option of opening up a new agency miles away and having customer calls forwarded to the new office.  Third, and perhaps most problematic, Allstate affirmatively stated that even if these agents walked away with no income, no office, and no business telephone, and abided by the non-compete restrictions, they could still never attempt to initiate contact with former customers in whatever form and for any commercial purpose, regardless of how much time passed.   Specifically, as Allstate concedes, it informed agents that Allstate customer lists were the property of Allstate and that the names, addresses, and ages of these customers were confidential information and exclusive property of Allstate.  Thus, the customer list could not be used by a former agent "***for any purpose including marketing non-insurance products***."  (Zolner Decl., Ex. 102 ("Preparing for the Future Questions & Answers #8"), at Q20, ARI 094111 (emphasis added).)[50]   This was a particularly coercive statement in

---

[49]  Plaintiffs vigorously argue that the non-compete provisions of the R830/R1500 were not enforceable once Plaintiffs were terminated without cause.  This issue presents a separate legal question which the Court need not consider at this time.

[50]  If agents eligible for the Program left Allstate, they could still sell products or services to Allstate customers only if a "customer initiates contact with his/her prior agent" or "if the customer responds to general advertising that is not considered a solicitation."  (Zolner Decl., Ex.

light of the fact that many of the Plaintiffs' customers were built from their own community or

family contacts.[51]

Ultimately, this combination of factors appears to have created a true Hobson's choice.

Plaintiffs essentially had two options: (1) execute the Release in order to either continue as

Exclusive Agents, be able to sell their book of business, or receive enhanced severance; or (2)

refuse to sign the Release, give up an agency into which they had heavily invested time and

money, face certain termination with no retirement or health benefits, receive inconsequential to

no financial remuneration, face non-competition restrictions, and be forever barred from

contacting anyone on a customer list, built over many years, for any commercial purpose

whatsoever.  Allstate itself recognized the dilemma caused by requiring involuntary conversions

to the R1500 contract in its mid-1990s statement to the IRS, where it noted that: "[n]ot only

would individuals lose future benefit plan accruals and contributions, if they were all converted

to independent contractors, many of these individuals have spent all of their careers with Allstate

and have hoped to retire with retiree life and medical benefits.  Ceasing the NOA's employee

service at this juncture in their careers would have severe economic consequences to them."

(Meehan Decl, Ex. 54 ("Allstate Insurance Company Pre-Submission for June 23, 1997

Meeting"), at ARI 180110.)  In other words, the choice presented by Allstate reasonably appeared

to be either sign the Release or face likely financial ruin.  Such circumstances, much like those in

---

156 ("Preparing for the Future Questions & Answers #10"), Q4 at ARI 090473.)

[51]  Plaintiffs raise an unclean hands defense in light of several of Allstate's
representations.  The record, however, does not provide the Court with sufficient information
upon which to apply this doctrine.

Coventry and Torrez,[52] illustrate that Plaintiffs' decision to sign the Release was as a result of the

Allstate-created take-it-or-leave-it predicament that undermines a finding of voluntariness.[53]

At the core of this analysis, the Court is left with the task of drawing inferences from the

evidence, weighing the credibility of witnesses, and affixing a characterization to the events that

occurred.  On one hand, a methodical analysis under a strict application of the enumerated

totality of the circumstances factors yields a finding that the Release, while not necessarily

---

[52]  Allstate attempts to distinguish Coventry and Torrez from the present case by citing to various factual distinctions.  The Court, however, does not suggest that such cases are precisely analogous to the present one, but rather cites them for the principle that where a plaintiff has no real choice as to whether to sign a Release, the execution of that Release cannot be deemed voluntary.  Moreover, the Court cannot ignore that in this case, much like Coventry and Torrez, Plaintiffs in this case faced a sign-it-or-starve situation, particularly given the added considerations of the non-compete contracts and Allstate's indications that Plaintiffs could not ever use their customer lists for marketing any other type of product.

[53]  The cases cited by Allstate in an effort to undercut a finding of a Hobson's choice scenario are unconvincing and, in fact, highlight the direness of Plaintiffs' situation in this case.  First, Allstate cites Cirillo v. Archo Chem. Co., 862 F.2d 448 (3d Cir. 1988).   In that case, however, the Third Circuit expressly noted that termination plan at issue did not create a "sign the waiver or starve" choice because the plan ensured that, at no time subsequent to his termination, would the plaintiff be without income.  Id. at 452 n.2.  Therefore, in stark contrast to the Program devised by Allstate, the plaintiff in Cirillo's choice was whether "whether to sign the release and receive additional compensation or not sign the release and receive his ordinary retirement benefits."  Id.  The other cases are similarly distinguishable.  See, e.g., Ponzoni v. Kraft Gen. Foods, Inc., 774 F. Supp. 299, 311 (D.N.J. 1991) (plaintiff had opportunity to attempt to negotiate his termination date and regardless of whether he signed the Release, he was still entitled to his pension benefits and normal severance pay; by signing the Release, plaintiff got an additional twenty-four months' severance); Pears v. Span, 718 F. Supp. 441, 446 (W.D. Pa. 1989) ("[T]his case does not present the Hobson's choice confronted by the plaintiff in Coventry, forced to choose between an ADEA claim and his pension."); Pierce v. Chesapeake Corp., No. Civ.A.88-1361, 1989 WL 12703, at *6 (E.D. Pa. Oct. 24, 1989) (finding that plaintiff was not faced with a "sign the waiver or starve" situation.  "At no point was [plaintiff] Pierce told he would receive nothing if he did not sign the July 9 letter.  The parties never discussed the consequences that would result from Pierce's refusal to sign the letter.  To the contrary, in offering three months' severance pay Chesapeake demonstrated its willingness to negotiate a mutually acceptable termination agreement that would give Pierce time to secure another position.").

desirable, was supported by some consideration and was the product of the educated free will of

the Plaintiffs upon being given ample opportunity to consult with counsel and carefully read the

terms of the Program.  On the other hand, that methodical application of a defined set of factors

offers a short-sighted view of what occurred in this matter.  Underneath the impression conveyed

by the more rigid analysis lies an alternate—and very plausible— picture that Allstate forced its

employees into signing a Release with no real option for them other than losing their

investments, their livelihood, their health coverage, and their retirement benefits.  While the

Court is tempted to find as a matter of law that these circumstances deprived the Release of the

requisite voluntariness, the competing stories offered by the parties, considered in the totality of

the circumstances, create a genuine question of fact as to whether Plaintiffs voluntarily waived

their rights to bring a federal claim.  Such a question is not properly decided by a Court as a

matter of law, but rather is best resolved by a jury.  See Torrez, 908 F.2d at 690 ("In assessing the

totality of the circumstances in this case, we conclude there are material issues of fact precluding

summary judgment.");  Poppelreiter v. Straub Int'l, Inc., No. Civ.A.99-4122, 2001 WL 1464788,

at *7 (D. Kan. 2001) ("Under the totality of the circumstances, the evidence before the court

presents a material question of fact as to whether the plaintiff knowingly and voluntarily waived

his right to bring a private lawsuit under the FMLA and the ADA . . . .  The court believes it is

for the jury to decide whether the plaintiff knowingly and voluntarily waived his rights); Gorman

v. Earmark, Inc., 968 F. Supp. 58, 64 (D. Conn. 1997) ("Despite plaintiff's position as a

high-placed executive and part owner of the company, if his description of his termination and

the subsequent discussions regarding his stock and notes is believed by the jury, they could

reasonably conclude that the release was an eleventh-hour addition to the agreement, extracted

from [the plaintiff] without negotiation and additional consideration, and thus not enforceable. The Court thus concludes that summary judgment is an inappropriate vehicle for weighing the totality of the circumstances here.").  Accordingly, the Court denies both parties' Motions on this ground.

### b.    Whether the Release Was Knowingly Signed

The totality of the circumstances inquiry does not end at this juncture, as the ultimate question is whether the Release was voluntarily and *knowingly* signed.  It is well settled that a material representation may affect whether a release was knowingly signed and may, in turn, invalidate the release if there is evidence that the signers would have acted differently.  Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 781–82 (3d Cir. 2007).  Plaintiffs now contend that the Release was not knowingly signed due to at least five material misrepresentations by Allstate concerning the consequences of signing and not signing the Release.[54]  The Court finds that these

---

[54] Allstate asserts that to void the Release for a purported misrepresentation, Plaintiffs must prove all six elements of common law fraud.  This argument, like its duress argument, is incorrect.  The question of whether a release waiving federal claims was knowingly signed in light of various alleged misrepresentations is part of the totality of the circumstances test, which is governed by federal common law.  Plaintiffs need not establish each element of a state law fraud claim.  See Pierce v. Atchison, Topeka & Santa Fe Ry. Co., 65 F.3d 562, 571–72 (7th Cir. 1995) (agreeing with Second, Third, Fifth, Tenth, and Eleventh Circuits that a "totality of the circumstances" approach, governed by federal law is appropriate in determining whether a plaintiff knowingly and voluntarily executed a release of federal claims; rejecting the use of state law contract principles); Griffith v. Novation, LLC, No. Civ.A.04-2059, 2006 WL 1374017, at *4 (N.D. Tex. May 18, 2006) (rejecting application of Texas fraud law to misrepresentation claim made in connection with a totality of the circumstances test; holding that "the court will examine, as one of several factors in determining whether Griffith's claim was knowing and voluntary, whether there is a genuine fact issue that [the defendant] made a misrepresentation of material fact."); see also Feret v. First Union Corp., No. Civ.A.97-6759, 1999 WL 80374, at *7–8 (E.D. Pa. Jan. 25, 1999) (considering claim of misrepresentation under totality of the circumstances test without any reference to state law elements of a misrepresentation claim).  In light of this conclusion, the Court does not analyze Plaintiffs' assertions of misrepresentation under the six elements of a state law claim of misrepresentation, but rather under the federal

allegations are replete with genuine issues of material fact that preclude a legal ruling on this

matter.

**First**, Plaintiffs argue that, in a Program-related Question and Answer document that was

distributed to employee agents, Allstate represented that agents who refused to sign the Release

would nonetheless be contractually barred from ever contacting or soliciting their former

customers, even though the R830/R1500 contracts did not contain any such broad prohibition.

Specifically, the first Q&A, issued on March 23, 2000, stated:

> Q: If an agent ends his/her agency relationship and goes to work selling a non-insurance product, can the agent contact his/her prior Allstate customers regarding the new product?

> A.  No.  Although this is not a violation of the non-compete provision, it is a violation of the confidentiality provision.  The Allstate customer list is Allstate's property and cannot be used by a former agent for any purpose including marketing non-insurance products.

(Zolner Decl., Ex. 102 ("Preparing for the Future Questions & Answers #8"), Q20 at ARI

0094111.)  A subsequent Q&A, issued on June 7, 2000, stated:

> Q.  Can a former agent keep a list of his/her Allstate customers and, after the non-compete period has elapsed, use that list to contact them for the purpose of selling insurance or other products?

> A.  No.  This would be a violation of the confidentiality provision contained in the agent's agreement and the Agent Transition Severance Plan (if the agent elected the enhanced severance option).  A former agent can never use a list of Allstate customers for any purpose regardless of how much time has passed since the agency relationship ended.  All customer lists are considered confidential information and are the exclusive property of Allstate.

(Zolner Decl., Ex. 156 ("Preparing for the Future Questions & Answers #10"), Q1, at ARI

---

common law totality of the circumstances test.

090472.)  Plaintiffs now contend that nothing within any contract between themselves and Allstate supported a lifetime ban on contacting former customers for any purpose.

Allstate does not dispute that it made these representations or that it told agents that it would enforce them.  Rather, in response, Allstate cites to three pieces of evidence to establish that these representations were accurate.  First, it references the R830 and R1500 Agreements which provided that records pertaining to Allstate policyholders are the property of Allstate.  (See Heinz Decl, Ex. 10 ("R830 Agreement"), Part Four ¶ VII ("All supplies furnished to you and all records which you have pertaining to Allstate policyholders are the property of the Company and will upon demand be promptly returned to us."); Heinz Decl., Ex. 3, ("R1500 Agreement") ¶ 9 ("You understand that all materials furnished to you by the Company, including manuals, computer programs, microfiche and similar records and any derivative reports are the property of the Company and may contain trade secrets.  You agree not to use, copy, duplicate, disseminate or divulge the contents of these materials without written authorization by the Company . . . . You agree that you will not use Company property or any information obtained or derived therefrom in any manner, directly or indirectly, other than in the performance of this Agreement.").  Second, it asserts that it consistently reinforced with employee agents that Allstate customer lists were Allstate property through "Agent Compensation Agreements." Third, Allstate highlights testimony from various Plaintiffs evidencing their understanding that customer lists were confidential and belonged to Allstate, and that Allstate's representations were consistent with their understanding of the confidentiality and non-solicitation provisions in their agreements.

Remarkably, however, nothing in the contractual provisions cited by Allstate supports the

broad prohibition on contacting former customers.  Undoubtedly, Allstate customer lists were

confidential, particularly because they contained extensive information about the particular

policyholders.  Certainly, agents were precluded from using such "lists" to sell other products.

Nonetheless, this confidentiality provision did not create a lifetime ban on employee agents ever

contacting any former customer "for any purpose."  Indeed, stretching Allstate's theory to its

limits, a former agent, who had signed his or her mother to an Allstate policy, would be

prohibited from initiating contact with his/her mother several years later, for the purposes of

selling, for example, heating and air conditioning systems through a new business venture.

Nothing in the Allstate confidentiality provision could possibly be construed, under any

reasonable interpretation, as reaching that far.  Yet, this is the representation that Allstate

effectively made to its agents.

    The inquiry, however, does not end at this point.  The Court must next discern whether

this misrepresentation precluded Plaintiffs from "knowingly" signing the Release.  Both parties

offer citations from Plaintiffs' depositions and declarations reflecting, on one hand, that this

misrepresentation bore heavily on their decision to sign the Release and continue in Allstate's

employ and, on the other hand, that Allstate's statements did not change their understanding of

the Release and the Program.  As the Court is unable to resolve whether Plaintiffs would have

acted differently had they known of the misrepresentation, a genuine issue of material fact

remains.  See Jakimas, 485 F.3d at 782 (noting the importance of evidence that the plaintiffs

would have acted differently with respect to the release had they known the truth about the

misrepresentation).

    **Second**, Plaintiffs assert that, on the day the Program was announced and thereafter,

Allstate represented that employee agents who were terminated could find employment elsewhere in the company. After the fact, however, Allstate imposed a rehiring moratorium, which denied employee agents re-employment and prevented employee agents subject to the Program from ever satisfying the continuous service requirement necessary for retirement benefits.

Allstate responds that the purported new job opportunities referenced non-agent employees who were terminated as part of a reduction in force, rather than R830/R1500 employee agents eligible for the program. Allstate also contends that it did not begin to consider a potential rehire policy related to the Program until September 2000, and it is undisputed that Allstate did not formally adopt and implement the Rehiring Moratorium until September 26, 2000.

Again, the evidence on this issue is highly in dispute. A genuine issue of fact remains as to both when Allstate knew it was going to implement the Rehiring Moratorium—which is crucial to determining whether Allstate's statements to employee agents at the time of the Release were accurate—and whether any possible misrepresentations affected the Plaintiffs' knowing signature of the Release. Therefore, the Court cannot resolve the "knowingly" issue on these grounds.

**Third**, Plaintiffs argue that in widely-distributed communications, and through local managers, Allstate reassured agents that there was no ongoing work or plans to reduce R3001 agents' commission rates. Plaintiffs go on to note that this was false because Allstate already had such plans in place in 1999, but did not announce them until 2002.

Allstate claims, however, that it did not first begin to consider commission rate changes

143

for Exclusive Agents until October 2001, at which time it announced to all Exclusive Agents that it would begin reviewing agent revenue and compensation.  On September 25, 2002, Allstate gave notice to Exclusive Agents that commission changes would take effect on January 1, 2003.  Allstate ultimately reduced commission rates for Exclusive Agents on January 1, 2003.  At that point, the new property commission rates payable to R3001 agents went from twenty percent to ten percent.

The evidence reveals that Allstate engaged in some discussion regarding a reduction in the commission rates to R3001 agents beginning in the summer of 1999, just prior to the announcement of the Program.  Further, it is undisputed that a rate change ultimately was announced in September 2002.  The record, however, remains unclear as to whether the early discussions were simply talks that did not lead to any official action or whether the September 2002 rate change announcement was the direct result of these pre-Program discussions.  Clearly, if Allstate did not seriously plan on implementing any rate changes until well after it made the alleged representations and after the start date of the Program, such representations could not have been misrepresentations and could not have affected Plaintiffs' knowing signature of the Release.  On the other hand, if a jury could make the inference from the evidence that the rate changes were in early planning stages as of 1999, Plaintiffs could establish that Allstate's denials regarding rate changes were misrepresentations that affected their decision in signing the Release.  Neither party's evidence conclusively resolves this question, thereby making it a factual issue.

**Fourth**, Plaintiffs contend that Allstate failed to disclose to employee agents that the "certain business results" it expected from R3001 agents would be production quotas, which, if

144

not met, would lead to the termination of the agent.  Plaintiffs do not dispute that the Program

Information Booklet communicated to Plaintiffs that agents would be expected to achieve certain

business results.  They contend, however, that these expected results, and the consequences of

not meeting them, were never explained to Plaintiffs before they signed the Release.  According

to Plaintiffs, however, their managers specifically told them that Allstate would not impose

production requirements or quotas on agents who converted to the R3001 contract.  Yet the

expected results imposed on R3001 agents after the Program was implemented were contrary to

these various representations.

　　　　Allstate, on the other hand, asserts that Plaintiffs were well aware that they would be

expected to meet standards set by the company.  The R3001 contract itself stated that "[a]gency

will meet certain business objectives established by the Company in the areas of profitability,

growth, retention, customer satisfaction and customer service."  (Zolner Decl. ¶ 168, Ex. 168, §

II.B.)  This contract also incorporated the Exclusive Agency Independent Contractor Manual,

which stated that "[t]he Company may establish business objectives with respect to the above

areas that you are expected to meet."  (Zolner Decl., Ex. 46 ("Independent Contractor Manual"),

at A002062.)  These were also referenced in the Program Information Booklet.  (Zolner Decl.,

Ex. 65 ("Program Information Booklet"), at ARI 000806.)  Allstate then goes on to cite various

pieces of evidence detailing the expected results and the consequences of not meeting these

results.  (Allstate's Resp.  Opp'n Mot. Summ. J. 96–97.)  In addition, Allstate notes that the

R3001 contract was clear that it was terminable with or without cause, upon providing ninety

days written notice.  (Zolner Decl., Ex. 168 ("R3001C Exclusive Agency Agreement"), §

XVII.B.1–3; Zolner Decl., Ex. 169 ("R3001S Exclusive Agency Agreement"), § XVII.B.1–3.)

Again, the Court is left with a pure question of fact.  Although Allstate clearly disseminated some information regarding the "expected results" to Plaintiffs and other agents, it is unclear when this information was received and to what extent it was contradicted by statements from Allstate's managers.  Ultimately, a question of fact remains as to whether Plaintiffs were given sufficient information about what they would be required to do as R3001 Exclusive Agents in order for them to make an informed decision regarding their decision to sign the Release and convert to the R3001 contract.

**Fifth and finally**, Plaintiffs claim that Allstate represented that Exclusive Agents would have "more freedom and flexibility" than Employee Agents.  Specifically, Allstate and Allstate managers claimed that Exclusive Agents could determine the manner and means in which to conduct their business, control the hours they worked, attend or not attend meetings, and truly be their own bosses.  Nevertheless, Allstate exercised the same, if not more, control over Exclusive Agents after the Program.  Indeed, according to Plaintiffs' evidence, Allstate imposed multiple requirements on Exclusive Agents, including mandatory office hours, after-hours telephone-forwarding requirements, and meeting attendance requirements.

Allstate again denies that it made any misrepresentations and argue that under the R3001 contract, Exclusive Agents had entrepreneurial freedom that was not available to employee agents, including being able to conduct other business in addition to their insurance agency business and being able to decide the manner and means by which the agency would conduct business.  To the extent that Plaintiffs complain about the office hours and telephone forwarding requirements, Allstate contends that Plaintiffs were, or should have been, well aware of these mandates when they signed their R3001 contracts, as the available materials were quite explicit.

146

Upon consideration of the evidence, the Court agrees with Allstate that the R3001 contracts appear to clearly specify the various requirements about which the Plaintiffs now complain. As such, the Court is inclined to find that this representation was not a "misrepresentation" that affected the validity of the Release. Nevertheless, this factor is only one element in the totality of the circumstances equation. As the Court has already found that a jury must ultimately resolve the issue of whether the Release was knowingly and voluntarily signed, the parties may submit this issue to the factfinder as well.

### c.   Conclusion as to Knowing and Voluntary Execution of the Release

As set forth above, the totality of the circumstances test is taken "[i]n light of the strong policy concerns to eradicate discrimination in employment." Coventry, 856 F.2d at 522–23. Although courts have enumerated various factors, it is well settled that the list is "intended to be illustrative rather than exhaustive." Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007). Reviewing the evidence as a whole in some detail, the Court is left with an unusual dichotomy. On one hand, Allstate seems to have technically abided by its legal duties by complying with OWBPA and satisfying most of the enumerated factors under the totality of the circumstances test. On the other hand, the overall construction of the Program and Release requirement, together with the information—or lack thereof—disseminated by Allstate, seems to have eliminated any real choice or understanding. As repeatedly emphasized above, the true story will only be revealed through live testimony, credibility determinations, and weighing of various pieces of documentary evidence. Both Motions for Summary Judgment are therefore denied on these grounds.

147

### 3.      Whether the Release Was Unconscionable

Plaintiffs' last challenge to the Release contends that it is invalid as to all

claims—including Plaintiffs' common law claims of breach of contract and breach of fiduciary

duty—because it is unconscionable as a matter of law.  To prove unconscionability under

Pennsylvania law,[55] a plaintiff must show that a contract is both procedurally and substantively

unconscionable.  Quilloin v. Tenet HealthSystem Phila., Inc., 673 F.3d 221, 230 (3d Cir. 2012).

"The party challenging a contract provision as unconscionable generally bears the burden of

proving unconscionability."  Harris v. Gree Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999).

The Pennsylvania Supreme Court has indicated that, in examining these two prongs, "it might be

appropriate to use a 'sliding-scale approach' so that 'where the procedural unconscionability is

very high, a lesser degree of substantive unconscionability may be required' and presumably,

vice-versa."  Quilloin, 673 F.3d at 230 (quoting Salley v. Option One Mortg. Corp., 925 A.2d

115, 125 n.12 (Pa. 2007)).

### a.      Procedural Unconscionability

"Procedural unconscionability examines the process leading to the formation of the

contract and the form and language of the agreement."  Porreca v. Rose Grp., No. Civ.A.13-

1674, 2013 WL 6498392 (E.D. Pa. Dec. 11, 2013).  A procedurally unconscionable contract

---

[55]  Plaintiffs contend that Illinois law should apply to this issue because it is where
Allstate is headquartered, where it designed the Release and the Program, where it gave
information to Plaintiffs about the Release, where it implemented the Program, and where it
received any purported benefit from the Program.  Nonetheless, Plaintiffs analyze the issue
primarily under Pennsylvania law, recognizing that there is no material difference between
Pennsylvania and Illinois law on this issue.  Allstate follows suit with its reliance on
Pennsylvania law.  In keeping with the parties' agreement on this point, and absent any thorough
choice of law analysis by the parties, the Court likewise relies on Pennsylvania law.

148

bears a lack of meaningful choice in the acceptance of the challenged provision.  Quilloin, 673

F.3d at 235.  Such contracts are typically "contracts of adhesion," which are defined as "a

standard-form contract prepared by one party, to be signed by the party in the weaker position,

usually a consumer, who adheres to the contract with little choice about the terms."  Id.

(quotation omitted).  Although unequal bargaining power is a key factor, standing alone it is

insufficient to meet the standard for procedural unconscionability.  Id.  Rather, courts must

consider additional factors including "the take-it-or-leave-it nature of the standardized form of

the document, the parties' relative bargaining positions, and the degree of economic compulsion

motivating the adhering party."  Id. at 235–36.

Plaintiffs contend that the Release was procedurally unconscionable for three reasons.

First, they assert—and Allstate does not deny—that the Release was offered on a take-it-or-

leave-it basis.  Second, Plaintiffs claim that the Release was a contract of adhesion because

Allstate was the stronger contracting party with full control over the terms of the Release, but

Allstate held the reins over Plaintiffs' livelihood.  Third, Plaintiffs contend that they were in a

particularly vulnerable position because they were financially and emotionally committed to their

agencies—investments that were made at Allstate's urging.

These arguments, together with Allstate's denials, bear striking similarity to the

arguments raised with respect to Plaintiffs' contention that the Release was not voluntarily

signed.  As set forth in great detail above, these arguments give rise to numerous issues of

material fact that are improper for resolution on a motion for summary judgment.  As such, for

the same reasons described above, the Court will deny both parties' Motions on this issue.

b.      **Substantive Unconscionability**

The same holds true for Plaintiffs' allegation of substantive unconscionability.  Under

Pennsylvania law, procedural unconscionability alone is insufficient to invalidate a contract.

Rather, a party must prove substantive unconscionability which "refers to whether the terms of

the agreement unreasonably favor the party asserting it."  Porreca, 2013 WL 6498392, at *10.

"Substantively unconscionable terms are those that are unreasonably or grossly favorable to one

side and to which the disfavored party does not assent."  Id. (quoting Estate of Hodges, No.

Civ.A.12-1698, 2013 WL 1294480, at *6 (E.D. Pa. Mar. 29, 2013).  "To establish substantive

unconscionability, the plaintiff must show that the contract terms are unreasonably favorable to

the drafter and that the other party had no meaningful choice but to accept those terms."  Cronin

v. Citifinancial Servs., Inc., No. Civ.A.08-1523, 2008 WL 2944869, at *3 (E.D. Pa. July 25,

2008).

Plaintiffs' claim of substantive unconscionability is, like its procedurally

unconscionability claim, marked with disputes of fact.  The Court has no doubt that the Plaintiffs

lost substantial benefits, to Allstate's gain, when they signed the Release.  The Court also notes,

however, that Plaintiffs gained in other ways through various options they received in the

Program.  The question of whether those gains and benefits satisfied the concept of mutuality of

obligation cannot be resolved at this juncture.  Moreover, any conclusions regarding the import

of public policy are necessarily intertwined with the resolution of the multitude of factual issues.

Accordingly, the Court also leaves this issue open for review by a factfinder.[56]

---

[56]  Although not raised as grounds in support of their Motion for Summary Judgment as to
the Invalidity of the Release, Plaintiffs challenge, in somewhat cursory fashion, Allstate's Motion
for Summary Judgment on the ground that a reasonable jury could find that the Release was

V.      **CONCLUSION**

In light of the foregoing, the Court must deny the relief requested by both Motions for

Summary Judgment as to the Invalidity of the Release.  This ultimate conclusion, however,

comes with several legal findings that will bear on the remainder of this case.  First, the law of

the case, as set forth by the Third Circuit, dictates that the Release, if valid, would bar all Romero

I claims and Count II of Romero II.  Moreover, plain contract interpretation reveals that the

Release covers Counts I and III of Romero II.  Second, Allstate has met its burden of

proving—and Plaintiffs have failed to show a genuine issue of material fact as to—the eight

statutory factors set out under OWBPA.  Finally, the Court finds itself stymied by the multiple

issues of fact surrounding the question of whether the Release was knowingly and voluntarily

signed, issues which also bear on the claim of unconscionability.  Although, as noted previously,

the Court finds itself tempted to invalidate the Release based on the "knowingly and voluntarily"

analysis, such a premature finding would involve resolution of issues of credibility, require the

Court to discern the appropriate inferences to be drawn from the evidence, and improperly ignore

the multiple other factors that weigh in Allstate's favor.  Ultimately, the numerous credibility and

evidentiary determinations that must be made require that an objective factfinder resolve this

matter.

Undoubtedly, the parties are anxious for some resolution of at least this portion of the

---

executed under duress and as part and parcel of an illegal scheme.  As the Court is already
denying Allstate's Motion for Summary Judgment on numerous other grounds, we need not
resolve these additional issues.  Moreover, at no point do Plaintiffs assert that the Court could
affirmatively invalidate the Release under either of these theories—only that genuine issues of
material fact remain on those issues.  Thus, these matters are not properly before the Court with
respect to Plaintiffs' Motion for Summary Judgment.

case, having litigated it for over a decade.  Nonetheless, the Court remains bound by Federal

Rule of Civil Procedure 56 and its interpretive jurisprudence and, thus, cannot conclusively rule

on the validity of the Release.  Therefore, the parties shall be directed to contact the Court with

respect to setting up a status conference and establishing a firm date for trial on this matter.