**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GENE R. ROMERO, et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 01-3894 |
| | : | |
| | : | CONSOLIDATED WITH |
| ALLSTATE INSURANCE COMPANY, | : | |
| et al., | : | NO. 01-6764 |
| Defendants. | : | NO. 01-7042 |

**<u>MEMORANDUM</u>**

BUCKWALTER, S.J.                                                   March 13, 2014

  Currently pending before the Court are the Cross-motions for Summary Judgment by

Plaintiff Equal Employment Opportunity Commission ("EEOC") and Defendants Allstate

Insurance Company, et al. (collectively "Allstate" or "Defendant") on the EEOC's Complaint.

For the following reasons, Allstate's Motion is granted and the EEOC's Motion is denied.

**I. FACTUAL BACKGROUND**

  The factual and procedural background of this case is a lengthy and convoluted one,

commencing in 1999 and continuing to the present day.  The underlying facts are well known to

the parties and were summarized in great detail in the Court's Memorandum Opinion dated

February 27, 2014.  In lieu of rehashing this complicated history, the Court incorporates by

reference the recitation of facts set forth in the previous Memorandum.  <u>Romero v. Allstate Ins.

Co.</u>, __ F. Supp. 2d __, 2014 WL 796005, at *1–27 (E.D. Pa. Feb. 27, 2014).

  With that caveat aside, the present Motions nonetheless require a brief review of the core

facts giving rise to this matter.[1]  This case revolves around Allstate's announcement and

implementation of its Preparing for the Future Group Reorganization Program ("the Program").

Prior to November 1999, the majority of Allstate's captive agency force acted as employee agents

under either an R830 or an R1500 contract and were entitled to a wide range of company-

sponsored health, welfare, and retirement benefits.  On November 10, 1999, Allstate announced

the Program by noting that, as part of a new business model, it was reorganizing its entire captive

agency force into a single exclusive agency independent contractor program.  With few

exceptions, Allstate terminated the employment contracts of the 6,200-plus R830 and R1500

employee agents effective no later than June 30, 2000.  While the Program applied to all agents

regardless of age, productivity, or performance, approximately ninety percent of the R830/R1500

agents were over forty years of age.

In connection with the termination of the R830 and R1500 employment contracts,

Allstate offered the agents working under those contracts four options.  The first three options

were conditioned upon the agents' agreement to execute a release of claims, while the fourth

option did not.  The first "release-based" option was the "EA Option."  According to the Program

Information Booklet, this option would allow the agent to enter into an R3001C or R3001S

Agreement, thereby converting the agent from an employee to an Exclusive Agent ("EA")

independent contractor.  The agent would then be entitled to all of the benefits and requirements

of that contract, including increased renewal commissions, a conversion bonus, earlier

transferability in the agent's book of business, debt forgiveness, and reimbursement for moving

---

[1]  As with the previous Memorandum, the Court will stray from normal practice and will
not cite to the parties' evidentiary submissions for each undisputed fact.  Rather, the Court will
limit its evidentiary citations to situations where a source is directly quoted.

expenses if necessary.  The R3001 contract, however, did not entitle agents to the same employee benefits.

The second option was the "Sale Option."  This option also permitted an agent to enter into an R3001C/S Agreement with Allstate, thus converting the agent to an EA independent contractor.  In turn, the agent would receive a "conversion bonus" and Allstate would forgive any advances owed, assume certain lease and advertising obligations the agent incurred as an employee agent, and permit the agent, after thirty days' service as an EA, to sell his or her book of business written while an R830 or R1500 agent.  This option also required the agent to sign a release.

The third option was the "Enhanced Severance Option."  Under this option, Allstate would pay the agent "enhanced" severance equal to one year's pay based on the greater of 1997 or 1998 total compensation, forgive debt and/or expenses that Allstate had advanced to the agent, and relieve the agent of certain lease and advertising obligations incurred as an R830 or R1500 agent.  This option was unavailable unless the agent signed a release.

The final option was the "Base Severance Option."  If an agent elected this option, then Allstate paid him or her up to thirteen weeks of pay.  The agent electing this option did not need to enter into a release, although he/she was subject to certain additional non-compete and non-solicitation obligations.  Notably, Allstate had determined that agents affected by the Program were ineligible for the pre-existing severance or post-termination pay plans because they were not terminated for any of the reasons set forth in those plans.  Allstate also took the position that the pre-existing severance/post-termination pay plans were inapplicable because they did not apply to group reorganization programs.

3

The Release required by the first three options was three pages long, including a signature page.  The Release and Waiver Provision stated:

> In return for the consideration that I am receiving under the Program, I hereby release, waive, and forever discharge Allstate Insurance Company, its agents, parent, subsidiaries, affiliates, employees, officers, shareholders, successors, assigns, benefits plans, plan administrators, representatives, trustees and plan agents ("Allstate"), from any and all liability, actions, charges, causes of action, demands, damages, entitlements or claims for relief or remuneration of any kind whatsoever, whether known or unknown, or whether previously asserted or unasserted, stated or unstated, arising out of, connected with, or related to, my employment and/or the termination of my employment and my R830 or R1500 Agent Agreement with Allstate, or my transition to independent contractor status, including, but not limited to, all matters in law, in equity, in contract, or in tort, or pursuant to statute, including any claim for age or other types of discrimination prohibited under the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act, the Employee Retirement Income Security Act ("ERISA"), the Illinois Human Rights Act, and the West Virginia Human Rights Act as those acts have been amended, or any other federal, state, or local law or ordinance or the common law.  I further agree that if any claim is made in my behalf with respect to any matter released and waived above, I hereby waive any rights I may have with respect thereto and agree not to take any payments or other benefits from such claim. I understand that this release and waiver does not apply to any future claims that may arise after I sign this Release or to any benefits to which I am entitled in accordance with any Allstate plan subject to ERISA by virtue of my employment with Allstate prior to my employment termination date.

(Allstate's Mot. Summ. J. on the Validity of the Release, Heinz Decl., Nos. Civ.A.01-3894, 01-6764, Ex. 186 ("Release"), at ARI 004101.)

Several employee agents subject to this Program brought age discrimination charges against Allstate with the Equal Employment Opportunity Commission ("EEOC") and subsequently initiated two federal cases against Allstate:  Romero v. Allstate, No. Civ.A. 01-3895 ("Romero I") and Romero v. Allstate, No. Civ.A.01-6746 ("Romero II").  Shortly thereafter, the EEOC brought its own action against Allstate, on December 27, 2001, alleging that Allstate unlawfully retaliated against all employee agents, in violation of the ADEA and

4

other federal employment statutes, by refusing to permit them to continue as Allstate employees unless they signed the Release.  Via this action, the EEOC sought a declaratory judgment that the Release is invalid.  (Am. Compl., No. Civ.A.01-7042 ("EEOC v. Allstate").)

In compliance with the Court's scheduling order in the consolidated actions, the parties began filing summary judgment motions in early April 2013.  Briefing on those motions and related motions did not conclude until the end of August 2013.  As of December 2013, this Court had ruled on all of the evidentiary disputes associated with the summary judgment motions, leaving the latter motions ripe for judicial review.  On February 27, 2014, the Court issued a Memorandum and Order on the Cross-Motions for Summary Judgment as to the Validity of the Release signed by the Plaintiffs in Romero I and Romero II and determined that genuine issues of material fact remained as to whether the Release was knowingly and voluntarily signed. Romero, ___ F. Supp. 2d ___, 2014 WL 796005, at *68–79.

Now pending are the EEOC's and Allstate's Cross-Motions for Summary Judgment as to the EEOC's Amended Complaint.  These Motions are ripe for judicial review.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence

that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending.  Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).  As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is

entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.   DISCUSSION

In its Motion for Summary Judgment, the EEOC asserts that (1) the Release requirement that was part of the Program constituted unlawful retaliation in violation of multiple anti-retaliation statutes and (2) section 503(b) of the Americans With Disabilities Act invalidates Allstate's "sign the release or leave" scheme.  Allstate rests its Cross-motion on the proposition that the Release does not substantively violate any federal statute, thereby warranting summary judgment in its favor on the entirety of the EEOC's Complaint.  The Court addresses each argument separately.

### A.   <u>Retaliation Claim</u>

The EEOC frames its first argument in terms of a singular issue: "Did Allstate's replacement of its employee agents' right to seek to convert to the R3001 contract with the requirement that they release all of their rights under the employment discrimination laws in order to be allowed to convert, dissuade employee agents from freely pursuing their claims?" (EEOC's Mem. Supp. Mot. Summ. J. 16.)  More precisely, the EEOC contends that the Release-signing requirement imposed by Allstate as part of the Program constituted unlawful retaliation under section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, et seq. ("Title VII"),[2] section 4(d) of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"),[3] and section 503 of the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA").[4]

The United States Supreme Court has interpreted these retaliation provisions to have a

---

[2]  Title VII's anti-retaliation provision provides that:

It shall be an unlawful employment practice for any employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title [42 U.S.C. §§ 2000e-2000e-17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 U.S.C. §§ 2000e-2000e-17].

42 U.S.C. § 2000e-3(a).

[3]  The ADEA provides that:

It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act.

29 U.S.C. § 623(d).

[4]  The ADA's anti-retaliation provision states:

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

broad reach.[5]   In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), the Supreme Court held that "Title VII's substantive provision and its antiretaliation provision are not coterminous.  The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67.  It reaffirmed that "[t]he antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms. . . . It does so by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." Id. at 68 (quotations omitted).

Notwithstanding this broad reach, the essential elements of a prima facie case of illegal retaliation under the anti-discrimination statutes remain the same.  First, a plaintiff must show protected activity.  Fogelman v. Mercy Hosp., Inc., 283 F.3d 561, 567–68 (3d Cir. 2002) (quoting Krouse v. Am. Sterilizer, 126 F.3d 494, 500 (3d Cir. 1997)).  This element is satisfied by a showing of "complaints to [the employer], whether oral or written, formal or informal." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir. 2001).  For an employee's complaint to be protected, he or she "must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful . . . ." Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006) (citing Clark Cnty. v. Breeden, 532 U.S. 268, 271 (2001)).  Second, there must be some adverse action by the employer either after or contemporaneous with the employee's protected activity.  Fogelman, 283 F.3d at 567 (quoting Krouse, 126 F.3d at 500).  In

---

[5]   Because the anti-retaliation provisions of the three statutes are nearly identical, the United States Court of Appeals for the Third Circuit has held that precedent interpreting any one of these statutes is equally relevant to interpretation of the others.  Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).

addition to actions that "affect the terms and conditions of employment," the anti-retaliation

provisions more broadly proscribe "any employer action that 'well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination.'" Thompson v. N.

Am. Stainless, LP, 131 S. Ct. 863, 868 (2011) (quoting Burlington, 548 U.S. at 68). Finally, a

plaintiff seeking to establish retaliation must prove causal connection between the employee's

protected activity and the employer's adverse action." Fogelman, 283 F.3d at 567–68 (quoting

Krouse, 126 F.3d at 500).

 Acknowledging that the present case does not precisely fit the mold of a typical

retaliation claim, the EEOC offers three theories for establishing that the Release-signing

requirement substantively violated the various federal anti-retaliation statutes. First, it contends

that the Release requirement was a "facially retaliatory" policy that was per se unlawful. Second,

it avers that, with respect to the employee agents who opted to not sign the Release, the policy

was retaliatory because it deprived those agents of the right to continued employment with

Allstate in retaliation for their protected conduct of refusing to waive their federal discrimination

claims. Finally, the EEOC avers that the agents who did sign the Release were victims of

anticipatory retaliation. The Court addresses these arguments separately.

  **1.**  **Whether the Release-signing Requirement Was Facially Retaliatory**

 The EEOC's first theory rests on the principle that the very heart of the Program was a

retaliatory policy that only allowed agents who signed the Release to continue in Allsate's

employ, thereby insulating Allstate from any and all charges and preventing employee agents

from engaging in protected activity. According to the EEOC, the Release, in and of itself,

constituted an employee practice that was reasonably likely to deter or disincentivize persons

from engaging in future protected activity.

The EEOC loosely rests this claim of "facial retaliation" on the United States Supreme Court decision in <u>Trans World Airlines v. Thurston</u>, 469 U.S. 111 (1985).   In that case, the defendant airline allowed captains displaced for reasons other than age—*i.e.*, medical reasons or reductions in force—to become flight engineers.  <u>Id.</u> at 116–17.  Disqualified captains over the age of sixty, however, were unable to avail themselves of this privilege.  <u>Id.</u> at 116.  The Supreme Court remarked that although the airline was not required to grant transfer privileges to disqualified captains, once it did so, it could not deny the opportunity to others because of their age.  <u>Id.</u> at 120–21.  The court found that the policy itself was "direct evidence" of age discrimination since the method of job transfer available to a disqualified captain depended upon his age and, thus, was discriminatory on its face.  <u>Id.</u> at 121.

The United States Court of Appeals for the Third Circuit, however, subsequently clarified the scope of <u>Thurston</u> and limited the reach of the so-called facial retaliation theory.  In <u>DiBiase v. SmithKline Beecham Corporation</u>, the defendant consolidated four of its computer data centers into a single center and allowed employees to move to the central location.  48 F.3d 719, 722 (3d Cir. 1995).  Subsequently, the defendant decided to lay off several managers, including the plaintiff, and offered terminated employees a separation benefit plan, which provided twelve months salary and three months continued health and dental benefits.  <u>Id.</u>  Additionally, the plan offered enhanced benefits to employees willing to sign a general release of all claims against the defendant.  <u>Id.</u>  Those employees who signed the release were entitled to receive fifteen months' salary and six months' continued health and dental coverage.  <u>Id.</u>  The plaintiff declined to sign the release and indicated by letter to defendant that he had reason to believe that the company

violated federal and state age discrimination laws.  Id. at 723.  He later filed a charge with the EEOC and, thereafter, a complaint in federal court alleging, among other things, that the defendant's policy was facially discriminatory.  Id.

The Third Circuit held that the district court erred in determining that the defendant's policy was facially discriminatory.  Id. at 727.  It explained that "[t]he touchstone of explicit facial discrimination is that the discrimination is apparent from the terms of the policy itself."  Id. (citing Thurston, 469 U.S. 111).  The court agreed that when a policy facially discriminates on the basis of the protected trait, in certain circumstances it could constitute per se age discrimination.  Id.  "This is because, in a facial disparate treatment case, the protected trait by definition plays a role in the decision-making process, inasmuch as the policy explicitly classifies people on that basis.  Thus, when the policy itself displays the unlawful categorization, the employee is relieved from independently proving intent."  Id. at 726.  The court found that the defendant's policy did not fall within this "limited category of cases," because the plan, which did not classify persons on the basis of age, could not be deemed to be discriminatory on its face. Id. at 727.  "On the contrary," the Third Circuit observed that "the plan offering is an archetypical example of a facially non-discriminatory policy.  [Defendant] made the expanded package available to all persons willing to sign the release, regardless of age.  [Defendant] did not require employees to waive only ADEA claims, but to waive all claims.  A facially non-discriminatory policy cannot be transformed into a facially discriminatory policy simply because of the existence of the ADEA."  Id. at 727.

In line with the reasoning of DiBiase, it is well established that a release of claims used in connection with termination of employment is not, in and of itself, a per se retaliatory policy

simply because it may include the release of federal discrimination claims.  Indeed, Congress expressly addressed the propriety of such releases when it enacted the Older Workers Benefit Protection Act of 1990 ("OWBPA"), which "is designed to protect the rights and benefits of older workers" and "governs the effect under federal law of waivers or releases on ADEA claims . . . ." Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998).  The OWBPA defines the minimum requirements for determining what is a knowing and voluntary waiver.  29 U.S.C. § 626(f)(1).  In doing so, the statute makes clear that an offer of an employment benefit conditioned upon waiver of ADEA rights is not retaliatory per se.  Had Congress meant for such releases to be per se retaliatory due to their waiver of federal discrimination claims, it would not have so carefully defined the requirements necessary for such releases to be upheld.

Consistent with this congressional policy, the United States Court of Appeals for the Third Circuit has noted that "[t]he requirement that employees sign a release as a condition of receiving severance pay is a common provision in modern severance agreements." Local Union No. 1992, Int'l Bhd. of Elec. Workers v. Okonite Co., 189 F.3d 339, 348 (3d Cir. 1999).  "'An employee release is a contract in which a discharged employee abandons claims against a former employer after they have arisen, in exchange for benefits such as severance pay.'" Id. (quoting 2 Henry H. Perritt, Jr., Employee Dismissal Law & Practice § 8.10 (3d ed. 1992)).  Applicable jurisprudence has consistently emphasized that "[t]he mere offer of the severance agreement is insufficient to constitute discrimination in the retaliation context." E.E.O.C. v. Nucletron Corp., 563 F. Supp. 2d 592, 598 (D. Md. 2008).  "[T]he employer's action only reaches the level of retaliation if it denies severance benefits that are otherwise promised or owed or if the employer sues to enforce the agreement." Id. at 598–99; see, e.g., DiBiase v. SmithKline Beecham Corp.,

48 F.3d 719 (3d Cir. 1995) (holding that separation benefit plan providing enhanced benefits to terminated employees conditioned upon the signing of a general release—which expressly included waiver of age discrimination claims—did not violate ADEA even though the release did not provide any additional consideration to ADEA-protected workers); Corneveaux v. CUNA Mut. Ins. Grp., 76 F.3d 1498, 1508 (10th Cir. 1996) (concluding that the plaintiff failed to prove the causal link required for a retaliation claim simply because the defendant employer "required completion of a form waiving all claims against [the employer] from all employees prior to disbursing the [benefits]" (emphasis added)); Griffin v. Kraft Gen. Foods, 62 F.3d 368 (11th Cir. 1995) (rejecting claim that termination plan was facially discriminatory where it required employees to execute a general release which explicitly included waiver of ADEA claims before benefits could be received); Prestileo v. Sears, Roebuck & Co., No. Civ.A.99–2180, 2000 WL 190257, at *5–6 (E.D. Pa. Feb. 2, 2000) (holding no evidence of age discrimination where severance package was offered, with its accompanying waiver of legal rights, to all salaried employees, regardless of age, race or sex).

The challenged policy, in the present case, is precisely the type of general Release of claims described in the foregoing cases.  Allstate's entire employee agent workforce, with limited exceptions made to accommodate certain states' laws, was terminated pursuant to the Program regardless of age or protected activity.  In connection with that Program, all of the terminated employee agents were offered one of the four aforementioned options.  Three of those options, which provided some form of enhanced benefits, were conditioned upon the signature of the Release without regard to an employee's potential for having ADEA claims.  The Program and Release did not categorize employees according to age or protected activity.  Thus, the mere offer

14

of the Program and Release cannot be said to be facially retaliatory.[6]

In an effort to evade this conclusion, the EEOC asserts that the Program and Release were retaliatory because they took away a right to continued employment and conditioned any further employment on the employee's release of rights to engage in protected conduct.  As support for this theory, the EEOC relies heavily on the Seventh Circuit case of <u>EEOC v. Board of Governors of State Colleges & Universities</u>, 957 F.2d 424, 429 (7th Cir. 1992).  The EEOC, in that matter, brought an action to challenge—under the retaliation provision of the ADEA—the legality of a collective bargaining agreement provision that denied employees their contractual right to a grievance proceeding whenever the employee initiated a claim, including a claim of age-based discrimination, in an administrative or judicial forum.  <u>Id.</u> at 425.  The employee at issue had filed a claim with the EEOC and, as a result, the defendant terminated his grievance proceedings, thereby prompting the EEOC to bring a retaliation claim against the defendant.  <u>Id.</u> at 426.  The court found that, although the policy also adversely affected non-protected persons, the defendant could not "deny grievance proceedings on the basis that employees have filed protected ADEA claims."  <u>Id.</u> at 430.  The court deemed the policy itself retaliatory and concluded that "a retaliatory policy constitutes a per se violation of Section 4(d)" of the ADEA.  <u>Id.</u> at 430–31.

<u>Board of Governors</u>, however, is inapposite in multiple respects.  As a primary matter—and contrary to the EEOC's interpretation—<u>Board of Governors</u> did not state that the

---

[6]  Notably, in the Memorandum Opinion of February 27, 2014, this Court found that the Release at issue complied with OWBPA, but that there was a genuine issue of material fact as to whether they were knowingly and voluntarily signed.  <u>Romero</u>, ___ F. Supp. 2d ___, 2014 WL 796005, at *68–79.  Even if a factfinder ultimately determines that the Release was not knowingly and voluntarily signed, however, the remedy will be to invalidate the Release, not to find that it constitutes substantive retaliation.

existence of the policy alone constituted retaliation.  "The Court merely held that when the employer *enforced* its policy against employees who had filed EEOC charges, the affected employees could prove their retaliation claims without producing evidence that the employer had acted with retaliatory animus."  Nucletron, 563 F. Supp. 2d at 598 (citing Board of Governors, 957 F.2d at 427–428) (emphasis added); see also EEOC v. Sundance Rehabilitation Corp., 466 F.3d 490, 498 (6th Cir. 2006) ("[W]hile the Seventh Circuit in Board of Governors addressed what it determined to be the facially retaliatory CBA provision that purported to authorize that action, that policy was before the Seventh Circuit because the employer had implemented it and had engaged in a retaliatory act.").  The Seventh Circuit did not create a cause of action for employees who had not yet been denied a grievance proceeding.  Id.

Moreover, and perhaps more importantly, the Board of Governors ruling relied on the principle that "'[a] benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all.'"  Id. at 430 (quoting Hishon v. King & Spalding, 467 U.S. 69, 75 (1984)).  The court noted that the employees' collective bargaining agreement guaranteed them the right to proceed against their employers in a binding arbitration.  Id. at 429–30.  The new policy denied that contractual right for the sole reason that the employee engaged in the protected activity of filing a lawsuit.  Id.  In other words, the policy preemptively retaliated against employees by creating an automatic adverse employment action against a contractual employment benefit in the event of protected activity.

As noted above, however, where an employer offers something in addition to what the terminated employee is entitled and conditions receipt of that benefit upon the signing of a

16

waiver of federal discrimination claims, the waiver is not facially retaliatory.  See Davis v. Precoat Metals, a Div. of Sequa Corp., 328 F. Supp. 2d 847, 853 (N.D. Ill. 2004) (distinguishing Board of Governors and finding that employer's offer of severance benefits—to which employees were not otherwise entitled—to all employees subject to execution of release was not discriminatory per se); SunDance Rehabilitation, 466 F.3d at 500-01 (distinguishing Board of Governors and rejecting argument that the employer's "mere offer of the Separation Agreement to all employees terminated in the reduction in force, without more, amounts to facial retaliation under the four statutes at issue here.").[7]

In the present case, the EEOC's entire argument is premised on the faulty assumption that the Program discriminatorily doled out an absolute right that was part and parcel of the employee agents' R830 and R1500 contracts—i.e., the right to convert to independent contractor status. Prior to the announcement of the Program, employee agents had the opportunity to apply to convert to independent contractor status and were subject to somewhat perfunctory application requirements.  At no point, however, did the employee agents—unlike the employees in Board of Governors—maintain any contractual or legal right to such conversion.  Indeed, Allstate could

---

[7]  The EEOC also cites to EEOC v. Lockheed Martin Corp., 444 F. Supp. 2d 414, 421–22 (D. Md. 2006) in support of its theory.  In that case, however, the employer conditioned the plaintiff's receipt of severance benefits on the plaintiff's withdrawal of a charge she had already filed with the EEOC and on her execution of a release.  Id. at 421–22.  Unlike the receipt of severance benefits, which is a privilege rather than a right, the opportunity to file a charge of discrimination with the EEOC is a statutory right that is not subject to waiver.  See 29 U.S.C. § 626(f)(4).

As discussed in great detail in this Court's Memorandum Opinion filed February 27, 2014, the Agreement and Release at issue in this case did not prohibit Plaintiffs from filing a charge with the EEOC and, thus, did not compel Plaintiffs to waive any right to which they where entitled.  Romero, ___ F. Supp. 2d ___, 2014 WL 796005, at *57–62.  Accordingly, Allstate's contingency of severance pay and benefits on execution of the Agreement and Release was not akin to the release in Lockheed.

refuse a conversion at its discretion.  When the Program was announced, all R830 and R1500 employee agents were terminated, without exception, with no opportunity to continue working as employee agents of Allstate under their existing contracts.  At that point, the employee agents were offered either a base severance package or one of several options contingent upon signature of a Release, one of which was a guaranteed right to convert to independent contractor status. This new right to convert was, therefore, a benefit to which the employees were not otherwise entitled.  As the applicable jurisprudence has made clear, the provision of such additional benefits in exchange for the signature of a release waiving a federal claim is not a per se retaliatory policy.  To now hold that such a document was, by its very nature, retaliatory would contravene a well-settled congressional policy to permit the use of such releases so long as they comply with certain requirements.[8]

In short, the Court finds no authority on which to hold the Release at issue retaliatory per se.  An employer's mandate that a departing employee sign a release of federal claims in exchange for some enhanced benefit has been well-regulated by Congress and repeatedly upheld by the courts.  The Release requirement at issue was applied in an entirely non-discriminatory manner and affected all employees equally regardless of age or protected activity.  Accordingly, the Court rejects any argument that the Release was facially retaliatory.

---

[8]  In the Memorandum Opinion of February 27, 2014, this Court found that the offer of an ability to convert constitute adequate consideration sufficient to support the Release.  Romero, __ F. Supp. 2d ___, 2014 WL 796005, at *57–62.

2. **Whether Allstate Retaliated Against Employee Agents Who Did Not Sign the Release for Engaging in Protected Activity by Refusing to Consider Them for Conversion to the R3001 Contract**

The EEOC next argues that, even if the Court does not find that the Release-signing requirement was facially retaliatory, Allstate unlawfully retaliated against the employee agents who did not sign the Release by not allowing them to convert to independent contractor status. Stated differently, the EEOC contends that the refusal to sign the Release constituted protected activity and Allstate's resulting refusal to allow such agents to remain employed was a causally-connected adverse employment action, thereby satisfying the elements of a retaliation claim.

To bolster this somewhat novel concept, the EEOC does not cite to any analogous cases, but rather relies on a policy-based argument that retaliation statutes should have broad reach to protect workers in such situations. To that end, it cites to two Supreme Court cases for the proposition that the anti-retaliation provisions were intended to cover a broad range of employer action. First, in Burlington N. & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) ("BNSF"), the Supreme Court gave a broad interpretation of the retaliation provision of Title VII. Specifically, it remarked that "[t]he antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status." Id. at 63. In turn, "[t]he antiretaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct." Id. The court went on to note that:

To secure the first objective, Congress did not need to prohibit anything other than employment-related discrimination. The substantive provision's basic objective of "equality of employment opportunities" and the elimination of practices that tend to bring about "stratified job environments," . . . would be achieved were all employment-related discrimination miraculously eliminated.

But one cannot secure the second objective by focusing only upon employer actions and harm that concern employment and the workplace. Were all such actions and harms eliminated, the antiretaliation provision's objective would not be achieved. An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace. . . . A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the antiretaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms." . . .

Thus, purpose reinforces what language already indicates, namely, that the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment. . . .

Id. at 63–64.

Thereafter, in Thompson v. North American Stainless, 131 S. Ct. 863 (2011), the Supreme Court continued to favor a broad interpretation of the anti-retaliation provisions. In that matter, after the petitioner's fiancée filed a sex discrimination charge with the EEOC against their mutual employer, the employer fired the petitioner. Id. at 867. He filed his own EEOC charge and a subsequent suit under Title VII of the Civil Rights Act, claiming that the employer fired him to retaliate against his fiancée for filing her charge. Id. The Supreme Court held that if the facts alleged by plaintiff were true, his firing by the employer constituted unlawful retaliation since Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct. Id. at 867–68. "It prohibits any employer action that well might have 'dissuaded a reasonable worker from making or supporting a [discrimination] charge.'" Id. (citing BNSF, 548 U.S. at 68). Ultimately, the court found it "obvious that a reasonable worker might be dissuaded

from engaging in protected activity if she knew that her fiance would be fired."  Id. at 868.

Drawing broad and somewhat tenuous inferences from those cases, the EEOC now asserts that the Congressional purpose behind the anti-retaliation provisions compels the conclusion that activity, such as a refusal to sign a broad release of claims, is protected activity for purposes of a retaliation claim.  (EEOC's Mem. Supp. Mot. Summ. J. 21.)  It reasons that antiretaliation provisions prohibit employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.  The EEOC goes on to argue that, in contravention of that prohibition, Allstate used a "carrot and a stick" approach to obtain Releases from its employee agents.  Prior to the Program, employee agents had, as an incident of their employment, the ability to apply and be considered for conversion to the R3001 contract without signing a release.  Under the Program, however, if an employee-agent refused to sign the Release, then that agent could not convert to the R3001 contract, even if he or she met all of the current requirements, and therefore could not continue in Allstate's service.  Thus, Allstate's inclusion within the Program of a disincentive to pursue an employment discrimination claim against Allstate—i.e., the "stick" in Allstate's efforts—effectuated a retaliatory action against such agents for engaging in the protected activity of refusing to sign the release.

While creative, the EEOC's argument again rests on faulty assumptions and misplaced legal theories.  **First**, basic retaliation principles undermine the concept that a mere refusal to sign a broad release of claims—some of which may be federal discrimination claims—constitutes protected conduct.  It is well established that:

An employee cannot establish retaliation without proving that the employer *knew* that

the employee engaged in protected activity.  Without knowledge, there can be no
retaliatory intent, and thus there can be no causal connection.  Knowledge alone,
however, is insufficient to prove retaliation.

Barbara T. Lindemann & Paul Grossman, 1 Employment Discrimination Law 1034 (4th ed.

2007) (emphasis in original).  The jurisprudence cited by the EEOC underscores this notion.  See

EEOC v. L.B. Foster Co., 123 F.3d 746, 753 (3d Cir. 1997) (finding protected activity when the

employee told a supervisor that she intended to file a sex discrimination suit against the

supervisor and the company); Aviles v. Cornell Forge Co., 183 F.3d 598, 603 (7th Cir. 1999)

(holding that threatening to file a charge with the EEOC constitutes protected activity); Gifford v.

Atchison, Topeka & Santa Fe Ry., 685 F.2d 1149, 1156 n.3 (9th Cir. 1982) (writing letter to

employer and union informing them of intent to file EEOC charge is protected).[9]

　　　　With little support for its position, the EEOC now asks the Court to make the broad legal

leap that the decision to not sign a release that waives federal discrimination claims is akin to a

communicated threat or intent to actually file a charge.  The mere refusal to sign a release,

however, does not clearly signal that the individual intends to participate in *any* litigation, let

---

　　　[9]　The other cases cited by the EEOC involve situations where the employees had actually
filed charges and refused to release specific claims.  See Curl v. Reavis, 740 F.2d 1323, 1329
(4th Cir. 1984) (holding that employer's statement that "if she would drop the [sex
discrimination] charges pending at the time . . . she would be transferred to the EOC [sic] as a
communications dispatcher," constituted retaliation); Johnson v. Palma, 931 F.2d 203, 208 (2d
Cir. 1991) (holding that prima facie Title VII retaliation case was established by employee
against his local union by allegations that employee had filed racial complaint against his
employer in state human rights department, that local union refused to proceed with employee's
grievance under collective bargaining procedures until he withdrew his human rights complaint,
and that employee was persuaded to withdraw his human rights complaint); Marshall v. Parking
Co. of Am.-Denver, 670 F.2d 141, 142 (10th Cir. 1982) (holding that employer's statement that
it would forget employee's failed lie detector test if he would release the back pay claim against
the company constituted retaliation).  The present case, by contrast, involves no efforts by
Allstate to coerce employees into releasing claims.

alone litigation which challenges some form of discrimination or other protected activity under

the federal anti-discrimination statutes.[10]  Moreover, Allstate points to no evidence in the record

indicating that, prior to implementing the Release-signing requirement, any employee agent

threatened to pursue an age discrimination claim against the company.  As far as Allstate knew,

the employee agents who refused to sign the Release did so because they wanted to raise some

form of breach of contract claim in connection with their termination, not because they wanted to

pursue litigation against an unlawful discrimination practice.[11]  Accordingly, this Court declines

to make the tenuous inference that employee agents' mere refusal to sign a release constituted

some sort of opposition to discrimination that Allstate should have understood to be protected

---

[10]  See Barber v. CSX Distrib. Servs., 68 F.3d 694, 701–02 (3d Cir. 1995) (holding that employee's letter to the human resources department setting forth a general complaint of unfair treatment because someone else received a desired position does not translate into a charge of illegal age discrimination and, thus, cannot constitute protected conduct); see also Jackson v. Unisys, Inc., No. Civ.A.08-3298, 2009 WL 1393736, at *5–6 (E.D. Pa. May 15, 2009) (holding that plaintiff's attempt to rescind a severance agreement that waived a broad range of claims was not protected activity under the ADEA because it was "not opposition to discrimination on the basis of age because Plaintiff never complained about age discrimination before or during his attempt to rescind the Severance Agreement.").

[11]  The EEOC argues that some agents filed charges over the release-signing requirement or discussed their concerns over the discriminatory nature of the Program and the release with the EEOC.  Allstate was aware of these efforts and, as of February 2000, had actually implemented a litigation hold because of threatened litigation over the Program.  (EEOC Resp. Opp'n Mot. Summ. J. 18–19.)

    This argument, however, relies on the wrong time-frame for Allstate's knowledge. Allstate announced the Program in November 1999 and made clear at that time that none of the terminated agents could continue working for Allstate without signing a Release.  Only *subsequent* to that announcement did agents begin communicating with the EEOC, meaning that prior to taking the allegedly adverse employment action, Allstate had no knowledge of any perceived or threatened litigation.

activity prior to implementing the Program.[12]

The EEOC's policy-based arguments for deeming a refusal to sign to be protected conduct are similarly unconvincing.  Specifically, the EEOC contends that "because of the broad interpretation due the antiretaliation provisions, and the wide recognition that the purpose of these provisions is to prohibit employers from deterring victims of discrimination from exercising their legal rights, this Court should find that individuals who refuse to sign a waiver or release are protected from employer reprisal."  (EEOC Mem. Supp. Mot. Summ. J. 23.)  The EEOC, however, cites no jurisprudence suggesting that the antiretaliation provisions were intended to have this broad of a scope.  Indeed, to accept this theory would result in findings of substantive retaliation for all releases that ask employees to waive federal discrimination claims, regardless of whether those releases comply with the Congressionally-mandated OWBPA requirements.  As noted above, Congress certainly intended no such result.

**Second**, even were the Court to find that a refusal to sign a Release constitutes protected activity, the EEOC has failed to prove that the consequent withholding of benefits to which the employee is not otherwise entitled is an adverse employment action.  In Isbell v. Allstate

---

[12]  The EEOC's efforts to analogize cases under the Fair Labor Standards Act ("FLSA") are misguided.  The EEOC cites to two cases in which the courts found that the refusal to release overtime pay claims under the FLSA constitutes protected activity.  See Brock v. Richardson, 812 F.2d 121, 124 (3d Cir. 1987) and Brock v. Casey Truck Sales, 839 F.2d 872, 879 (2d Cir. 1987).  These cases, however, are inapposite to the present matter.  It is well established that unlike claims of federal discrimination that may be waived via a proper release that complies with OWBPA, claims to back pay or overtime pay under the FLSA may *not* be released.  Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 740 (1981) ("This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act.  Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate.").

Insurance Co., 418 F.3d 788 (7th Cir. 2005), the Seventh Circuit addressed this precise argument under this precise factual scenario and rejected it.  In that matter, the plaintiff was an employee agent of Allstate who was terminated as part of the identical Program at issue here.  Id. at 790–91.  The plaintiff declined to sign the release and brought, in part, a retaliation claim against Allstate.  Id. at 792.  On appeal, she framed her retaliation theory by "claiming that Allstate retaliated against her when it refused her 'the opportunity to work for Allstate albeit under a different contract unless she signed the release.'  [Plaintiff] thus argues that Allstate could not require her to sign the Release as a condition to becoming an independent contractor with the Company."  Id. at 793.  The Seventh Circuit pointedly rejected this theory, finding that the plaintiff "was not a victim of retaliation."  Id.  It explained that:

> Her reason for termination was the same for all employees at Allstate who were similarly situated. She had four options.  Three of those options had various incentives and benefits in exchange for the release.  In order to be valid, a release, like all agreements, must be supported by consideration.  See, e.g., 29 U.S.C. § 626(f)(1)(D) (stating that for a release to be valid under the Older Workers Benefits Protection Act, a release must be supported by consideration).  An employee who refuses to sign a release will not be offered the same deal as a terminated employee who is willing to sign the release.
>
> It is also clear that Isbell did not lose her job, because she refused to sign the Release. She lost her job for the same reason 6,400 other employee agents of Allstate lost theirs, including those who signed the Release—because Allstate had decided to eliminate all employee agent positions with the Company.  Isbell's fellow plaintiff Schneider signed the Release, yet he too lost his job as an employee agent. The district court did not err in granting summary judgment in Allstate's favor on Isbell's claim of retaliation.

Id.

This case presents the identical facts.  The employee agents who did not sign the Release were terminated for the same reason as those who signed the Release—Allstate chose to end its

employee agent program in lieu of an independent contractor agency force.  Regardless of

whether an employee agent signed the Release, they could no longer continue to act as employee

agents for Allstate under either the R830 or R1500 contract.[13]  Their only option in order to

continue in some form of employment with Allstate was to sign the Release and convert to the

R3001 contract, which was an entirely different form of employment than what they had

previously had.  As the Court explained in great detail in its Memorandum of February 27, 2014,

and has re-emphasized above, the right to convert to the R3001 contract was something more

than what the employee agents were entitled to at the time of termination, and thus served as

consideration for the Release.  The right to convert was never part and parcel of the original

employment agreement.  It is well settled that there is no retaliation where an employer withholds

benefits from an employee who declines to sign a release where the employee is not otherwise

entitled to such benefits.[14]  See Mitchell v. MG Indus., Inc., 822 F. Supp. 2d 490, 503 (E.D. Pa.

---

[13]  The EEOC's efforts to distinguish Isbell are entirely unconvincing.  The EEOC
contends that, in Isbell, the court characterized the plaintiff's claim as a challenge to her
termination as an employee agent, not Allstate's refusal to convert employee agents to the R3001
contract.  In this case, however, the EEOC claims that it does not allege that Allstate retaliated
against those who did not sign the release by terminating their employer, but rather by refusing to
consider them for conversion to the R3001 contract.

Notably, however, on appeal in Isbell, the plaintiff re-characterized her claim as precisely
the one at issue in this case:  "Allstate retaliated against her when it refused her 'the opportunity
to work for Allstate albeit under a different contract unless she signed the release.'"  Id. at 793.
The Seventh Circuit rejected this theory of retaliation.  Id.

[14]  Allstate places heavy reliance on the Rule 30(b)(6) deposition testimony of former
President of Property and Casualty Richard Cohen, who testified that Allstate was not interested
in terminating agents, but that continuation of employment was contingent upon signing a
release.  (EEOC Mot. Summ. J., Ex. 10, Rule 30(b)(6) Deposition of Richard Cohen,
191:21–193:14, Feb. 7, 2013.)  Such testimony does nothing to change the Court's ruling on the
retaliation claim.  While Allstate may have hoped that many agents would choose the conversion
option of the Program, the fact remained that *all* employee agents were being terminated,
regardless of whether they signed the Release, and that they could choose one of several options

2011) ("Muller's retaliation claim fails because MG denied him severance benefits only after he refused to sign the same general Release and Waiver required of all MG employees seeking similar benefits, and Muller therefore cannot show benefits were denied because of his EEOC charge rather than his failure to sign the release.").  Nor is there any evidence that employee agents who did not sign the Release and brought charges against Allstate were threatened with some form of retaliation or coercion in order to get them to drop the charges.

Moreover, the EEOC's theory of adverse employment action completely disregards the fact that the Program and Release at issue offered a total of four different options to terminated employees.  In exchange for signing the Release, an employee agent was not limited to converting to the R3001 contract.  Rather, he or she could also elect to obtain an immediately transferable economic interest in a book of business with a bonus and debt forgiveness, or an enhanced severance package.  The EEOC concedes that these latter two options provided benefits to which employee agents were not otherwise entitled and, thus, the mere offer of such options would not constitute per se retaliation.  Had Allstate structured its Program to offer only these options plus the base severance option—thereby eliminating the conversion option—the EEOC, by its own admission, would have nothing on which to hang a claim of retaliation.  Therefore, it makes little sense to find that by adding a fourth option—conversion to an independent contractor status and an ability to work in a different capacity for Allstate—that Allstate suddenly

---

at that juncture.  One of those options was conversion to an independent contractor contract—a form of employment that was structurally different than their previous employment—and that option required the signing of Release.  While the EEOC attempts to argue that the refusal to consider non-signers for the R3001 contract shows a causal connection between the protected activity and the adverse action, this argument again relies on the faulty presumption that conversion to the R3001 contract was a privilege of employment.

engaged in actionable retaliation.

As such, the Court declines to accept the EEOC's theory that employees who did not sign the Release were retaliated against for engaging in the protected activity of refusing to release their employment discrimination claims.  In turn, the Court rejects this portion of the EEOC's Motion.

3.    **Whether Allstate Engaged in Anticipatory Retaliation Against Employee Agents Who Signed the Release**

The EEOC's third and final theory of retaliation contends that Allstate unlawfully retaliated against employee agents who signed the Release by threatening that they could not bring employment discrimination claims in order to work as an R3001 agent.  It goes on to assert that such conduct constituted anticipatory retaliation by preemptively precluding the filing of discrimination claims in exchange for a right to continue to work as a sales agent for Allstate in the future.

As a springboard for this theory, the EEOC relies heavily on the case of Commonwealth of Massachusetts v. Bull H.N. Information Systems, Inc., 16 F. Supp. 2d 90 (D. Mass. 1990).  In that matter, the defendant employer had approximately 4,500 employees in Massachusetts as of December, 1998, when it engaged in a reduction-in-force leaving only 3,000 employees.  Id. at 94.  Several of the laid-off employees filed age discrimination complaints with the EEOC and the Massachusetts Commission Against Discrimination ("MCAD").  Id.  In 1993, the Massachusetts Attorney General initiated an investigation into Bull's employment practices and, subsequently, intervened in a complaint alleging that the employer was engaged in a pattern and practice of age discrimination, and that older employees had been disproportionately affected by the lay-offs

28

between 1990 and 1994.  Id.  Prior to the Attorney General's investigation, the employer had a longstanding severance pay plan in effect that offered one week of base pay for each year of service to certain employees who were laid off.  Id.  The employer revised this severance plan effective July 5, 1994, after the Attorney General's investigation had begun.  Id.  Under the new plan, laid-off employees were required to sign a waiver of rights, including ADEA rights, before receiving any severance pay.  Id. at 95.  This "General Release and Severance Agreement" provided that in exchange for receiving severance benefits, an employee gives up the ability to sue the employer for any current or prior claims arising out of the employee's employment with the employer.  Id.  The amount of severance pay under the new plan did not change.  Id.  The severance plan further provided that if an employee who executed a release later brought or maintained any claim covered by the agreement, he or she would be required to return all severance paid and would have to indemnify the employer for all attorneys fees, costs and expenses associated with defending the complaint or claim.  Id.

On review, the Tenth Circuit Court of Appeal confronted a retaliation claim premised on the employer's alleged "threats" of retaliation.  The Commonwealth alleged that the employer had "a finger on the trigger of a gun pointed at each of the former employees who signed the waivers.  The moment one of them engages in conduct clearly protected by the ADEA—filing a charge, participating in litigation—the trigger is pulled."  Id. at 109.  The Court agreed and held that it did not "believe that section 626(d) requires that the Commonwealth sit idly by and wait until that moment before seeking the Court's assistance under this provision."  Id.  It reasoned that "[t]he Commonwealth's claim . . . arises out of the harm that [the employer] threatens to inflict against employees who file a charge of discrimination after signing a waiver.  The filing of

29

a charge or lawsuit is unambiguously a protected activity under section 623(d) . . .”[15]  Id.

According to the EEOC, numerous courts have followed suit and similarly found that threats of retaliation, in place of actual protected activity, are enough to constitute actionable retaliation.  See Sauers v. Salt Lake Cnty., 1 F.3d 1122, 1128 (10th Cir. 1993) (“Action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact; consequently, we hold that this form of preemptive retaliation falls within the scope of 42 U.S.C. § 2000e-3(a).”); Beckel v. Wal-Mart Assoc., Inc., 301 F.3d 621, 624 (7th Cir. 2002) (“Even if there were admissible evidence that Wal-Mart had threatened the plaintiff with firing her if she sued, this would not make out a case of equitable estoppel.  Such a threat would be a form of anticipatory retaliation, actionable as retaliation under Title VII.”); EEOC v. Bojangles Rests., Inc., 284 F. Supp. 2d 320, 328 (M.D.N.C. 2003) (holding that Title VII’s antiretaliation clause covers preemptive employer actions and precludes an employer from discriminating against an employee it fears will later engage in protected activity).  Relying on these cases, the EEOC then reasons that Allstate clearly anticipated that agents would engage in protected activity and, as a result, forced agents to sign the Release and waive their rights in order to become an R3001 agent.

While the Court acknowledges the principle of anticipatory or preemptive retaliation, the EEOC’s effort to apply it to the present case ignores two crucial distinguishing factors.  First, in all of the cited cases dealing with preemptive retaliation, the facts followed a similar temporal

---

[15]  Ultimately, however, the court did not need to decide the case on an anticipatory retaliation theory as the defendant actually retaliated against one individual, who filed an age discrimination claim after signing the waiver, by seeking the return of severance paid under the waiver agreement.  Id.

sequence:  the employer was made aware of or reasonably feared the employee's specific *intent*

to engage in protected activity and subsequently the employer engaged in the retaliatory activity.

For example, in Bojangles Restaurants, the court emphasized that anticipatory retaliation claims

were based on "the employer's knowledge or perception of an employee's status or actions which

result in an intentional act of discrimination."  284 F. Supp. 2d at 328.  The plaintiff in that

matter satisfied the element of protected activity by alleging that her fiancé had announced his

intention to file a complaint with the EEOC against their joint employer.  Id. at 329.  Shortly

thereafter, the plaintiff was the subject of adverse employment action and was not allowed to

return to work.  Id.  The court found that the plaintiff could reasonably be perceived as someone

likely to aid the fiancé with his complaints against the employer, regardless of the fact that the

fiancé had not yet filed a complaint of discrimination.  Id. at 330.   Likewise in Beckel, the

employee's termination came after she complained to one of her supervisors about sexual

harassment.  301 F.3d at 622.  Finally, in Sauers, the plaintiff had produced a tape-recorded

conversation where the employer had expressed his fear that the plaintiff would file sexual

harassment charges against him due to his previous sexual advances towards her, and shortly

thereafter she was transferred from her job.  Id. at 1128.  The Court found that the plaintiff's

opposition to discrimination, made known to her employer, constituted protected activity even

though the adverse action came prior to her filing of a legal claim.  Id.  Put succinctly, in all of

these cases the employer had some knowledge of the employee's concerns about discrimination

or intent to pursue a discrimination claim, which then triggered the adverse employment action,

even though the employee had not yet actually filed a claim or charge.

By contrast, in the present case, the EEOC points to no evidence in the record to

demonstrate that, prior to the announcement of the Program or the implementation of the

Release-signing requirement, any lawsuits involving any protected rights were threatened or any

complaints of discrimination were made.  Rather, Allstate simply terminated its employees and

then offered them several options—one of which was re-employment under a different

contract— in exchange for signing a Release.  Although Allstate may have feared that the mass

termination of over 6,000 employees would result in some litigation, thus prompting their use of

the Release, it is a fairly safe assumption that such releases are generally used by

employers—and permitted by the courts—precisely to avoid such potential litigation.  Nothing in

the facts indicates that Allstate had reasonably specific fears of *federally-protected litigation*,

such as discrimination or ERISA-based suits.  This Court cannot now envision any anticipatory

retaliation theory which would encompass such a scenario.

Second, in the anticipatory retaliation cases cited by the EEOC, the employer clearly

threatened some form of adverse employment action following the protected activity.  For

example, in Bull H.N. Info. Sys., the employer told employees that if they brought ADEA claims

in violation of the waiver, the employer would seek the return of severance payments and

indemnification of the company.  16 F. Supp. 2d 109.  The court found that because such

threatened retaliation was clearly illegal, the employees did not need to wait for it to happen

before bringing a retaliation claim.  Id.  Likewise, in EEOC v. Cognis Corp., No. Civ.A.10-2182,

2012 WL 189372 (C.D. Ill. May 23, 2012), the employer required the employee to sign a release

of claims or otherwise face termination.  Id. at *4.  The employee signed it and then revoked his

signature, immediately resulting in termination.  Id. at *5.

Here, whether or not employee agents signed the Release, they were terminated with no

ability to continue in their former positions.  The Release had no bearing on the termination of the previous employment contracts.  Allstate then offered the employee agents a new non-employee position if they signed the Release.  Crucially, however, they did not stand to lose any of their benefits if they brought claims prohibited by the Release, and Allstate never threatened them with any adverse actions.  Indeed, the record is devoid of evidence that any of the Plaintiffs in Romero I and Romero II—who have filed multiple claims expressly waived under the Release's terms—have been terminated from the R1500 contracts, have had to return any of their conversion benefits, or have had to reimburse Allstate for any other enhanced severance as a result of filing such claims.

In short, the EEOC's theory of anticipatory retaliation has no application to the present case.  At no point prior the announcement of the Program did Allstate face any threatened charges or lawsuits.  Moreover, and particularly with respect to the employees who signed the Release, Allstate did not take or threaten to take any adverse action against such employees for bringing EEOC charges or lawsuits.  Accordingly, the Court rejects this theory.

### 3.  <u>Conclusion as to Whether the Release Was Retaliatory</u>

At its core, the Program implemented by Allstate presents a situation common to the employer-employee workplace—a group termination or reduction-in-force of which one component is a general release of claims, including federal discrimination claims.  To the extent that the Release at issue does not comply with the statutory and federal common law prerequisites for such documents, the appropriate remedy is invalidation of the Release.  As the Court noted in the previous Memorandum and Order, the Release at issue clearly suffers from several infirmities that could potentially affect its validity.

The EEOC's Amended Complaint, however, goes one step further and attempts to turn these infirmities into a substantive violation of the anti-retaliation statutes.  Under any reasonable analysis, these efforts are the proverbial attempt to fit a square peg into a round hole.  The anti-retaliation provisions were simply not meant to address this type of scenario.  To hold otherwise would open the door for retaliation claims any time an employer uses a release of claims, regardless of whether the use of that release is discriminatorily employed.  Given the well-settled and abundantly logical jurisprudence regarding releases and retaliation, this Court declines to open that door and, therefore, grants Allstate's Motion for Summary Judgment and denies the EEOC's Motion for Summary Judgment with respect to the retaliation claims.

**B.     ADA Interference, Coercion, and Intimidation Claim**

In an alternative argument, the EEOC asserts that, regardless of how the Court rules concerning the retaliation claims, section 503(b) of the Americans With Disabilities Act has a unique provision that furnishes an additional basis for relief.  Specifically, it contends that by its express terms, this statute makes Allstate's "sign the release or leave" scheme unlawful.  Upon review, the Court finds that this provision does not apply.

Section 503(b) states, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."  42 U.S.C. § 12203(b).  "The scope of this second anti-retaliation provision of the ADA 'arguably sweeps more broadly' than the first."  Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 570 (3d Cir. 2002) (quoting Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 789 (3d Cir. 1998)).  "In particular, unlike

the first provision, the text of this provision does not expressly limit a cause of action to the particular employee that engaged in protected activity." Id.  Although there is little jurisprudence interpreting this provision, "[t]he language of the statute and what case law there is . . . make clear that to establish a violation of § 12203 plaintiffs must show that when the coercion took place they were exercising or enjoying a right protected by the ADA." Wray v. Nat'l R.R. Passenger Corp., 10 F. Supp. 2d 1036, 1040 (E.D. Wis. 1998) (citing Roth v. Lutheran Gen. Hosp., 57 F.3d 1446 (7th Cir.1995); Doe v. Kohn, Nast & Graf, P.C., 866 F. Supp. 190 (E.D. Pa. 1994)).  Plaintiff need not be "disabled" to prosecute a claim for retaliation or coercion under the ADA, rather "a reasonable good faith belief that the statute has been violated suffices." Selenke v. Med. Imaging of Colorado, 248 F.3d 1249, 1264 (10th Cir. 2001).  "The plain words of the statute . . . preclude a party from intimidating or coercing another party not to exercise his rights under the ADA, as well as barring interference against a person who has exercised his rights under the ADA." Breimhorst v. Educ. Testing Serv., No. Civ.A.99-3387, 2000 WL 34510621, at *7 (N.D. Cal. Mar. 27, 2000) (citing Doe, 866 F. Supp. at 197 (lawyer stated a claim under § 503(b) when his law firm asked him to leave because it learned he intended to file an ADA complaint against them); Bingham v. Oregon Sch. Activities Ass'n, 24 F. Supp. 2d 1110, 1118–19 (D. Or. 1998) (policy that discouraged disabled students from making requests for accommodation violated § 503(b))).

The question, therefore, becomes whether—when Allstate allegedly "coerced," "threatened," or "intimidated" its employee agents into signing the Release for fear of being forced to leave Allstate's employ—the employees were enjoying a right protected by the ADA. Title I of the ADA seeks to eliminate employment discrimination against individuals with

disabilities.  42 U.S.C. § 12101(b)(1).  It prohibits covered entities from discriminating against "a qualified individual with a disability because of the disability . . . in regard to . . . discharge of employees."  42 U.S.C. § 12112(a).  The EEOC, however, does not contend—and nothing in the record suggests—that any of the employee agents at issue were exercising any rights under the ADA, *i.e.*, rights in connection with the prohibition of disability discrimination and/or obtaining a reasonable accommodation for an employee with a disability.  Nor is there any indication that any of the employee agents intended or communicated to Allstate an intent to file any cause of action under the ADA in connection with their termination under the Program.

In sum, the EEOC's reliance on a provision from the ADA is inapplicable to the present case.  The EEOC attempts to argue that section 503(b) provides an independent ground for finding that Allstate acted unlawfully when it deprived its employee agents of their right to convert to the R3001 contract under established prerequisites without signing the Release.  This contention, however, reads section 503(b) in a vacuum and completely disregards its statutory framework of the Americans With Disabilities Act.  Absent a showing that the employee agents were enjoying or exercising a right protected by the ADA, the EEOC cannot simply invoke a provision within that Act in order to hold Allstate substantively liable.  As such, the Court grants summary judgment in favor of Allstate and against EEOC on this claim.

## IV.    CONCLUSION

In light of the foregoing, the Court finds that there is no genuine issue of material fact precluding an entry of judgment in this case.  As set forth in the Memorandum Opinion of February 27, 2014, the Court certainly questions the *validity* of the Release signed by Allstate's former employee agents.  The Court does not, however, find that the Release constitutes a

*substantive* violation of the anti-retaliation provisions set forth in any of the federal discrimination statutes at issue.  Accordingly, the Court grants Allstate's Motion for Summary Judgment and denies the EEOC's Motion for Summary Judgment.

An appropriate Order follows.